**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

TOPIA TECHNOLOGY, INC.,

Plaintiff,

v.

BOX, INC., SAILPOINT TECHNOLOGIES
HOLDINGS, INC. AND VISTRA CORP.,

Defendants.

Case No. 6:21-cv-01372

**JURY TRIAL DEMANDED**

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Topia Technology, Inc., ("Topia" or "Plaintiff") files this Complaint for patent

infringement against Defendant Box, Inc., ("Box" or "Defendant"), SailPoint Technologies

Holdings, Inc. ("SailPoint") and Vistra Corp. ("Vistra") (collectively "Defendants"), and alleges

as follows:

**NATURE OF ACTION**

1.      This is an action for patent infringement arising under 35 U.S.C. § 1 *et seq.*,

including §§ 271, 283, 284, and 285.

**THE PARTIES**

2.      Topia is a company organized and existing under the laws of the State of

Washington with its principal place of business in Tacoma, Washington.

3.      Upon information and belief, Box, Inc. ("Box" or "Defendant"), is a corporation

organized and existing under the laws of the State of Delaware.

4.      Box has a regular and established place of business in this District, including an

office in Austin, Texas located at 600 Congress Ave, 24th Floor, Austin, Texas 78701. Box's

registered agent for service of process is Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin TX 78701.

5.    Upon information and belief, SailPoint is a corporation organized and existing under the laws of the State of Delaware.

6.    SailPoint has a regular and established place of business in this District, including its headquarters in Austin, Texas located at 11120 Four Points Drive, Suite 100, Austin TX 78726.  SailPoint's registered agent for service of process is C T Corporation System located at 1999 Bryan St., STE. 900, Dallas, TX 75201.

7.    Upon information and belief, Vistra is a corporation organized and existing under the laws of the State of Delaware.

8.    Vistra has a regular and established place of business in this District, including an office at 1005 Congress Ave., Austin, TX 78701.  Vistra's registered agent for service of process is Capital Corporate Services, Inc., located at 206 E 9th St., Suite 1300 Austin, TX 78701.

## JURISDICTION AND VENUE

9.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1367, and 1338(a).

10.    Upon information and belief, Box is in the business of providing online document storage and synchronization products and services, including products and services that infringe Plaintiff's patents identified below, through Box's online platforms and mobile applications to customers. Upon information and belief, Box has about 41 million users across multiple countries, including users in the State of Texas and this District.

11.    Upon information and belief, Box is subject to personal jurisdiction of this Court because it has a regular and established place of business in Austin, Texas, and is a resident of this state in this judicial District.

12.     Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400, because Box has committed infringing acts in this District and has a regular and established place of business in this District.

13.     Upon information and belief, SailPoint is in the business of using Box products and services and providing valued added integration services and products for Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified below, through Box's online platforms and mobile applications to customers.

14.     Upon information and belief, SailPoint is subject to personal jurisdiction of this Court because it has a regular and established place of business in Austin, Texas, and is a resident of this state in this judicial District.

15.     Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400, because SailPoint has committed infringing acts in this District and has a regular and established place of business in this District.

16.     Upon information and belief, Vistra is a Box customer and uses Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified below, through Box's online platforms and mobile applications.

17.     Upon information and belief, Vistra is subject to personal jurisdiction of this Court based upon it having regularly conducted business, including the acts complained of herein, within the State of Texas and/or deriving substantial revenue from goods and services provided to customers in Texas and in this District.  Upon information and belief, this Court has personal jurisdiction over Vistra, because Vistra, including acts throughout Texas and in this District, has committed, and/or aided, abetted, contributed to and/or participated in the

commission of, the tortious action of patent infringement that has led to foreseeable harm and injury to Plaintiff, such that Vistra should anticipate being hauled into court in this judicial District.

18.     Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400, because Vistra has committed infringing acts in this District and has a regular and established business in this District.

19.     The allegations provided below are exemplary and without prejudice to Plaintiff's infringement contentions that will be provided pursuant to the Court's scheduling order and local civil rules, including after discovery as provided under the Federal Rules of Civil Procedure. In providing these allegations, Plaintiff does not convey or imply any particular claim constructions or the precise scope of the claims of the asserted patents. Plaintiff's proposed claim constructions, if any, will be provided pursuant to the Court's scheduling order and local civil rules.

<u>**COUNT ONE**</u>

<u>**INFRINGEMENT OF U.S. PATENT NO. 9,143,561**</u>

20.     Plaintiff incorporates Paragraphs 1 through 19 as though fully set forth herein.

21.     U.S. Patent No. 9,143,561 ("the '561 Patent"), entitled "Architecture For Management of Digital Files Across Distributed Network," issued on September 22, 2015. A copy of the '561 Patent is attached as Exhibit 1.

22.     The '561 patent is generally directed to systems and methods for sharing electronic files between multiple devices, wherein when a user modifies an electronic file on a device, a copy of the modified electronic file is automatically transferred to at least one other device.

23.     Plaintiff is the owner by assignment of all rights, title, and interest in and to the '561 Patent, including the right to assert all causes of action arising under the '561 Patent and the right to all remedies for the infringement of the '561 Patent.

24.     Claim 1 of the '561 Patent recites:

1.     A system, comprising:

a first electronic device configured to selectively execute a first application, the first electronic device being in communication with a second electronic device and a third electronic device, each associated with a user wherein the first electronic device is configured to:

receive from a second application executable on the second electronic device a copy of a first electronic file automatically transferred from the second application when the user modifies a content of the first electronic file; and

wherein the first electronic device is further configured to receive from a third application executable on the third electronic device a copy of a second electronic file automatically transferred from the third application when the user modifies a content of the second electronic file; and

wherein the first application is further configured to automatically transfer the modified first electronic file copy to the third electronic device to replace an older version of the first electronic file stored on the third electronic device with the modified first electronic file copy having the content modified by the user; and

automatically transfer the modified second electronic file copy to the second electronic device to replace an older version of the second electronic file

stored on the second electronic device with the modified second electronic

file copy having the content modified by the user;

wherein the second application automatically transfers the copy of the modified

first electronic file to the first electronic device upon determining that a save

operation has been performed on the modified first electronic file.

**DEFENDANT BOX**

25.    Box offers a suite of products and services, including Box Sync and Box Drive,

for individuals which practice each and every limitation of one or more claims of the '561 patent.

Box's products and services include systems and methods for sharing electronic files between

multiple devices, wherein when a user modifies an electronic file on a device, a copy of the

modified electronic file is automatically transferred to at least one other device.

26.    Box products and services involve systems that include various client and server

devices and software.  Box's server infrastructure includes a first electronic device (*e.g.*, a server

system) executing an application (*e.g.*, running Box server software).  The first electronic device

(*e.g.*, the server system) is in communication with a second electronic device (*e.g.*, a first client

device such as a laptop or a smart phone) and a third electronic device (*e.g.*, a second client

device such as a laptop or a smart phone).  Box promotes its products and services as a system

for enabling its customers to mirror data across multiple devices:

27.    For example, Box offers client software, including Box Sync and Box Drive,

running on Windows, Mac, iOS, Android, and web browsers:

## About Box Sync

Print

Posted Feb 26, 2020    **Updated Mar 3, 2020**

Box Sync is a productivity tool that allows you to mirror data stored on Box to your desktop. You can then navigate and modify content stored on the Box website through your computer's native file browsing interface, without using a web browser. Content that syncs down to your computer are available for offline access. If you make changes to the synced files locally, these changes automatically sync back up to your Box account.

https://support.box.com/hc/en-us/articles/360043696154-About-Box-Sync (last visited

December 16, 2021)

## Installing Box Sync

Print

Posted Feb 26, 2020    **Updated Feb 24, 2021**

Box Sync is a productivity tool that enables you to mirror data stored on Box to your desktop. You can then navigate and modify content stored on the Box website through your computer's native file browsing interface, without using a web browser. Content that syncs down to your computer is available for offline access, and if you make changes to the synced files locally, these changes automatically sync back up to your Box account.

### Mac

**Box Sync system requirements for Macs**

- Supported OS version
- HFS+ or APFS formatted hard drive.

**Mac install steps**

1. Download the Box Sync Installer DMG file.
2. Open the DMG file when the download is complete.
3. Drag the Box Sync app icon into your Applications folder.
4. Double-click on Box Sync in your Applications folder.

Your synced files are stored in a new folder called **Box Sync**. You can access this folder from the **Favorites** section in the left pane of your Finder window.

**Windows install steps**

1. Download the Box Sync Setup EXE file.

2. Open the EXE file from where the file was downloaded to Windows, and follow the installation instructions.

3. Box Sync starts automatically when the installation completes.

Your synced files are stored in a new folder called **Box Sync**. You can access this folder from the **Favorites** section in the left pane of Windows Explorer. Alternately, right-click the **Box Sync** icon in the system tray (bottom right corner of your screen - near the clock) and click **Open Sync Folder**.

https://support.box.com/hc/en-us/articles/360043697194-Installing-Box-Sync: (last visited December 16, 2021)

# Work with your cloud files on your desktop

Box Drive is the incredibly simple way to work with all of your files — even billions of files — right from your desktop, taking up very little hard drive space. Open your Windows Explorer or Mac Finder to find every file you need, edit like you would any local file and save it automatically to the cloud. And, keep enterprise-grade security protecting everything you do.

## Seamlessly create and edit files

Whether you're creating a new document or editing a PDF, any changes you make, even when offline, will automatically save to Box. You can also lock shared files so others can't overwrite your edits.



[https://www.box.com/drive](https://www.box.com/drive): (last visited December 16, 2021)



**To install Box Drive on macOS:**

1. Download the Box Drive installer.
2. Navigate to the location where you saved the file, then, double-click it. The installer starts.
3. When prompted, select **Install for all users of this computer** and click **Continue**.
4. **DO NOT** change the install location. Click **Install**.

5. The system displays a notificatation when the installation completes. Click **Close**.
6. Box Drive launches. (If you are using macOS 10.13 or later, continue below for additional steps.)

**To install Box Drive on Windows:**

1. Download the Box Drive installer.
2. Navigate to the location where you downloaded the file, and double-click it to run the installer.
3. Follow the instructions to complete the installation. If Box Drive does not launch automatically when the installation completes, you may need to go to the **Start** menu and launch the application manually.
4. You must log in to Box Drive the first time you open it. You may be redirected to your company's logfin page.
5. After you log in, Box Drive displays a brief walkthrough of its features. When this completes, your Box content is available at C:\Users\USERNAME\Box.

https://support.box.com/hc/en-us/articles/360043697474-Installing-and-Updating-Box-Drive:

(last visited December 16, 2021)

28.    Box server infrastructure includes an electronic device running Box server software that is configured to execute a Box server application, and electronic client devices running Box software being in communication with the electronic device running Box server software.

29.    Box operates data centers in the United States that store files that are synched with Box Sync or Box Drive.  Box provides the following overview of its architecture:

## Your data where you want it

Box Zones enables organizations to address data residency obligations across multiple geographies, allowing them to raise the bar for privacy and control in the cloud — whether they have employees, customers, or partners across Europe, Asia, Canada, or Australia. With Box Zones, we're removing the barriers to cloud adoption so every business around the globe can work as one.

Box Zones builds on the strong data protection and privacy provided by Box, allowing companies to store their encrypted-at-rest content around the world. Now, organizations with users in Europe, Asia, Canada or Australia can use local data storage to store files in-region. This helps address regional and country-specific data privacy concerns, customer data residency concerns (including concerns about Brexit) and other requirements to store files in-region.

With Box Zones, we deliver flexibility and choice for in-region storage at unparalleled reach and scale - all with the ease of use you expect from Box.

 United States - US Federal Zone

## How it works

Box Zones provides data localization by separating all the powerful collaboration, productivity, and ease of use features of Box from the storage layer.  In fact, where content is stored, while determined by the admin, is invisible to the end user.  This allows end users to go on with their day without ever having to think about where their data needs to be stored.  Box Zones is made possible by leveraging the global network of data centers of our partners.

https://www.box.com/zones: (last visited December 16, 2021)

That's why we're incredibly excited to announce Box Zones: a breakthrough technology providing in-region data storage with Box, and raising the bar for privacy and control in the cloud. Box Zones enables businesses around the globe to adopt Box as their modern content management platform, while letting them store their data in the region of their choice, starting with Germany, Ireland, Singapore or Japan, in partnership with IBM and Amazon.



## How we did it

Box Zones has been a key focus of our engineering team for the past couple of years, with the core goal of separating our application and service from how and where we store encrypted files. Box Zones, and its corresponding architecture affords us the flexibility to leverage both our own data centers and select cloud partners to accelerate our footprint in new geographies.

With Box Zones, we're partnering with two world-class global companies, IBM and Amazon, to provide our customers with storage infrastructure at unparalleled reach and scale. Over time, you will see us enter more regions throughout (and beyond) Europe and Asia, and potentially open up to other partners in the future.

Box will continue to operate our own data centers in the US, but Box Zones is a powerful extension of our infrastructure that will help us expand to more places faster. Best of all, it's fully transparent to the user (and enterprise).

https://blog.box.com/introducing-box-zones: (last visited December 16, 2021)

Managing your content with Box enables you to work in a secure, resilient environment where you can prevent and manage threats. When your end users are on Box, they operate within a single redundant, integrated, and centralized architecture with security embedded throughout the infrastructure and processes. This means employees access and share content directly and securely from the cloud, eliminating the incentive to use unauthorized, insecure methods and services, and have access through a highly available software solution.

- **Infrastructure security and assurance** is the bedrock on which Box operates. Box processes over one billion files every single day, and has multiple data centers with reliable power sources and backup systems.

**What Box offers:**
- 99.9% SLAs
- In-transit and at-rest encryption (256 bit AES)
- Customer-driven penetration testing
- Dedicated 24/7 incident response
- Right to audit
- Hardware security modules (HSMs)
- Automation of Intrusion Prevention Systems (IPS) and Intrusion Detection Systems (IDS) into firewalls
- Only US citizens have access to critical production areas (a FedRAMP requirement)



https://www.box.com/resources/sdp-secure-content-with-box: (last visited December 16, 2021)

30.     The first electronic device (*e.g.*, the server system) running Box server software and the first and the second electronic client devices (the first and second client devices such as laptop or a smart phone) running Box software are associated with a user.  Client devices are associated with a user using a Box account:



https://support.box.com/hc/en-us/articles/360044196373-The-Basics-of-Box: (last visited December 16, 2021)

| Login and Account |
| --- |
| **Can I sync different subsets of files across multiple personal computers using the same login?** |
| No. Box Sync 4.x does not allow you to sync a different subset of files across different computers. |

**How often do I need to login to Box Sync?**

If you actively use Box Sync on a daily basis, you may not need to explicitly login.

If you have not connected to Box Sync in 60 days, you will need to explicitly login.

**Can I use multiple logins with the same Sync client?**

Yes, it is possible to logout of one Box account and then login to another account on the same client. However, logging into Sync with a Box account that is different from the previous login will always prompt a re-download of all synced content to a new Box Sync folder. Please allow all content to download to the new Box Sync folder before manually introducing content to this local directory.

**Can multiple instances of Box Sync run on the same computer?**

No, multiple instances of Box Sync cannot be run on a single machine. Only one Box Sync process can be running on a machine at any given time.

**Example:** John and Mary both use computer A. They have separate machine logins. John and Mary cannot have Box Sync running at the same time on their different accounts.

**Can I log into Box Sync using a Roaming User Profile?**

No, Box Sync will not function if you are logged into your computer with a Roaming User Profile.The Box Sync folder is not tied to roaming profiles.

https://support.box.com/hc/en-us/articles/360043696354-Box-Sync-Frequently-Asked-Questions#crosscompsync:  (last visited December 16, 2021)

You must log in to Box Drive the first time you open it. (You may be redirected to your company's login page.)

After you log in, Box Drive displays a brief walkthrough of its features. When this is complete, your Box content is available at ~/Box.

**Signing In**

**Mac**

After installation, Box Drive prompts you to sign in. You may be redirected to your company's login page.

After you log in, Box Drive displays a new Finder window. **Box** should display in the Finder sidebar, under both **Favorites** and **Devices**.

**Windows**

Box Drive runs automatically after it is installed. You can also open it from the **Start** menu.

To start using Box Drive, simply sign in to Box at the prompt. You may be redirected to your company's login page. After you launch Box Drive for the first time, you can access Box from either the **File Explorer** or the Windows system tray.

**Logging out / switching accounts**

To log out from Drive, click the Box Drive icon in your system tray (Windows) or menu bar (macOS). With the search window open, click the gear icon and then click **Logout**.

https://support.box.com/hc/en-us/articles/360043697474-Installing-and-Updating-Box-Drive

(last visited December 16, 2021)

31.     The first electronic device (*e.g.*, the server system running Box server software) is configured to receive from a second application (*e.g.*, BoxSync software) executable on the second electronic device (*e.g.*, the first client device such as a laptop or a smart phone) a copy of a first electronic file automatically transferred from the second application when the user modifies a content of the first electronic file.

32.     Box server system receives, over a network, a copy of a first file from the first client device (*e.g.*, a laptop or a smart phone) associated with a user, the copy of the first file being automatically received from the first client device when the user modifies the content of the first file stored on the first client device, the copy of the first file being an updated version of the first file that is generated from the user modifying the content of the first file in the client device.  When a user modifies a file that has been configured to be synched, the Box software on the client device will upload the updated version of the file that the user modified to Box's servers:

33.     When a user modifies a file inside the Box Sync or Box Drive folder on a second electronic device, a copy of the file will be automatically uploaded to Box's servers:



https://support.box.com/hc/en-us/articles/360043696154-About-Box-Sync: (last visited December 16, 2021)

## Marking Content for Box Sync

2 months ago · Updated

Control the content you that is synced to your local Box Sync folder by marking content in your Box.com account. A folder that is marked for Sync displays a blue check mark icon beside its name.

1. Select a folder by clicking beside its name, or click the folder name to open the folder. The right hand sidebar should display information about the folder you've selected or opened.
2. Click **Details** in the sidebar.
3. Click the **Sync to Desktop** slider to mark this folder for sync. By default, this will mark all contained folders for sync as well. You can unmark specific subfolders within a synced folder, if you only want certain content to be synced.

https://support.box.com/hc/en-us/articles/360044196393-Marking-Content-for-Box-Sync:

(last visited December 16, 2021)

### What is the behavior when deleting files and folders from Sync?

- If you delete a file or folder from your local Box Sync folder, the action will be mirrored on Box.com.
- If you delete a file or folder from the online Box.com site that was marked as *Sync Folder to Computer*, that file or folder deletion will be mimicked in your local Box Sync folder.

https://support.box.com/hc/en-us/articles/360043696354-Box-Sync-Frequently-Asked-Questions: (last visited December 16, 2021)

## Working in Finder

If you use a Mac, you can access Box Drive by opening Finder. In the sidebar, navigate to **Devices > Favorites > Box**. Open this folder to display all of the contents of your **All Files** page on Box.com. You can navigate through any folder and open every file you see just as if it were a local file.

For each file in the Box folder, Box Drive displays these standard properties:

- File name
- File size
- File type
- Date created (more information on Box timestamps)
- Date modified (more information on Box timestamps)

The blue cloud icon beside a file or folder indicates the item is safely stored and up to date in Box. Add or update a file or folder in Box Drive, and the icon changes to an orange syncing icon. The icon also displays as syncing when Box Drive is uploading changes you made to files offline. When the sync completes the icon resets to the blue cloud.



## Working in Explorer

If you use Windows, you can access Box Drive by opening Explorer and navigating to the folder named Box. Open this folder to display all of the contents of your All Files page on Box.com. You can navigate through any folder and open every file you see just as if it were a local file.

For each file in the Box folder, Box Drive displays these standard properties:

- File name
- File size
- File type
- Date created (more information on Box timestamps)
- Date modified (more information on Box timestamps)

The blue cloud icon beside a file or folder indicates the item is safely stored and up to date in Box. Add or update a file or folder in Box Drive, and the icon changes to an orange syncing icon. The icon also displays as syncing when Box Drive is uploading changes you made to files offline. When the sync completes the icon resets to the blue cloud.



**Working with Other Applications**

Working with Box files in other applications such as Word or Excel is seamless. Open the file from Box Drive and work with it as you usually would. When you're done, save the file. The file automatically syncs back to Box. You can also use Save As to save the file to a new location, save the file with a new name, or create new folders to store your file. All of those changes save automatically in Box.

**Marking Content for Offline Use**

You can also mark content in Box Drive to make it available offline. Drive downloads this content to your device's hard drive so you can work when you're not connected to the Internet. When you get back online, Drive automatically uploads the revised content, so you are always working with the most up-to-date versions of your files. More information about making content available offline.

https://support.box.com/hc/en-us/articles/360043697494-Using-Box-Drive-Basics: (last visited December 16, 2021)

34.     Files may also be updated using the Box API:





### Query Parameters

**fields**  string array   in query   *optional*

example  `id,type,name`

A comma-separated list of attributes to include in the response. This can be used to request fields that are not normally returned in a standard response.

Be aware that specifying this parameter will have the effect that none of the standard fields are returned in the response unless explicitly specified, instead only fields for the mini representation are returned, additional to the fields requested.

### Request Body

**description**  string   in body   *optional*

example  `The latest reports. Automatically updated`  MaxLength  `256`

The description for a file. This can be seen in the right-hand sidebar panel when viewing a file in the Box web app. Additionally, this index is used in the search index of the file, allowing users to find the file by the content in the description.



**lock**  object   in body

Defines a lock on an item. This prevents the item from being moved, renamed, or otherwise changed by anyone other than the user who created the lock.

Set this to  `null`  to remove the lock.

**lock.access**  string   null   *optional*

example  `lock`

Value is always  `lock`

**lock.expires_at**  string / date-time   null   *optional*

example  `2012-12-12T10:53:43-08:00`

Defines the time at which the lock expires.

**lock.is_download_prevented**  boolean   null   *optional*

example  `true`

Defines if the file can be downloaded while it is locked.

**name**  string   in body   *optional*

example  `NewFile.txt`

An optional different name for the file. This can be used to rename the file.



**parent** object in body

An optional new parent folder for the file. This can be used to move the file to a new folder.

optional

**parent.id** string null

example 123

The ID of parent item



**permissions** object in body

Defines who can download a file.

optional

**permissions.can_download** string null

example open

Defines who is allowed to download this file. The possible values are either open for everyone or company for the other members of the user's enterprise.

This setting overrides the download permissions that are normally part of the role of a collaboration. When set to company , this essentially removes the download option for external users with viewer or editor a roles.

Value is one of open , company



**shared_link** object in body

Defines a shared link for a file. Set this to null to remove the shared link.

optional

**shared_link.access** string null

example open

The level of access for the shared link. This can be restricted to anyone with the link ( open ), only people within the company ( company ) and only those who have been invited to the folder ( collaborators ).

This field defaults to the default access level, which is the access level as specified by the enterprise admin.

The company access level is only available to paid accounts.

Value is one of default , open , company , collaborators



https://developer.box.com/reference/put-files-id/: (last visited December 16, 2021).

35.    The first electronic device (*e.g.*, the server system running Box server software) is configured to automatically transfer the modified first file copy to the third electronic device (*e.g.*, the second client device such as a laptop or a smart phone) to replace an older version of the first file stored on the third electronic device (*e.g.*, the second client device) with the modified first file copy having the content modified by the user.  Box provides the following architecture for synchronizing the files across the devices:



https://support.box.com/hc/en-us/articles/360043696154-About-Box-Sync: (last visited

December 16, 2021)

> **Marking Content for Offline Use**
>
> You can also mark content in Box Drive to make it available offline. Drive downloads this content to your device's hard drive so you can work when you're not connected to the Internet. When you get back online, Drive automatically uploads the revised content, so you are always working with the most up-to-date versions of your files. More information about making content available offline.

https://support.box.com/hc/en-us/articles/360043697494-Using-Box-Drive-Basics: (last

visited December 16, 2021)

36.    When a file is marked for offline usage in Box Drive by a client device, a copy of

the file will automatically be transferred to that device when the file is change:

> **Making Content Available Offline**                     Print
>
> Posted Feb 26, 2020    Updated Sep 22, 2021
>
> With Box Drive's Mark for Offline feature, your Box cloud content is available wherever you are - in a remote office, traveling on a plane, and so on - regardless of internet connectivity. Just select the Box folders you need access to, and Box Drive automatically downloads all of the folder contents to your computer. If you or someone else make changes to this content while you're offline, Box Drive automatically uploads the revised content when you are back online so you are always working with the most up-to-date versions of your files.
>
> **Collaborating with another person?**
>
> Box uploads changes as they're saved. However, collaborators cannot see each others' revisions in real-time -- that is, not until after each of you have saved and exited the file and Box Drive syncs all changes. This is true regardless of whether you are working while connected or offline, However, in this case the possibility exists for two collaborators to save conflicting changes on the same file. By way of illustration: if you go back online first, Box uploads and saves your revised file as a new version. When your collaborator goes back online, Box uploads her revised file, but saves it as a separate version. If necessary, you both must then decide which revision to keep and which to discard.

https://support.box.com/hc/en-us/articles/360043697574-Making-Content-Available-Offline:

(last visited December 16, 2021)

37.    Additionally, using the Box API, a third party application can subscribe to be notified of events, such as file modification, and can respond by downloading a copy of the modified file:

## Events

The event feed provides a way for an application to subscribe to any actions performed by any user or users in an enterprise.

## User events

User Events provide low latency stream of events for the currently authenticated user.

## Admin events

Admin Events provide an event feed for all users and content in an enterprise.

https://developer.box.com/guides/events/: (last visited December 16, 2021)

## Long-Poll Events

To get real-time notification of activity in a Box account you can use the long poll feature of the `OPTIONS /events` API.

## Long Polling

Long polling involves opening an HTTP request and keeping it open until the server sends a response, then repeating the process over and over to receive updated responses.

https://developer.box.com/guides/events/polling/: (last visited December 16, 2021)

```
event_type  string

example  FILE_MARKED_MALICIOUS

The event type that triggered this event

Value is one of  ACCESS_GRANTED ,  ACCESS_REVOKED ,  ADD_DEVICE_ASSOCIATION ,
ADD_LOGIN_ACTIVITY_DEVICE ,  ADMIN_LOGIN ,  APPLICATION_CREATED ,
APPLICATION_PUBLIC_KEY_ADDED ,  APPLICATION_PUBLIC_KEY_DELETED ,
CHANGE_ADMIN_ROLE ,  CHANGE_FOLDER_PERMISSION ,  COLLABORATION_ACCEPT ,
COLLABORATION_EXPIRATION ,  COLLABORATION_INVITE ,  COLLABORATION_REMOVE ,
COLLABORATION_ROLE_CHANGE ,  COLLAB_ADD_COLLABORATOR ,
COLLAB_INVITE_COLLABORATOR ,  COLLAB_REMOVE_COLLABORATOR ,  COLLAB_ROLE_CHANGE ,
COMMENT_CREATE ,  COMMENT_DELETE ,  CONTENT_ACCESS ,
CONTENT_WORKFLOW_ABNORMAL_DOWNLOAD_ACTIVITY ,  CONTENT_WORKFLOW_AUTOMATION_ADD ,
CONTENT_WORKFLOW_AUTOMATION_DELETE ,  CONTENT_WORKFLOW_POLICY_ADD ,
CONTENT_WORKFLOW_SHARING_POLICY_VIOLATION ,
CONTENT_WORKFLOW_UPLOAD_POLICY_VIOLATION ,  COPY ,
DATA_RETENTION_CREATE_RETENTION ,  DATA_RETENTION_REMOVE_RETENTION ,  DELETE ,
DELETE_USER ,  DEVICE_TRUST_CHECK_FAILED ,  DOWNLOAD ,  EDIT ,  EDIT_USER ,
EMAIL_ALIAS_CONFIRM ,  EMAIL_ALIAS_REMOVE ,  ENABLE_TWO_FACTOR_AUTH ,
ENTERPRISE_APP_AUTHORIZATION_UPDATE ,  FAILED_LOGIN ,  FILE_MARKED_MALICIOUS ,
FILE_WATERMARKED_DOWNLOAD ,  GROUP_ADD_ITEM ,  GROUP_ADD_USER ,  GROUP_CREATION ,
GROUP_DELETION ,  GROUP_EDITED ,  GROUP_REMOVE_ITEM ,  GROUP_REMOVE_USER ,
ITEM_COPY ,  ITEM_CREATE ,  ITEM_DOWNLOAD ,  ITEM_MAKE_CURRENT_VERSION ,
ITEM_MODIFY ,  ITEM_MOVE ,  ITEM_OPEN ,  ITEM_PREVIEW ,  ITEM_RENAME ,  ITEM_SHARED ,
ITEM_SHARED_CREATE ,  ITEM_SHARED_UNSHARE ,  ITEM_SHARED_UPDATE ,  ITEM_SYNC ,
```

https://developer.box.com/reference/resources/event/: (last visited December 16, 2021)

38.　　The second application (*e.g.*, Box software application running on the first client device) automatically transfers the copy of the modified first file to the first electronic device (*e.g.*, the server system) upon determining that a save operation has been performed on the modified first electronic file.

39.　　The first electronic device (*e.g.*, the server system) is further configured to receive from a third application (*e.g.*, BoxSync) executable on the third electronic device (*e.g.*, the second client device) a copy of a second file automatically transferred from the third application when the user modifies a content of the second electronic file, and automatically transfer the modified second file copy to the second electronic device (*e.g.*, the first client device) to replace

an older version of the second file stored on the second electronic device with the modified second electronic file copy having the content modified by the user.

40.     On information and belief, Box has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '561 Patent under 35 U.S.C. § 271(a) by developing, manufacturing, distributing, operating, using, selling, and/or offering to sell Box products and services in the United States and abroadwithout authority. Included in these acts of infringement are situations where devices owned by users and customers of Box products and services interact with Box servers to perform file sync operations.

41.     On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '561 Patent under 35 U.S.C. § 271(b) based on its active marketing and promotion of its Box products and services in the United States to its customers and prospective customers.  On information and belief Box has, and will continue to, intentionally encourage acts of direct infringement with knowledge of the '561 Patent and knowledge that its acts are encouraging infringement.

42.     On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '561 Patent under 35 U.S.C. § 271(c), because Box has had, and continues to have, knowledge that its Box products are especially developed or adapted for a use that infringes the '561 Patent and constitute a material part of the claimed systems and methods.  Box has had, and continues to have, knowledge that there are no substantial non-infringing uses for these Products. Box has infringed and continues to infringe the '561 Patent directly and/or indirectly in violation of 35 U.S.C. § 271(c).

**DEFENDANT SAILPOINT**

43.     SailPoint makes and sells valued added integration services and products for Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '561 patent.

44.     More specifically, SailPoint's Identity Governance Platform provides identity governance solutions that are integrated with Box products and services, enabling users of Box products and services to, among other things, control user access, identify sensitive data, and monitor for malicious behavior.









https://www.sailpoint.com/integrations/box/ (last visited December 16, 2021)

45.    On information and belief, SailPoint, in order to develop, support, and provide its identity governance solutions, has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '561 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority. Included in these acts of infringement are situations where devices associated with SailPoint interact with Box servers to perform file sync operations.

## DEFENDANT VISTRA

46.    Vistra uses Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '561 patent.

47.    On its website, Box identifies Vistra as a user of Box's products and services.

**PROBLEM**

Vistra Energy is growing quickly through both organic means and acquisitions. Over an 18-month period, Vistra expanded from operating in Texas to 20 states, the District of Columbia, Japan, and Canada. Rapid growth makes for rapidly changing processes as a diverse workforce assembles across geographic locations.

**SOLUTION**

By migrating content to the cloud on a central platform with Box, Vistra can now leverage Box Keysafe to create consistent processes and better secure data — even at sensitive locations like nuclear facilities and during the acquisition planning phase of an M&A effort. Putting Box Governance in place is giving Vistra even more control over content.

**OUTCOME**

Box gives Vistra's workforce the user experience they expect and has saved the company money as it's retired expensive subscription-based tools. Processes across lines of business are now poised for automation, and all content is in compliance with FedRAMP and other regulations. Plus, cloud-based infrastructure means content processes scale as the company grows.

Technology has gradually been transitioning the entire workforce over to one central content platform with which a lot of the existing collaboration tools integrate well: Box.

"Box started as a grassroots effort by some of the folks on our political affairs team in order to share information with external consultants," Pelosi explains. "But as additional folks heard it was there, it became, 'Oh!, we could also use that for other teams.'"

The initial Box test case of about 250 people was so successful that, within a year, the number of users had bumped up to 1,000. Now, when Vistra acquires a new team, incoming employees are given "birthright access" to Box on day one. This practice is scaling up the number of Box users dramatically, and Box has become the de facto content layer of the company's digital work processes.

An early group that migrated to Box was a marketing team using an expensive file-sharing tool for digital asset management. The tool was robust, but it wasn't delivering a lot of value because the team simply didn't use most of its features. IT helped the team move their entire repository of graphical assets to the cloud into Box, saving the company a tremendous amount of money in subscription costs for an underutilized file-sharing tool.

The regulatory response organization within Vistra has to keep a close eye on governance and retention policies, and over time, their network shared drive space had run out. Accessing files on this drive was not easy, either, since users had to be onsite and connected to the network. IT migrated these assets to Box, using Box Governance to better manage content and stay in compliance.

https://www.box.com/customers/vistra-energy (last visited December 16, 2021)

48.    On information and belief, Vistra has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '561 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority.  Included in these acts of infringement are situations where devices associated with Vistra interact with Box servers to perform file sync operations.

## COUNT TWO

### INFRINGEMENT OF U.S. PATENT NO. 10,006,942

49.    Plaintiff incorporates paragraphs 1 through 48 as though fully set forth herein.

50.    Plaintiff is the owner, by assignment of U.S. Patent No. 10,067,942 (the "'942 Patent"), entitled "Architecture For Management of Digital Files Across Distributed Network," issued on September 4, 2018. A copy of the '942 Patent is attached as Exhibit 2.

51.    The '942 Patent is generally directed to systems and methods for sharing electronic files between multiple devices, wherein when a user modifies an electronic file on a device, a copy of the modified electronic file is automatically transferred to other devices based on a communication state of the other devices.

52.    Plaintiff is the owner by assignment of all rights, title, and interest in and to the '942 Patent, including the right to assert all causes of action arising under the '942 Patent and the right to all remedies for the infringement of the '942 Patent.

53.    For example, claim 1 of the '942 Patent states:

1. A system, comprising:

a first electronic device, associated with a user, configured to:

receive, via a first application at the first electronic device, a copy of a modified first electronic file from a second application at a second electronic device associated with the user, wherein the modified first electronic file copy is automatically received from the second application responsive to the user modifying a content of the first electronic file;

determine whether the first electronic device is in communication with a third electronic device;

automatically send, via the first application, the modified first electronic file copy to a third application at the third electronic device responsive to the determination that the first electronic device is in communication with the third electronic device and responsive to receiving the modified first electronic file copy from the second electronic device;

receive, via the first application, a copy of a modified second electronic file from the third application at the third electronic device associated with the user, wherein the modified second electronic file copy is automatically received from the third application responsive to the user modifying a content of the second electronic file;

determine whether the first electronic device is in communication with the second

electronic device; and

automatically send, via the first application, the modified second electronic file

copy to the second application at the second electronic device responsive to

the determination that the first electronic device is in communication with the

second electronic device and responsive to receiving the modified second

electronic file copy from the third electronic device,

wherein, responsive to sending the modified first electronic file copy to the third

electronic device, an older version of the first electronic file stored on the third

electronic device is automatically caused to be replaced with the modified

first electronic file copy such that the modified first electronic file copy is

stored on the third electronic device in lieu of the older version of the first

electronic file, and

wherein, responsive to sending the modified second electronic file copy to the

second electronic device, an older version of the second electronic file stored

on the second electronic device is automatically caused to be replaced with

the modified second electronic file copy such that the modified second

electronic file copy is stored on the second electronic device in lieu of the

older version of the second electronic file.

## **DEFENDANT BOX**

54.    In addition to the description in paragraphs 25-42, Box's products and services

include systems and methods for sharing electronic files between multiple client devices,

wherein when a user modifies an electronic file on a device, a copy of the modified electronic

file is automatically transferred to other devices based on a communication state of the other devices.

55.    The first electronic device (*e.g.*, the server system) is configured to determine whether the first electronic device is in communication with a third electronic device (*e.g.*, the second client device such as a laptop or a smart phone). Box's server and client software will determine that the server is in contact with a client.  Box determines if a device is online:



https://support.box.com/hc/en-us/articles/360043697574-Making-Content-Available-Offline:

(last visited December 16, 2021)

56.    The first electronic device (*e.g.*, the server system) is configured to automatically send, via the first application (*e.g.*, application running on the server system), the modified first electronic file copy to a third application at the third electronic device (*e.g.*, the second client device) responsive to the determination that the first electronic device is in communication with the third electronic device and responsive to receiving the modified first electronic file copy from the second electronic device (*e.g.*, the first client device). The Box server system will

automatically send the modified file copy to the client device responsive to the determination that the client device is connected to the Box server system and responsive to changes to the file in another client device:

**Marking Content for Offline Use**

You can also mark content in Box Drive to make it available offline. Drive downloads this content to your device's hard drive so you can work when you're not connected to the Internet. When you get back online, Drive automatically uploads the revised content, so you are always working with the most up-to-date versions of your files. More information about making content available offline.

https://support.box.com/hc/en-us/articles/360043697494-Using-Box-Drive-Basics: (last visited December 16, 2021)

57.    Additionally, using the Box API, a third party application can subscribe to be notified of events, such as file modification, and can respond by downloading a copy of the modified file:

**Events**

The event feed provides a way for an application to subscribe to any actions performed by any user or users in an enterprise.

**User events**

User Events provide low latency stream of events for the currently authenticated user.

**Admin events**

Admin Events provide an event feed for all users and content in an enterprise.

https://developer.box.com/guides/events/: (last visited December 16, 2021)

**Long-Poll Events**

To get real-time notification of activity in a Box account you can use the long poll feature of the `OPTIONS /events` API.

**Long Polling**

Long polling involves opening an HTTP request and keeping it open until the server sends a response, then repeating the process over and over to receive updated responses.

https://developer.box.com/guides/events/polling/: (last visited December 16, 2021)

```
event_type    string

example  FILE_MARKED_MALICIOUS

The event type that triggered this event

Value is one of  ACCESS_GRANTED ,  ACCESS_REVOKED ,  ADD_DEVICE_ASSOCIATION ,
ADD_LOGIN_ACTIVITY_DEVICE ,  ADMIN_LOGIN ,  APPLICATION_CREATED ,
APPLICATION_PUBLIC_KEY_ADDED ,  APPLICATION_PUBLIC_KEY_DELETED ,
CHANGE_ADMIN_ROLE ,  CHANGE_FOLDER_PERMISSION ,  COLLABORATION_ACCEPT ,
COLLABORATION_EXPIRATION ,  COLLABORATION_INVITE ,  COLLABORATION_REMOVE ,
COLLABORATION_ROLE_CHANGE ,  COLLAB_ADD_COLLABORATOR ,
COLLAB_INVITE_COLLABORATOR ,  COLLAB_REMOVE_COLLABORATOR ,  COLLAB_ROLE_CHANGE ,
COMMENT_CREATE ,  COMMENT_DELETE ,  CONTENT_ACCESS ,
CONTENT_WORKFLOW_ABNORMAL_DOWNLOAD_ACTIVITY ,  CONTENT_WORKFLOW_AUTOMATION_ADD ,
CONTENT_WORKFLOW_AUTOMATION_DELETE ,  CONTENT_WORKFLOW_POLICY_ADD ,
CONTENT_WORKFLOW_SHARING_POLICY_VIOLATION ,
CONTENT_WORKFLOW_UPLOAD_POLICY_VIOLATION ,  COPY ,
DATA_RETENTION_CREATE_RETENTION ,  DATA_RETENTION_REMOVE_RETENTION ,  DELETE ,
DELETE_USER ,  DEVICE_TRUST_CHECK_FAILED ,  DOWNLOAD ,  EDIT ,  EDIT_USER ,
EMAIL_ALIAS_CONFIRM ,  EMAIL_ALIAS_REMOVE ,  ENABLE_TWO_FACTOR_AUTH ,
ENTERPRISE_APP_AUTHORIZATION_UPDATE ,  FAILED_LOGIN ,  FILE_MARKED_MALICIOUS ,
FILE_WATERMARKED_DOWNLOAD ,  GROUP_ADD_ITEM ,  GROUP_ADD_USER ,  GROUP_CREATION ,
GROUP_DELETION ,  GROUP_EDITED ,  GROUP_REMOVE_ITEM ,  GROUP_REMOVE_USER ,
ITEM_COPY ,  ITEM_CREATE ,  ITEM_DOWNLOAD ,  ITEM_MAKE_CURRENT_VERSION ,
ITEM_MODIFY ,  ITEM_MOVE ,  ITEM_OPEN ,  ITEM_PREVIEW ,  ITEM_RENAME ,  ITEM_SHARED ,
ITEM_SHARED_CREATE ,  ITEM_SHARED_UNSHARE ,  ITEM_SHARED_UPDATE ,  ITEM_SYNC ,
```

https://developer.box.com/reference/resources/event/: (last visited December 16, 2021)

58.    On information and belief, Box has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '942 Patent under 35 U.S.C. § 271(a) by developing, manufacturing, distributing, operating, using, selling, and/or offering to sell Box products and services in the United States without authority.

59.    On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '942 Patent under 35 U.S.C. § 271(b) based on its active marketing and promotion of its Box products and services in the United States

to its customers and prospective customers. On information and belief Box has, and will continue to, intentionally encourage acts of direct infringement with knowledge of the '942 Patent and knowledge that its acts are encouraging infringement.

60.     On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '942 Patent under 35 U.S.C. § 271(c), because Box has had, and continues to have, knowledge that its Box products are especially developed or adapted for a use that infringes the '942 Patent and constitute a material part of the claimed systems and methods. Box has had, and continues to have, knowledge that there are no substantial non-infringing uses for these Products. Box has infringed and continues to infringe the '942 Patent directly and/or indirectly in violation of 35 U.S.C. § 271(c).

## DEFENDANT SAILPOINT

61.     SailPoint makes and sells valued added integration services and products for Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '942 patent.

62.     More specifically, SailPoint's Identity Governance Platform provides identity governance solutions that are integrated with Box products and services, enabling users of Box products and services to, among other things, control user access, identify sensitive data, and monitor for malicious behavior.

# How does SailPoint integrate with Box?

SailPoint collects and analyzes the data and file permissions in Box to identify sensitive data and who has access to it. We can also alert you about inappropriate access to help you maintain security.

## Examples



- Data discovery and classification ▶
- Permission analysis ▶
- Access monitoring and alerting ▶

# Do you have files in Box that could be a compliance risk?

SailPoint's integration with Box helps you identify sensitive information, manage data ownership and alert you to any suspicious access activity. As more people collaborate and share information in the cloud, protecting access to your Box files has never been more important.

- Find and address your compliance gaps
- Ensure consistent governance across all data types
- Be alerted if inappropriate access is detected
- Minimize exposure to data leakage



## Learn more

- How identity governance helps ensure GDPR compliance ▶
- Governing unstructured data and data access ▶
- Watch our Box integration demo ▶



Identify where sensitive data resides in Box

Classify and analyze data based on content and behavior

https://www.sailpoint.com/integrations/box/ (last visited December 16, 2021)

63.     On information and belief, SailPoint, in order to develop, support, and provide its identity governance solutions, has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '942 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority. Included in these acts of infringement are situations where devices associated with SailPoint interact with Box servers to perform file sync operations.

## DEFENDANT VISTRA

64.     Vistra uses Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '942 patent.

65.     On its website, Box identifies Vistra as a user of Box's products and services.

**PROBLEM**

Vistra Energy is growing quickly through both organic means and acquisitions. Over an 18-month period, Vistra expanded from operating in Texas to 20 states, the District of Columbia, Japan, and Canada. Rapid growth makes for rapidly changing processes as a diverse workforce assembles across geographic locations.

**SOLUTION**

By migrating content to the cloud on a central platform with Box, Vistra can now leverage Box Keysafe to create consistent processes and better secure data — even at sensitive locations like nuclear facilities and during the acquisition planning phase of an M&A effort. Putting Box Governance in place is giving Vistra even more control over content.

**OUTCOME**

Box gives Vistra's workforce the user experience they expect and has saved the company money as it's retired expensive subscription-based tools. Processes across lines of business are now poised for automation, and all content is in compliance with FedRAMP and other regulations. Plus, cloud-based infrastructure means content processes scale as the company grows.

Technology has gradually been transitioning the entire workforce over to one central content platform with which a lot of the existing collaboration tools integrate well: Box.

"Box started as a grassroots effort by some of the folks on our political affairs team in order to share information with external consultants," Pelosi explains. "But as additional folks heard it was there, it became, 'Oh!, we could also use that for other teams.'"

The initial Box test case of about 250 people was so successful that, within a year, the number of users had bumped up to 1,000. Now, when Vistra acquires a new team, incoming employees are given "birthright access" to Box on day one. This practice is scaling up the number of Box users dramatically, and Box has become the de facto content layer of the company's digital work processes.

An early group that migrated to Box was a marketing team using an expensive file-sharing tool for digital asset management. The tool was robust, but it wasn't delivering a lot of value because the team simply didn't use most of its features. IT helped the team move their entire repository of graphical assets to the cloud into Box, saving the company a tremendous amount of money in subscription costs for an underutilized file-sharing tool.

The regulatory response organization within Vistra has to keep a close eye on governance and retention policies, and over time, their network shared drive space had run out. Accessing files on this drive was not easy, either, since users had to be onsite and connected to the network. IT migrated these assets to Box, using Box Governance to better manage content and stay in compliance.

https://www.box.com/customers/vistra-energy (last visited December 16, 2021)

66.     On information and belief, Vistra has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '942 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority.  Included in these acts of infringement are situations where devices associated with Vistra interact with Box servers to perform file sync operations.

**COUNT THREE**

**INFRINGEMENT OF U.S. PATENT NO. 10,289,607**

67.     Plaintiff incorporates paragraphs 1 through 66 as though fully set forth herein.

68.     Plaintiff is the owner, by assignment of U.S. Patent No. 10,289,607 (the "'607 Patent"), entitled "Architecture For Management of Digital Files Across Distributed Network" issued on May 14, 2019. A copy of the '607 Patent is attached as Exhibit 3.

69.     The '607 Patent is generally directed to systems and methods for sharing electronic files between multiple devices, wherein when a user modifies an electronic file on a device, a copy of the modified electronic file is automatically transferred to other devices, and wherein metadata associated with the modified electronic file is assigned a greater priority than

the copy of the modified electronic file, and the metadata is automatically transferred to the other devices prior to the copy of the modified electronic file.

70.    Plaintiff is the owner by assignment of all rights, title, and interest in and to the '607 Patent, including the right to assert all causes of action arising under the '607 Patent and the right to all remedies for the infringement of the '607 Patent.

71.    For example, claim 1 of the '607 Patent states:

1. A system, comprising:

server system comprising one or more processors programmed with computer program instructions that, when executed, cause the server system to:

receive, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being a version of the first file that is generated from the user modifying the content of the first file;

receive, from the first client device, first metadata associated with the version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;

determine that the server system is not in communication with a second client device associated with the user;

store the copy of the first file on the server system;

automatically transfer the first metadata to the second client device based on the first priority being greater than the second priority such that the first metadata

is transferred to the second client device prior to the copy of the first file being

transferred to the second client device; and

automatically transfer, over a network, the copy of the first file to the second client

device associated with the user to replace an older version of the first file

stored on the second client device, responsive to (i) resuming communication

with the second client device and (ii) receiving the copy of the first file from

the first client device.

**DEFENDANT BOX**

72.     In addition to the description in paragraphs 54-60, Box products and services

include systems and methods for sharing electronic files between multiple devices, wherein

when a user modifies an electronic file on a device, a copy of the modified electronic file is

automatically transferred to other devices, and wherein metadata associated with the modified

electronic file is assigned a greater priority than the copy of the modified electronic file, and the

metadata is automatically transferred to the other devices prior to the copy of the modified

electronic file.

73.     Box tracks and stores multiple types of metadata associated with stored files:



https://support.box.com/hc/en-us/articles/360044196173-Using-Metadata: (last visited

December 16, 2021)

## Metadata

Metadata allows users and applications to define and store custom data associated with files and folders.

Metadata consists of key/value pairs that are assigned to a file or a folder. For example, an important contract may have the key/value pairs of `clientNumber: 820183` and `clientName: bioMedicalCorp`.

### Metadata terminology

Working with metadata requires a developer to work with a few distinct types of resources.



- Templates: A metadata template describes a re-usable set of key/value pairs that can be assigned to a file. For example, an `invoiceData` template might hold data about an invoice, having a field for the invoice ID as well as the customer ID.
  - Fields: A metadata template field describes a specific piece of data within a metadata template. For example, the ID of an invoice might be represented as an `id` field on an `invoiceData` template.
- Instances: A metadata instance describes the relation between a template and a file or folder, including the values that are assigned for every field. For example, a user might have assigned an `invoiceData` metadata template to a file and provided 2 values, one for the invoice ID and one for the customer ID.

- Cascade Policies: A metadata cascade policy describes how metadata instances applied to a folder should be applied to any item within that folder. For example, a user might assign the same `invoiceData` metadata template to a project folder (including the 2 values), allowing them to automatically apply to all the files and folders within that project folder.
- Queries: A metadata query provides a way to find files and folders by searching for the metadata attached to them. For example, to find the all files for an invoice with a certain ID, the query would look for all files and folders with the `invoiceData` template attached to it and a value of `id = :id`, where `:id` would be the value of the invoice.

https://developer.box.com/guides/metadata/: (last visited December 16, 2021)

## File

A full representation of a file, as can be returned from any file API endpoints by default

**etag**   string

example   1

The HTTP `etag` of this file. This can be used within some API endpoints in the `If-Match` and `If-None-Match` headers to only perform changes on the file if (no) changes have happened.

---

**id**   string

example   12345

The unique identifier that represent a file.

The ID for any file can be determined by visiting a file in the web application and copying the ID from the URL. For example, for the URL `https://*.app.box.com/files/123` the `file_id` is `123`.

---

**name**   string

example   Contract.pdf

The name of the file

---

**sequence_id**   string

example   3

A numeric identifier that represents the most recent user event that has been applied to this item.

This can be used in combination with the `GET /events` -endpoint to filter out user events that would have occurred before this identifier was read.

An example would be where a Box Drive-like application would fetch an item via the API, and then listen to incoming user events for changes to the item. The application would ignore any user events where the `sequence_id` in the event is smaller than or equal to the `sequence_id` in the originally fetched resource.

---

**allowed_invitee_roles**   string array

example   ["editor"]

A list of the types of roles that user can be invited at when sharing this file.

---

**content_created_at**   string / date-time

example   2012-12-12T10:53:43-08:00

The date and time at which this file was originally created, which might be before it was uploaded to Box.

---

**content_modified_at**   string / date-time

example   2012-12-12T10:53:43-08:00

The date and time at which this folder was last updated, which might be before it was uploaded to Box.

---

**created_at**   string / date-time

example   2012-12-12T10:53:43-08:00

The date and time when the file was created on Box.

**created_by**  User (Mini) object

The user who created this file

---

**description**  string

example  Contract for Q1 renewal  Max Length  256

The optional description of this file

---

**file_version**  File version (Mini) object

The information about the current version of the file.

---

**has_collaborations**  boolean

example  true

Specifies if this folder has any other collaborators.

---

**is_externally_owned**  boolean

example  true

Specifies if this folder is owned by a user outside of the authenticated enterprise.

---

**item_status**  string

example  active

Defines if this item has been deleted or not.

- active  when the item has is not in the trash
- trashed  when the item has been moved to the trash but not deleted
- deleted  when the item has been permanently deleted.

Value is one of  active ,  trashed ,  deleted

---

**modified_at**  string / date-time

example  2012-12-12T10:53:43-08:00

The date and time when the folder was last updated on Box.

---

**modified_by**  User (Mini) object

The user who last modified this file

---

**owned_by**  User (Mini) object

The user who owns this file

---

**parent**  Folder (Mini) object

The folder that this file is located within.



https://developer.box.com/reference/resources/file/: (last visited December 16, 2021)

74.    When a file is modified, the file's metadata is uploaded to Box's servers with a

higher priority than the file contents:

## Working in Finder

If you use a Mac, you can access Box Drive by opening Finder. In the sidebar, navigate to **Devices** > **Favorites** > **Box**. Open this folder to display all of the contents of your **All Files** page on Box.com. You can navigate through any folder and open every file you see just as if it were a local file.

For each file in the Box folder, Box Drive displays these standard properties:

- File name
- File size
- File type
- Date created (more information on Box timestamps)
- Date modified (more information on Box timestamps)

The blue cloud icon beside a file or folder indicates the item is safely stored and up to date in Box. Add or update a file or folder in Box Drive, and the icon changes to an orange syncing icon. The icon also displays as syncing when Box Drive is uploading changes you made to files offline. When the sync completes the icon resets to the blue cloud.



## Working in Explorer

If you use Windows, you can access Box Drive by opening Explorer and navigating to the folder named Box. Open this folder to display all of the contents of your All Files page on Box.com. You can navigate through any folder and open every file you see just as if it were a local file.

For each file in the Box folder, Box Drive displays these standard properties:

- File name
- File size
- File type
- Date created (more information on Box timestamps)
- Date modified (more information on Box timestamps)

The blue cloud icon beside a file or folder indicates the item is safely stored and up to date in Box. Add or update a file or folder in Box Drive, and the icon changes to an orange syncing icon. The icon also displays as syncing when Box Drive is uploading changes you made to files offline. When the sync completes the icon resets to the blue cloud.



## Working with Other Applications

Working with Box files in other applications such as Word or Excel is seamless. Open the file from Box Drive and work with it as you usually would. When you're done, save the file. The file automatically syncs back to Box. You can also use Save As to save the file to a new location, save the file with a new name, or create new folders to store your file. All of those changes save automatically in Box.

## Marking Content for Offline Use

You can also mark content in Box Drive to make it available offline. Drive downloads this content to your device's hard drive so you can work when you're not connected to the Internet. When you get back online, Drive automatically uploads the revised content, so you are always working with the most up-to-date versions of your files. More information about making content available offline.

https://support.box.com/hc/en-us/articles/360043697494-Using-Box-Drive-Basics: (last visited December 16, 2021)

## Making Content Available Offline

3 months ago · Updated

With Box Drive's Mark for Offline feature, your Box cloud content is available wherever you are - in a remote office, traveling on a plane, and so on - regardless of internet connectivity. Just select the Box folders you need access to, and Box Drive automatically downloads all of the folder contents to your computer. If you or someone else make changes to this content while you're offline, Box Drive automatically uploads the revised content when you are back online so you are always working with the most up-to-date versions of your files.



https://support.box.com/hc/en-us/articles/360043697574-Making-Content-Available-Offline:

(last visited December 16, 2021)

75.     On information and belief, Box has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '607 Patent under 35 U.S.C. § 271(a) by developing, manufacturing, distributing, operating, using, selling, and/or offering to sell Box products and services in the United States without authority.

76.     On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '607 Patent under 35 U.S.C. § 271(b) based on its active marketing and promotion of its Box products and services in the United States to its customers and prospective customers.  On information and belief Box has, and will continue to, intentionally encourage acts of direct infringement with knowledge of the '607 Patent and knowledge that its acts are encouraging infringement.

77.     On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '607 Patent under 35 U.S.C. § 271(c), because Box has had, and continues to have, knowledge that its Box products are especially developed or adapted for a use that infringes the '607 Patent and constitute a material part of the

claimed systems and methods.  Box has had, and continues to have, knowledge that there are no substantial non-infringing uses for these Products. Box has infringed and continues to infringe the '607 Patent directly and/or indirectly in violation of 35 U.S.C. § 271(c).

## DEFENDANT SAILPOINT

78.    SailPoint makes and sells valued added integration services and products for Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '607 patent.

79.    More specifically, SailPoint's Identity Governance Platform provides identity governance solutions that are integrated with Box products and services, enabling users of Box products and services to, among other things, control user access, identify sensitive data, and monitor for malicious behavior.

## How does SailPoint integrate with Box?

SailPoint collects and analyzes the data and file permissions in Box to identify sensitive data and who has access to it. We can also alert you about inappropriate access to help you maintain security.

### Examples



Data discovery and classification  ▸

Permission analysis  ▸

Access monitoring and alerting  ▸

## Do you have files in Box that could be a compliance risk?

SailPoint's integration with Box helps you identify sensitive information, manage data ownership and alert you to any suspicious access activity. As more people collaborate and share information in the cloud, protecting access to your Box files has never been more important.

- Find and address your compliance gaps
- Ensure consistent governance across all data types
- Be alerted if inappropriate access is detected
- Minimize exposure to data leakage



### Learn more

How identity governance helps ensure GDPR compliance  ▸

Governing unstructured data and data access  ▸

Watch our Box integration demo  ▸



https://www.sailpoint.com/integrations/box/ (last visited December 16, 2021)

80.     On information and belief, SailPoint, in order to develop, support, and provide its identity governance solutions, has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '607 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority. Included in these acts of infringement are situations where devices associated with SailPoint interact with Box servers to perform file sync operations.

## DEFENDANT VISTRA

81.     Vistra uses Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '607 patent.

82.     On its website, Box identifies Vistra as a user of Box's products and services.

**PROBLEM**

Vistra Energy is growing quickly through both organic means and acquisitions. Over an 18-month period, Vistra expanded from operating in Texas to 20 states, the District of Columbia, Japan, and Canada. Rapid growth makes for rapidly changing processes as a diverse workforce assembles across geographic locations.

**SOLUTION**

By migrating content to the cloud on a central platform with Box, Vistra can now leverage Box Keysafe to create consistent processes and better secure data — even at sensitive locations like nuclear facilities and during the acquisition planning phase of an M&A effort. Putting Box Governance in place is giving Vistra even more control over content.

**OUTCOME**

Box gives Vistra's workforce the user experience they expect and has saved the company money as it's retired expensive subscription-based tools. Processes across lines of business are now poised for automation, and all content is in compliance with FedRAMP and other regulations. Plus, cloud-based infrastructure means content processes scale as the company grows.

Technology has gradually been transitioning the entire workforce over to one central content platform with which a lot of the existing collaboration tools integrate well: Box.

"Box started as a grassroots effort by some of the folks on our political affairs team in order to share information with external consultants," Pelosi explains. "But as additional folks heard it was there, it became, 'Oh!, we could also use that for other teams.'"

The initial Box test case of about 250 people was so successful that, within a year, the number of users had bumped up to 1,000. Now, when Vistra acquires a new team, incoming employees are given "birthright access" to Box on day one. This practice is scaling up the number of Box users dramatically, and Box has become the de facto content layer of the company's digital work processes.

An early group that migrated to Box was a marketing team using an expensive file-sharing tool for digital asset management. The tool was robust, but it wasn't delivering a lot of value because the team simply didn't use most of its features. IT helped the team move their entire repository of graphical assets to the cloud into Box, saving the company a tremendous amount of money in subscription costs for an underutilized file-sharing tool.

The regulatory response organization within Vistra has to keep a close eye on governance and retention policies, and over time, their network shared drive space had run out. Accessing files on this drive was not easy, either, since users had to be onsite and connected to the network. IT migrated these assets to Box, using Box Governance to better manage content and stay in compliance.

https://www.box.com/customers/vistra-energy (last visited December 16, 2021)

83.     On information and belief, Vistra has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '607 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority.  Included in these acts of infringement are situations where devices associated with Vistra interact with Box servers to perform file sync operations.

**COUNT FOUR**

**INFRINGEMENT OF U.S. PATENT NO. 10,642,787**

84.     Plaintiff incorporates paragraphs 1 through 83 as though fully set forth herein.

85.     Plaintiff is the owner, by assignment of U.S. Patent No. 10,642,787 (the "'787 Patent"), entitled "Pre-file-transfer update based on prioritized metadata" issued on May 5, 2020. A copy of the '787 Patent is attached as Exhibit 4.

86.     The '787 Patent is generally directed to systems and methods for sharing electronic files between multiple devices, wherein when a user modifies an electronic file on a device, metadata associated with the modified electronic file is automatically transferred to other devices with higher priority before a copy of the modified electronic file is transferred to the

other devices, which causes a user interface of the other devices to indicate the updated version of the modified electronic file.

87.    Plaintiff is the owner by assignment of all rights, title, and interest in and to the '787 Patent, including the right to assert all causes of action arising under the '787 Patent and the right to all remedies for the infringement of the '787 Patent.

88.    For example, claim 1 of the '787 Patent states:

1.    A system comprising:

a server system comprising one or more processors programmed with computer program instructions that, when executed, cause the server system to:

receive, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being an updated version of the first file that is generated from the user modifying the content of the first file;

receive, over a network, from the first client device, first metadata associated with the updated version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file; and

automatically transfer, based on the first priority being greater than the second priority, the first metadata over a network to a second client device associated with the user such that the first metadata is transferred to the second client device before the copy of the first file is transferred to the second client device,

wherein, before the copy of the first file is transferred to the second client device:

> (i) the transfer of the first metadata to the second client device causes a file representation of the first file presented on a user interface of the second client device to be updated based on the first metadata, and

> (ii) instead of the updated file representation of the first file representing a version of the first file currently stored on the second client device, the updated file representation represents the updated version of the first file that is currently stored on the first client device and not currently stored on the second client device, and

wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

## **DEFENDANT BOX**

89.     In addition to the description in paragraphs 72-77, Box's server system comprises one or more processors running Box server software, and Box's file sharing software running on a first client device and a second client device configure the first client device and the second client device to sync with each other. When a user modifies a content of a first file stored on the first client device, Box's server system receives metadata, with higher priority, about the modified first file from the first client device, and automatically transfers the metadata to the second client device before a copy of the modified first file, with lower priority, is transferred to the second client device.

90.    Based on the higher-priority metadata transferred from the Box server system to the second client device, a file representation of the first file presented on a Box user interface of the second client device is updated, before the copy of the modified first file is transferred to the second client device. The updated file representation represents the updated version of the first file that is currently stored on the first client device and not currently stored on the second client device.

91.    Based on the metadata being assigned higher priority than the copy of the first file, the status of Box Sync or Box Drive folder at the first client device is updated before the modified file is uploaded to the Box's servers. Box provides the following icons that indicate the status of the files and folders:





[https://support.box.com/hc/en-us/articles/360043697494-Using-Box-Drive-Basics](https://support.box.com/hc/en-us/articles/360043697494-Using-Box-Drive-Basics) (last

visited December 16, 2021)



[https://support.box.com/hc/en-us/articles/360043697574-Making-Content-Available-Offline](https://support.box.com/hc/en-us/articles/360043697574-Making-Content-Available-Offline)

(last visited December 16, 2021)

92.     When the modified file is uploaded to the Box's server system, Box's server

system first transfers the metadata associated with the modified file to the second client device to

notify that there is an updated version of the file that is available for download. Box displays a

dialog box with a refresh button to prompt the user to download the new version of the file. Once

the Box page is refreshed, the updated version is downloaded to the second client device.  See

e.g., the following screenshot image of a personal Box account user:



A new version of "Presentation2.pptx" was just uploaded. Would you like to refresh the page?

93.    As described previously, Box's server system has a configuration to assign greater priority to metadata than priority assigned to the files.  Box's notification system enforces a priority system where changes to file metadata are propagated faster than, and downloaded by other client devices before, changes to file content.

94.    On information and belief, Box has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '787 Patent under 35 U.S.C. § 271(a) by developing, manufacturing, distributing, operating, using, selling, and/or offering to sell Box products and services in the United States without authority.  Included in these acts of infringement are situations where devices owned by users and customers of Box products and services interact with Box servers to perform file sync operations.

95.    On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '787 Patent under 35 U.S.C. § 271(b) based on its active marketing and promotion of its Box products and services in the United States to its customers and prospective customers.  On information and belief Box has, and will continue to, intentionally encourage acts of direct infringement with knowledge of the '787 Patent and knowledge that its acts are encouraging infringement.

96.    On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '787 Patent under 35 U.S.C. § 271(c), because Box has had, and continues to have, knowledge that its Box products are especially developed or adapted for a use that infringes the '787 Patent and constitute a material part of the claimed systems and methods.  Box has had, and continues to have, knowledge that there are no substantial non-infringing uses for these Products. Box has infringed and continues to infringe the '787 Patent directly and/or indirectly in violation of 35 U.S.C. § 271(c).

## DEFENDANT SAILPOINT

97.    SailPoint makes and sells valued added integration services and products for Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '787 patent.

98.    More specifically, SailPoint's Identity Governance Platform provides identity governance solutions that are integrated with Box products and services, enabling users of Box products and services to, among other things, control user access, identify sensitive data, and monitor for malicious behavior.

# How does SailPoint integrate with Box?

SailPoint collects and analyzes the data and file permissions in Box to identify sensitive data and who has access to it. We can also alert you about inappropriate access to help you maintain security.



**Examples**

Data discovery and classification ▶

Permission analysis ▶

Access monitoring and alerting ▶

# Do you have files in Box that could be a compliance risk?

SailPoint's integration with Box helps you identify sensitive information, manage data ownership and alert you to any suspicious access activity. As more people collaborate and share information in the cloud, protecting access to your Box files has never been more important.

- Find and address your compliance gaps
- Ensure consistent governance across all data types
- Be alerted if inappropriate access is detected
- Minimize exposure to data leakage



**Learn more**

How identity governance helps ensure GDPR compliance ▶

Governing unstructured data and data access ▶

Watch our Box integration demo ▶



https://www.sailpoint.com/integrations/box/ (last visited December 16, 2021)

99.     On information and belief, SailPoint, in order to develop, support, and provide its identity governance solutions, has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '787 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority. Included in these acts of infringement are situations where devices associated with SailPoint interact with Box servers to perform file sync operations.

### DEFENDANT VISTRA

100.    Vistra uses Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '787 patent.

101.    On its website, Box identifies Vistra as a user of Box's products and services.

**PROBLEM**

Vistra Energy is growing quickly through both organic means and acquisitions. Over an 18-month period, Vistra expanded from operating in Texas to 20 states, the District of Columbia, Japan, and Canada. Rapid growth makes for rapidly changing processes as a diverse workforce assembles across geographic locations.

**SOLUTION**

By migrating content to the cloud on a central platform with Box, Vistra can now leverage Box Keysafe to create consistent processes and better secure data — even at sensitive locations like nuclear facilities and during the acquisition planning phase of an M&A effort. Putting Box Governance in place is giving Vistra even more control over content.

**OUTCOME**

Box gives Vistra's workforce the user experience they expect and has saved the company money as it's retired expensive subscription-based tools. Processes across lines of business are now poised for automation, and all content is in compliance with FedRAMP and other regulations. Plus, cloud-based infrastructure means content processes scale as the company grows.

Technology has gradually been transitioning the entire workforce over to one central content platform with which a lot of the existing collaboration tools integrate well: Box.

"Box started as a grassroots effort by some of the folks on our political affairs team in order to share information with external consultants," Pelosi explains. "But as additional folks heard it was there, it became, 'Oh!, we could also use that for other teams.'"

The initial Box test case of about 250 people was so successful that, within a year, the number of users had bumped up to 1,000. Now, when Vistra acquires a new team, incoming employees are given "birthright access" to Box on day one. This practice is scaling up the number of Box users dramatically, and Box has become the de facto content layer of the company's digital work processes.

An early group that migrated to Box was a marketing team using an expensive file-sharing tool for digital asset management. The tool was robust, but it wasn't delivering a lot of value because the team simply didn't use most of its features. IT helped the team move their entire repository of graphical assets to the cloud into Box, saving the company a tremendous amount of money in subscription costs for an underutilized file-sharing tool.

The regulatory response organization within Vistra has to keep a close eye on governance and retention policies, and over time, their network shared drive space had run out. Accessing files on this drive was not easy, either, since users had to be onsite and connected to the network. IT migrated these assets to Box, using Box Governance to better manage content and stay in compliance.

https://www.box.com/customers/vistra-energy (last visited December 16, 2021)

102.    On information and belief, Vistra has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '787 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority.  Included in these acts of infringement are situations where devices associated with Vistra interact with Box servers to perform file sync operations.

## COUNT FIVE

## INFRINGEMENT OF U.S. PATENT NO. 10,754,823

103.    Plaintiff incorporates paragraphs 1 through 102 as though fully set forth herein.

104.    Plaintiff is the owner, by assignment of U.S. Patent No. 10,754,823 (the "'823 Patent"), entitled "Pre-file-transfer availability indication based on prioritized metadata" issued on August 25, 2020. A copy of the '823 Patent is attached as Exhibit 5.

105.    The '823 Patent is generally directed to systems and methods for sharing electronic files between multiple devices, wherein when a user modifies an electronic file on a device, metadata associated with the modified electronic file is automatically transferred to other devices with higher priority, which causes a graphical availability indication of the updated version of the modified electronic file to be presented on the other devices, and subsequently the copy of the modified electronic file is transferred to the other devices.

106.    Plaintiff is the owner by assignment of all rights, title, and interest in and to the '823 Patent, including the right to assert all causes of action arising under the '823 Patent and the right to all remedies for the infringement of the '823 Patent.

107.    For example, claim 1 of the '823 Patent states:

1.    A system comprising:

a server system comprising one or more processors programmed with computer program instructions that, when executed, cause the server system to:

receive, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being an updated version of the first file that is generated from the user modifying the content of the first file;

receive, over a network, from the first client device, first metadata associated with the updated version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;

automatically transfer, based on the first priority being greater than the second priority, the first metadata over a network to a second client device associated with the user such that the first metadata is transferred to the second client device before the copy of the first file is transferred to the second client device,

wherein, before the copy of the first file is transferred to the second client device:

(i) the transfer of the first metadata to the second client device causes a graphical availability indication of the updated version of the first file to be presented at the second client device based on the first metadata, and

(ii) the graphical availability indication is presented proximate a file icon representing the first file on a user interface of the second client device, and

wherein the graphical availability indication indicates that the updated version of the first file generated from the user modifying the content of the first file is available to be downloaded from the server system to the second client device; and

subsequent to the transfer of the first metadata to the second client device, transfer the copy of the first file to the second client device,

wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

**<u>DEFENDANT BOX</u>**

108.    In addition to the description in paragraphs 89-96, Box's server system comprises one or more processors running Box server software, and Box's file sharing software running on a first client device and a second client device configure the first client device and the second client device to sync with each other. When a user modifies a content of a first file stored on the first client device, Box's server system receives metadata, with higher priority, about the modified first file from the first client device, and automatically transfers the metadata to the

second client device before a copy of the modified first file, with lower priority, is transferred to the second client device.

109.    Based on the higher-priority metadata transferred from the Box server system to the second client device, a graphical availability indication of the updated version of the first file is presented proximate a file icon representing the first file on a Box user interface of the second client device, before the copy of the modified first file is transferred to the second client device. The graphical availability indication represents that the updated version of the first file is available to be downloaded from the Box server system to the second client device.

110.    Based on the metadata downloaded from Box's servers to the second client device, and prior to receiving the modified file, graphical availability indications are presented proximate to file icons on Box user interface of the second client device to indicate that the updated version is available for download.





The blue cloud icon beside a file or folder indicates the item is safely stored and up to date in Box. Add or update a file or folder in Box Drive, and the icon changes to an orange syncing icon. The icon also displays as syncing when Box Drive is uploading changes you made to files offline. When the sync completes the icon resets to the blue cloud.

https://support.box.com/hc/en-us/articles/360043697494-Using-Box-Drive-Basics (last visited December 16, 2021)

111.    Subsequent to the metadata transfer, and in response to a page refresh, Box's server system transfers the modified file to the linked device. In response to the Box page being refreshed and the updated version being downloaded, Box's server system displays the version number of the modified file indicating the updated version. Box overwrites the old version with the new version.

112.    On information and belief, Box has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '823 Patent under 35 U.S.C. § 271(a) by developing, manufacturing, distributing, operating, using, selling, and/or offering to sell Box products and services in the United States without authority.  Included in these acts of infringement are situations where devices owned by users and customers of Box products and services interact with Box servers to perform file sync operations.

113.    On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '823 Patent under 35 U.S.C. § 271(b) based on its active marketing and promotion of its Box products and services in the United States to its customers and prospective customers.  On information and belief Box has, and will continue to, intentionally encourage acts of direct infringement with knowledge of the '823 Patent and knowledge that its acts are encouraging infringement.

114.     On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '823 Patent under 35 U.S.C. § 271(c), because Box has had, and continues to have, knowledge that its Box products are especially developed or adapted for a use that infringes the '823 Patent and constitute a material part of the claimed systems and methods.  Box has had, and continues to have, knowledge that there are no substantial non-infringing uses for these Products. Box has infringed and continues to infringe the '823 Patent directly and/or indirectly in violation of 35 U.S.C. § 271.

## DEFENDANT SAILPOINT

115.     SailPoint makes and sells valued added integration services and products for Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '823 patent.

116.     More specifically, SailPoint's Identity Governance Platform provides identity governance solutions that are integrated with Box products and services, enabling users of Box products and services to, among other things, control user access, identify sensitive data, and monitor for malicious behavior.

## How does SailPoint integrate with Box?

SailPoint collects and analyzes the data and file permissions in Box to identify sensitive data and who has access to it. We can also alert you about inappropriate access to help you maintain security.

### Examples



Data discovery and classification  ▸

Permission analysis  ▸

Access monitoring and alerting  ▸

## Do you have files in Box that could be a compliance risk?

SailPoint's integration with Box helps you identify sensitive information, manage data ownership and alert you to any suspicious access activity. As more people collaborate and share information in the cloud, protecting access to your Box files has never been more important.

- Find and address your compliance gaps
- Ensure consistent governance across all data types
- Be alerted if inappropriate access is detected
- Minimize exposure to data leakage



### Learn more

How identity governance helps ensure GDPR compliance  ▸

Governing unstructured data and data access  ▸

Watch our Box integration demo  ▸



https://www.sailpoint.com/integrations/box/ (last visited December 16, 2021)

117.     On information and belief, SailPoint, in order to develop, support, and provide its identity governance solutions, has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '823 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority. Included in these acts of infringement are situations where devices associated with SailPoint interact with Box servers to perform file sync operations.

## DEFENDANT VISTRA

118.     Vistra uses Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '823 patent.

119.     On its website, Box identifies Vistra as a user of Box's products and services.

**PROBLEM**

Vistra Energy is growing quickly through both organic means and acquisitions. Over an 18-month period, Vistra expanded from operating in Texas to 20 states, the District of Columbia, Japan, and Canada. Rapid growth makes for rapidly changing processes as a diverse workforce assembles across geographic locations.

**SOLUTION**

By migrating content to the cloud on a central platform with Box, Vistra can now leverage Box Keysafe to create consistent processes and better secure data — even at sensitive locations like nuclear facilities and during the acquisition planning phase of an M&A effort. Putting Box Governance in place is giving Vistra even more control over content.

**OUTCOME**

Box gives Vistra's workforce the user experience they expect and has saved the company money as it's retired expensive subscription-based tools. Processes across lines of business are now poised for automation, and all content is in compliance with FedRAMP and other regulations. Plus, cloud-based infrastructure means content processes scale as the company grows.

Technology has gradually been transitioning the entire workforce over to one central content platform with which a lot of the existing collaboration tools integrate well: Box.

"Box started as a grassroots effort by some of the folks on our political affairs team in order to share information with external consultants," Pelosi explains. "But as additional folks heard it was there, it became, 'Oh!, we could also use that for other teams.'"

The initial Box test case of about 250 people was so successful that, within a year, the number of users had bumped up to 1,000. Now, when Vistra acquires a new team, incoming employees are given "birthright access" to Box on day one. This practice is scaling up the number of Box users dramatically, and Box has become the de facto content layer of the company's digital work processes.

An early group that migrated to Box was a marketing team using an expensive file-sharing tool for digital asset management. The tool was robust, but it wasn't delivering a lot of value because the team simply didn't use most of its features. IT helped the team move their entire repository of graphical assets to the cloud into Box, saving the company a tremendous amount of money in subscription costs for an underutilized file-sharing tool.

The regulatory response organization within Vistra has to keep a close eye on governance and retention policies, and over time, their network shared drive space had run out. Accessing files on this drive was not easy, either, since users had to be onsite and connected to the network. IT migrated these assets to Box, using Box Governance to better manage content and stay in compliance.

https://www.box.com/customers/vistra-energy (last visited December 16, 2021)

120.    On information and belief, Vistra has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '823 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority. Included in these acts of infringement are situations where devices associated with Vistra interact with Box servers to perform file sync operations.

## COUNT SIX

## INFRINGEMENT OF U.S. PATENT NO. 11,003,622

121.    Plaintiff incorporates paragraphs 1 through 120 as though fully set forth herein.

122.    Plaintiff is the owner, by assignment of U.S. Patent No. 11,003,622 (the "'622 Patent"), entitled "Architecture For Management of Digital Files Across Distributed Network" issued on May 11, 2021. A copy of the '622 Patent is attached as Exhibit 6.

123.    The '622 Patent is generally directed to systems and methods for sharing electronic files between multiple devices, wherein when a user modifies an electronic file on a device, metadata associated with the modified electronic file is first automatically transferred to other devices with higher priority and a copy of the modified file is automatically transferred to the other devices to replace an older version of the electronic file stored on the other devices.

124.    Plaintiff is the owner by assignment of all rights, title, and interest in and to the '622 Patent, including the right to assert all causes of action arising under the '622 Patent and the right to all remedies for the infringement of the '622 Patent.

125.    For example, claim 1 of the '622 Patent states:

1.    A system comprising:

a server system comprising one or more processors programmed with computer program instructions that, when executed, cause the server system to:

receive, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being a version of the first file that is generated from the user modifying the content of the first file;

store the copy of the first file on the server system;

receive, from the first client device, first metadata associated with the version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;

automatically transfer, based on the first priority being greater than the second priority, the first metadata to the second client device such that the first metadata is transferred to the second client device prior to the copy of the first file being transferred to the second client device; and

automatically transfer, over a network, the copy of the first file to the second client device associated with the user to replace an older version of the first file

stored on the second client device, responsive to receiving the copy of the first file from the first client device.

**DEFENDANT BOX**

126.    In addition to the description in paragraphs 108-114, Box's server system comprises one or more processors running Box server software, and Box's file sharing software running on a first client device and a second client device configure the first client device and the second client device to sync with each other. When a user modifies a content of a first file stored on the first client device, Box's server system receives metadata, with higher priority, about the modified first file from the first client device, and automatically transfers the metadata to the second client device before a copy of the modified first file, with lower priority, is transferred to the second client device. Subsequently, Box's server system automatically transfers the copy of the modified first file to the second client device to replace an older version of the first file stored on the second client device.

127.    When the modified file is uploaded to Box's server system, Box user interface prompts the second client device to receive the updated version of the modified file.

128.    Once the updated version is received at the second client device, the updated version overwrites the older version of the file previously stored on the second client device. Box's server system keeps track of file versions of the file:

Box overwrites a file and and updates the version each time you:

- edit the file using an online editor, such as Box Edit, Microsoft Office Online, or the Google editing suite)
- edit the file within your Box Sync or Box Drive folder
- use the **Upload New Version** button on the Web app
- upload a file into a folder that has an existing file with the **exact** same name in it on the Box Web app.

https://support.box.com/hc/en-us/articles/360043697054-Accessing-Version-History (last visited December 16, 2021)



https://support.box.com/hc/en-us/articles/360043697054-Accessing-Version-History (last visited December 16, 2021)

129.    On information and belief, Box has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '622 Patent under 35 U.S.C. § 271(a) by developing, manufacturing, distributing, operating, using, selling, and/or offering to sell Box products and services in the United States without authority.  Included in these acts of infringement are situations where devices owned by users and customers of Box products and services interact with Box servers to perform file sync operations.

130.    On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '622 Patent under 35 U.S.C. § 271(b)

based on its active marketing and promotion of its Box products and services in the United States to its customers and prospective customers. On information and belief Box has, and will continue to, intentionally encourage acts of direct infringement with knowledge of the '622 Patent and knowledge that its acts are encouraging infringement.

131. On information and belief, Box is liable for infringement, literally and/or under the doctrine of equivalents, of one or more claims of the '622 Patent under 35 U.S.C. § 271(c), because Box has had, and continues to have, knowledge that its Box products are especially developed or adapted for a use that infringes the '622 Patent and constitute a material part of the claimed systems and methods. Box has had, and continues to have, knowledge that there are no substantial non-infringing uses for these Products. Box has infringed and continues to infringe the '622 Patent directly and/or indirectly in violation of 35 U.S.C. § 271.

## **DEFENDANT SAILPOINT**

132. SailPoint makes and sells valued added integration services and products for Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '622 patent.

133. More specifically, SailPoint's Identity Governance Platform provides identity governance solutions that are integrated with Box products and services, enabling users of Box products and services to, among other things, control user access, identify sensitive data, and monitor for malicious behavior.

## How does SailPoint integrate with Box?

SailPoint collects and analyzes the data and file permissions in Box to identify sensitive data and who has access to it. We can also alert you about inappropriate access to help you maintain security.

**Examples**



## Do you have files in Box that could be a compliance risk?

SailPoint's integration with Box helps you identify sensitive information, manage data ownership and alert you to any suspicious access activity. As more people collaborate and share information in the cloud, protecting access to your Box files has never been more important.

- Find and address your compliance gaps
- Ensure consistent governance across all data types
- Be alerted if inappropriate access is detected
- Minimize exposure to data leakage





https://www.sailpoint.com/integrations/box/ (last visited December 16, 2021)

134.    On information and belief, SailPoint, in order to develop, support, and provide its identity governance solutions, has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '622 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority. Included in these acts of infringement are situations where devices associated with SailPoint interact with Box servers to perform file sync operations.

## DEFENDANT VISTRA

135.    Vistra uses Box's online document storage and synchronization products and services, including those products and services that infringe Plaintiff's patents identified above, through Box's online platforms and mobile applications to customers, which practice each and every limitation of one or more claims of the '622 patent.

136.    On its website, Box identifies Vistra as a user of Box's products and services.

**PROBLEM**

Vistra Energy is growing quickly through both organic means and acquisitions. Over an 18-month period, Vistra expanded from operating in Texas to 20 states, the District of Columbia, Japan, and Canada. Rapid growth makes for rapidly changing processes as a diverse workforce assembles across geographic locations.

**SOLUTION**

By migrating content to the cloud on a central platform with Box, Vistra can now leverage Box Keysafe to create consistent processes and better secure data — even at sensitive locations like nuclear facilities and during the acquisition planning phase of an M&A effort. Putting Box Governance in place is giving Vistra even more control over content.

**OUTCOME**

Box gives Vistra's workforce the user experience they expect and has saved the company money as it's retired expensive subscription-based tools. Processes across lines of business are now poised for automation, and all content is in compliance with FedRAMP and other regulations. Plus, cloud-based infrastructure means content processes scale as the company grows.

Technology has gradually been transitioning the entire workforce over to one central content platform with which a lot of the existing collaboration tools integrate well: Box.

"Box started as a grassroots effort by some of the folks on our political affairs team in order to share information with external consultants," Pelosi explains. "But as additional folks heard it was there, it became, 'Oh!, we could also use that for other teams.'"

The initial Box test case of about 250 people was so successful that, within a year, the number of users had bumped up to 1,000. Now, when Vistra acquires a new team, incoming employees are given "birthright access" to Box on day one. This practice is scaling up the number of Box users dramatically, and Box has become the de facto content layer of the company's digital work processes.

An early group that migrated to Box was a marketing team using an expensive file-sharing tool for digital asset management. The tool was robust, but it wasn't delivering a lot of value because the team simply didn't use most of its features. IT helped the team move their entire repository of graphical assets to the cloud into Box, saving the company a tremendous amount of money in subscription costs for an underutilized file-sharing tool.

The regulatory response organization within Vistra has to keep a close eye on governance and retention policies, and over time, their network shared drive space had run out. Accessing files on this drive was not easy, either, since users had to be onsite and connected to the network. IT migrated these assets to Box, using Box Governance to better manage content and stay in compliance.

https://www.box.com/customers/vistra-energy (last visited December 16, 2021)

137.    On information and belief, Vistra has directly infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '622 Patent under 35 U.S.C. § 271(a) by using Box products and services in the United States and abroad without authority.  Included in these acts of infringement are situations where devices associated with Vistra interact with Box servers to perform file sync operations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court enter judgement against the Defendants:

a.    Declaring that the Defendants have infringed the '561, '942, '607, '787, '823, and '622 Patents;

b.    Awarding Plaintiff its damages suffered as a result of the Defendants' infringement of the '561, '942, '607, '787, '823, and '622 Patents, including pre-judgement and post-judgement interest and supplemental damages for any continuing post-verdict or post-judgement infringement with an accounting as needed;

c.    An order enjoining Defendants, their officers, agents, employees, attorneys, and all other persons or entities acting in concert, participation or in privity with one or more

of them, and their successors and assigns, from infringing

the '561, '942, '607, '787, '823, and '622 Patents;

d.  A judgment declaring that this is an exceptional case and awarding Plaintiff's

reasonable attorneys' fees and costs in this action, as provided by 35 U.S.C. § 285;

e.  A judgment, declaration or order that Defendant's infringement is willful and

increasing damages under 35 U.S.C. § 284;

f.  Awarding Plaintiff its costs, attorney's fees, expenses, and interest; and

g.  Granting Plaintiff such further relief which may be requested and as the Court find

appropriate.

## **<u>DEMAND FOR A JURY TRIAL</u>**

Plaintiff demands a trial by jury on all issues so triable in this Complaint.

Dated:  December 29, 2021                         Respectfully submitted,

                                        */s/ Raymond W. Mort, III*
                                        Raymond W. Mort, III
                                        Texas State Bar No. 00791308
OF COUNSEL:                             raymort@austinlaw.com

Raja N. Saliba                          THE MORT LAW FIRM, PLLC
Michael R. Dzwonczyk                    100 Congress Ave, Suite 2200
Chidambaram S. Iyer                     Austin, Texas 78701
Mark Boland                             Tel/Fax: (512) 865-7950

SUGHRUE MION, PLLC                      ATTORNEYS FOR PLAINTIFF
2000 Pennsylvania Ave., NW              TOPIA TECHNOLOGY, INC.
Washington, DC 20037
(202) 293-7060
mboland@sughrue.com
rsaliba@sughrue.com
mdzwonczyk@sughrue.com
ciyer@sughrue.com

S 44   (Rev. 06/17)

# CIVIL COVER SHEET

The  S 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the  udicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)

## I.  PLAINTIFFS

Topia Technology, Inc.

County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

Attorneys (Firm Name, Address, and Telephone Number)
The Mort Law Firm, PLLC
100 Congress Ave, Suite 2000, Austin, TX 78701
(512) 865-7950

## DEFENDANTS

Box, Inc., Sailpoint Technologies Holdings, Inc., and Vistra Corp.

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
        Plaintiff

☒ 3  Federal Question
        (U.S. Government Not a Party)

☐ 2  U.S. Government
        Defendant

☐ 4  Diversity
        (Indicate Citizenship of Parties in Item III)

## III. CITI ENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                  and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT (Place an "X" in One Box Only)

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE PENALTY | BAN RUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |         Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument |         Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel |         Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|         Enforcement of udgment |         Slander |         Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |         Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |         Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|         Student Loans | ☐ 340 Marine |         Injury Product | |         New Drug Application | ☐ 470 Racketeer Influenced and |
|         (Excludes Veterans) | ☐ 345 Marine Product |         Liability | | ☐ 840 Trademark |         Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |         Liability | **PERSONAL PROPERTY** | | **LABOR** | ☐ 480 Consumer Credit |
|         of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395fi) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract |         Product Liability | ☐ 380 Other Personal | |         Act | ☐ 862 Black Lung (923) |         Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |         Property Damage | | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |         Injury | ☐ 385 Property Damage | |         Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - |         Product Liability | | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| |         Medical Malpractice | | | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | |         Leave Act | |         Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **H      C r** | | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease   Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | |         Income Security Act |         or Defendant) |         Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ |         Sentence | | | ☐ 871 IRS   Third Party |         Agency Decision |
| ☐ 245 Tort Product Liability |         Accommodations | ☐ 530 General | | |         26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | | **IMMIGRATION** | |         State Statutes |
| |         Employment | **O     r** | | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus    Other | | ☐ 465 Other Immigration | | |
| |         Other | ☐ 550 Civil Rights | |         Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | | |
| | | ☐ 560 Civil Detainee - | | | | |
| | |         Conditions of | | | | |
| | |         Confinement | | | | |

## V.  ORIGIN (Place an "X" in One Box Only)

☒ 1  Original
        Proceeding

☐ 2  Removed from
        State Court

☐ 3  Remanded from
        Appellate Court

☐ 4  Reinstated or
        Reopened

☐ 5  Transferred from
        Another District
        (specify)

☐ 6  Multidistrict
        Litigation -
        Transfer

☐ 8  Multidistrict
        Litigation -
        Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
35 U.S.C. § 1 et seq.
Brief description of cause:
Patent Infringement

## VII. RE UESTED IN
## COMPLAINT

☐ CHEC    IF THIS IS A CLASS ACTION
        UNDER RULE 23, F.R.Cv.P.

DEMAND

CHEC   YES only if demanded in complaint:
JURY DEMAND     ☒ Yes   ☐ No

## VIII. RELATED CASE S
## IF ANY

(See instructions):

UDGE _____     DOC ET NUMBER _____

DATE
December 29, 2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ Raymond W. Mort, III

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   UDGE _____   MAG. UDGE _____

# EXHIBIT 1

US009143561B2

(12) **United States Patent**
Manzano

(10) Patent No.: **US 9,143,561 B2**
(45) Date of Patent: *Sep. 22, 2015

(54) **ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK**

(75) Inventor: **Michael R. Manzano**, Seattle, WA (US)

(73) Assignee: **TOPIA TECHNOLOGY, INC.**, Tacoma, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 860 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/267,852**

(22) Filed: **Nov. 10, 2008**

(65) **Prior Publication Data**

US 2009/0138528 A1     May 28, 2009

**Related U.S. Application Data**

(60) Provisional application No. 60/986,896, filed on Nov. 9, 2007.

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 17/00* | (2006.01) |
| *G06F 17/30* | (2006.01) |
(Continued)

(52) **U.S. Cl.**
CPC ............ *H04L 67/1095* (2013.01); *G06F 15/16* (2013.01); *G06F 17/30* (2013.01); *G06F 17/30174* (2013.01)

(58) **Field of Classification Search**
CPC .......... G06F 17/00; G06F 17/30; G06F 15/16
USPC ......... 707/608–609, 638, 657, 695, 806, 818, 707/821–822, 825; 709/203, 206; 715/229
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,600,834 A | * | 2/1997 | Howard | ..................... 713/178 |
| 5,806,078 A | * | 9/1998 | Hug et al. | ................... 715/205 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | | 1130511 | * | 9/2001 |
| WO | WO 2007047302 | | * | 4/2007 |

OTHER PUBLICATIONS

U.S. Office Action dated Aug. 13, 2014 for U.S. Appl. No. 11/739,083.

*Primary Examiner* — Srirama Channavajjala
(74) *Attorney, Agent, or Firm* — Pillsbury Winthrop Shaw Pittman LLP

(57) **ABSTRACT**

A system includes a first application executable on a first electronic device. The system further includes a second application executable on a second electronic device in communication with the first electronic device. The second electronic device is configured to store a first electronic file. Subsequent to a user modifying the first electronic file, the second application is operable to automatically transfer the modified first electronic file, or a copy thereof, to the first electronic device. The system further includes a third application executable on a third electronic device in communication with the first electronic device. The third electronic device is configured to store a second electronic file. Subsequent to the user modifying the second electronic file, the third application is operable to automatically transfer the modified second electronic file, or a copy thereof, to the first electronic device. The first application is operable to automatically transfer the modified first electronic file or copy to the third electronic device, and automatically transfer the modified second electronic file or copy to the second electronic device.

**13 Claims, 3 Drawing Sheets**



## US 9,143,561 B2

Page 2

(51) **Int. Cl.**
**G06F 15/16** (2006.01)
**H04L 29/08** (2006.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,026,414 A * | 2/2000 | Anglin | ........................................ | 1/1 |
| 6,154,817 A * | 11/2000 | Mohan et al. | ................. | 711/162 |
| 6,260,069 B1 * | 7/2001 | Anglin | .......................... | 709/229 |
| 6,449,624 B1 * | 9/2002 | Hammack et al. | ..................... | 1/1 |
| 6,606,646 B2 * | 8/2003 | Feigenbaum | ................. | 709/203 |
| 7,024,428 B1 * | 4/2006 | Huang et al. | .......................... | 1/1 |
| 7,136,934 B2 * | 11/2006 | Carter et al. | .................. | 709/248 |
| 7,224,973 B2 * | 5/2007 | Tsutazawa et al. | .......... | 455/437 |
| 7,260,646 B1 | 8/2007 | Stefanik et al. | | |

| | | | | |
|---|---|---|---|---|
| 7,325,038 B1 | 1/2008 | Wang | | |
| 7,788,303 B2 * | 8/2010 | Mikesell et al. | ............... | 707/828 |
| 2002/0026478 A1 | 2/2002 | Rodgers et al. | | |
| 2002/0087588 A1 * | 7/2002 | McBride et al. | ............... | 707/204 |
| 2003/0028542 A1 * | 2/2003 | Muttik et al. | ................. | 707/100 |
| 2004/0093361 A1 * | 5/2004 | Therrien et al. | ............... | 707/204 |
| 2004/0107225 A1 * | 6/2004 | Rudoff | ......................... | 707/204 |
| 2004/0172424 A1 * | 9/2004 | Edelstein et al. | ............... | 707/201 |
| 2005/0091316 A1 | 4/2005 | Ponce et al. | | |
| 2006/0010150 A1 * | 1/2006 | Shaath et al. | ............... | 707/102 |
| 2007/0027936 A1 * | 2/2007 | Stakutis et al. | ............... | 707/204 |
| 2007/0100913 A1 * | 5/2007 | Sumner et al. | ............... | 707/204 |
| 2007/0180084 A1 | 8/2007 | Mohanty | | |
| 2008/0005114 A1 * | 1/2008 | Li | ..................................... | 707/9 |
| 2013/0226871 A1 * | 8/2013 | Sarnowski | ................... | 707/637 |

* cited by examiner



FIG. 1



FIG. 2



FIG. 3

US 9,143,561 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority to U.S. Provisional Appl. No. 60/986,896 entitled "ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK" and filed Nov. 9, 2007, which is hereby incorporated by reference in its entirety.

## FIELD OF THE INVENTION

This invention relates generally to computer-implemented processes and, more specifically, to sharing of electronic files among electronic devices.

## BACKGROUND OF THE INVENTION

Users of modern computing systems are increasingly finding themselves in constantly-connected, high-speed networked environments. The Web continues to be a killer application, second only to email, on the Internet. Further, customers are increasingly using more than one computing device; a customer may have a desktop computer at home, one at work, and a constantly connected "smart phone". Due to the confluence of these two trends, file management across these devices has become a problem.

Although modern devices are easily connected, they do not provide the customer a seamless environment; the customer must manually handle many aspects of that connection. With regards to file management, customers must manually move files between their devices using some protocol like email, ftp, or by posting them on the Web. These practices lead to problems that include:

The proliferation of redundant file copies. This proliferation creates a confusing environment where the customer is unclear where the "official" or newest version of a file exists.

The creation of an error-prone environment. Some documents, such as those associated with word processing and desktop publishing, externally reference other files. Copying such a document can break these references causing errors that the customer has to handle manually. An example of such a document is a desktop publishing document that contains a reference to an image. If that image file is not transferred along with the desktop publishing file, the image will appear as a broken link.

Unnecessary complexity. Because devices tend to have their own filing system, customers must manage a different filing model on each of his devices. For example, instead of having a single "Movies" folder, he may have to deal with many "Movies" folders, which may be in different locations on each of his devices. Each device may also have its own security model, further complicating the matter.

That a customer has to manually move files around to ensure their accessibility on his devices is unnecessary, and is an indicator of a lack of customer-focused design in modern file systems. File systems in use today are direct offspring of systems used when graphical customer interfaces were non-existent. Modern file system customer interfaces, such as Windows® Explorer and Mac OS X's Finder are just now starting to provide experiences that are more in line to a customer's workflow. Whereas, before, these interfaces were concerned with representing files with abstracted icons, the file's actual contents are becoming paramount in how files are organized and presented.

Problems still exist with how these newer customer interfaces are implemented. They are not completely integrated with applications, suffer from performance problems, and do not generally work well outside of a device's local file system.

There are several solutions to this problem that are in one way or another inadequate to the task:

Remote Desktop software allows a customer to remotely "see" his desktop. Remote desktop software screen-scrapes a remote machine's screen (a "server") and displays it on a screen local to the customer (a "client"). Remote desktop gives a customer access to not only his files, but also to his applications. However, this approach requires that the host machine be turned on and connected to the internet at all times. Consequently, this approach would not be appropriate for mobile hosts such as laptops. Remote desktop does not use the resources of a local machine. For full accessibility, the customer would have to keep all files and application on the host machine as any files stored on a client are not guaranteed to be accessible.

Distributed File Systems, like remote desktop software, place data on an always-connected host machine. Unlike remote desktop software, the host machine is not one on which the customer performs computing tasks. The host machine is used as a storage mechanism, and any computation performed on that machine serves to supports its use as such. Distributed file systems generally provide the right functionality for customers to share files between their devices. However, distributed file systems are usually deployed as a shared resource; that is, other customers have access to it. Because of this sharing, a customer's files may be buried deep in a filing structure, and it may not always be immediately evident to customers what kind of access they have to a particular file. Further, to use a distributed file system, the customer must always be connected to it. Files stored on a distributed file system are generally inaccessible if the customer's machine is not connected to it, unless the customer has copied or moved the files to his machine's local hard drive. However, doing so immediately creates the problem of having two filing systems for the same file, creating a mental burden on the customer.

Additionally, accessing a file located on a distributed file system tends to be slower than accessing files on the local hard drive. Modern applications are usually written to assume that the files they access are located locally, and thus are not optimized to access remote files. When these applications are used with remote files, they can lose performance by an order of magnitude. This problem can be fixed by automatically caching often-used files on the local file system, and only synchronizing them when they have been changed. However, this separate synchronization step introduces another problem: because the synchronization process can be lengthy, the customer is never entirely sure if the file he is remotely accessing is the latest version of the file, versus an earlier one that has been marked to be updated. Further, the directory may not reflect the existence of the file at all until synchronization finishes.

FTP is similar to a distributed file system with regards to files being hosted on a remote server. However FTP generally does manifest as a "disk drive" on the customer's desktop; the customer must use special FTP client software to access an FTP server. It shares the same problem as distributed file systems, with the additional problem of weak integration with applications. Applications can generally write and read files directly to and from a distributed file system. This is not the

US 9,143,561 B2

3

case with FTP, as the customer has to manually use the client software to perform these operations as a separate task.

Email was originally invented for messaging. From the beginning, the model it employs to make files accessible remotely is necessarily inefficient. Email's model for making files accessible is in the form of an email "attachment". Attachments are so named because they piggy-back on a message sent from one customer to another. A customer can make a file remotely available using email by attaching the file to an email and sending it to himself. He can then retrieve the file from a remote location by accessing the message on the email server. Email used in this way is even worse than FTP as the process is even more manual: a customer must find the message containing the file before he can even access it. Further, the location in which the attachment lives is read only. If the customer, for example, were to open the file, change it, then save it back out, the results would be ambiguous to the user because the email application, not the user, specified its location. Thus, the saved file would end up buried in an email file cache in an undisclosed area of the file system.

Flash Drives and External Disk Drives, although seemingly the most "primitive" way to ensure file availability, avoid all the problems related to network latency. However, these devices must be physically connected to the computer on which the files will be accessed. These restrictions preclude the customer from employing several effective workflows including: using more than one computer to complete a single task (the files can only be accessed on one computer) and setting up an automated backup (the computer running the backup can't guarantee that the storage device will be connected come backup time). Further, to ensure full availability of the files, the customer must carry the device with them at all times, and must follow the associated protocols for mounting and dismounting the device.

Other problems with the prior art not described above can also be overcome using the teachings of embodiments of the present invention, as would be readily apparent to one of ordinary skill in the art after reading this disclosure.

SUMMARY OF THE INVENTION

In an embodiment, a system includes a first application executable on a first electronic device. The system further includes a second application executable on a second electronic device in communication with the first electronic device. The second electronic device is configured to store a first electronic file. Subsequent to a user modifying the first electronic file, the second application is operable to automatically transfer the modified first electronic file, or a copy thereof, to the first electronic device. The system further includes a third application executable on a third electronic device in communication with the first electronic device. The third electronic device is configured to store a second electronic file. Subsequent to the user modifying the second electronic file, the third application is operable to automatically transfer the modified second electronic file, or a copy thereof, to the first electronic device. The first application is operable to automatically transfer the modified first electronic file or copy to the third electronic device, and automatically transfer the modified second electronic file or copy to the second electronic device.

BRIEF DESCRIPTION OF THE DRAWING

Preferred and alternative embodiments of the present invention are described in detail below with reference to the following drawings.

4

FIG. 1 is a schematic view of an exemplary operating environment in which an embodiment of the invention can be implemented;

FIG. 2 is a functional block diagram of an exemplary operating environment in which an embodiment of the invention can be implemented; and

FIG. 3 is a functional block diagram illustrating file sharing and/or synchronization according to an embodiment of the invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

An embodiment of the invention leverages remote programming concepts by utilizing processes called mobile agents (sometimes referred to as mobile objects or agent objects). Generally speaking, these concepts provide the ability for an object (the mobile agent object) existing on a first ("host") computer system to transplant itself to a second ("remote host") computer system while preserving its current execution state. The operation of a mobile agent object is described briefly below.

The instructions of the mobile agent object, its preserved execution state, and other objects owned by the mobile agent object are packaged, or "encoded," to generate a string of data that is configured so that the string of data can be transported by all standard means of communication over a computer network. Once transported to the remote host, the string of data is decoded to generate a computer process, still called the mobile agent object, within the remote host system. The decoded mobile agent object includes those objects encoded as described above and remains in its preserved execution state. The remote host computer system resumes execution of the mobile agent object which is now operating in the remote host environment.

While now operating in the new environment, the instructions of the mobile agent object are executed by the remote host to perform operations of any complexity, including defining, creating, and manipulating data objects and interacting with other remote host computer objects.

File transfer and/or synchronization, according to an embodiment, may be accomplished using some or all of the concepts described in commonly owned U.S. patent application Ser. No. 11/739,083, entitled "Electronic File Sharing," the entirety of which is incorporated by reference as if fully set forth herein.

FIG. 1 illustrates an example of a suitable computing system environment 100 in which one or more embodiments of the invention may be implemented. The computing system environment 100 is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality of the invention. Neither should the computing environment 100 be interpreted as having any dependency or requirement relating to any one or combination of components illustrated in the exemplary operating environment 100.

Embodiments of the invention are operational with numerous other general purpose or special purpose computing system environments or configurations. Examples of well known computing systems, environments, and/or configurations that may be suitable for use with the invention include, but are not limited to, personal computers, server computers, hand-held or laptop devices, multiprocessor systems, microprocessor-based systems, set top boxes, programmable consumer electronics, network PCs, minicomputers, mainframe computers, distributed computing environments that include any of the above systems or devices, and the like.

US 9,143,561 B2

5

Embodiments of the invention may be described in the general context of computer-executable instructions, such as program modules, being executed by a computer and/or by computer-readable media on which such instructions or modules can be stored. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types. The invention may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in both local and remote computer storage media including memory storage devices.

With reference to FIG. 1, an exemplary system for implementing the invention includes a general purpose computing device in the form of a computer 110. Components of computer 110 may include, but are not limited to, a processing unit 120, a system memory 130, and a system bus 121 that couples various system components including the system memory to the processing unit 120. The system bus 121 may be any of several types of bus structures including a memory bus or memory controller, a peripheral bus, and a local bus using any of a variety of bus architectures. By way of example, and not limitation, such architectures include Industry Standard Architecture (ISA) bus, Micro Channel Architecture (MCA) bus, Enhanced ISA (EISA) bus, Video Electronics Standards Association (VESA) local bus, and Peripheral Component Interconnect (PCI) bus also known as Mezzanine bus.

Computer 110 typically includes a variety of computer readable media. Computer readable media can be any available media that can be accessed by computer 110 and includes both volatile and nonvolatile media, removable and non-removable media. By way of example, and not limitation, computer readable media may comprise computer storage media and communication media. Computer storage media includes both volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules or other data. Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical disk storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can accessed by computer 110. Communication media typically embodies computer readable instructions, data structures, program modules or other data in a modulated data signal such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" means a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal. By way of example, and not limitation, communication media includes wired media such as a wired network or direct-wired connection, and wireless media such as acoustic, RF, infrared and other wireless media. Combinations of the any of the above should also be included within the scope of computer readable media.

The system memory 130 includes computer storage media in the form of volatile and/or nonvolatile memory such as read only memory (ROM) 131 and random access memory (RAM) 132. A basic input/output system 133 (BIOS), containing the basic routines that help to transfer information between elements within computer 110, such as during start-up, is typically stored in ROM 131. RAM 132 typically contains data and/or program modules that are immediately

6

accessible to and/or presently being operated on by processing unit 120. By way of example, and not limitation, FIG. 1 illustrates operating system 134, application programs 135, other program modules 136, and program data 137.

The computer 110 may also include other removable/non-removable, volatile/nonvolatile computer storage media. By way of example only, FIG. 1 illustrates a hard disk drive 140 that reads from or writes to non-removable, nonvolatile magnetic media, a magnetic disk drive 151 that reads from or writes to a removable, nonvolatile magnetic disk 152, and an optical disk drive 155 that reads from or writes to a removable, nonvolatile optical disk 156 such as a CD ROM or other optical media. Other removable/non-removable, volatile/nonvolatile computer storage media that can be used in the exemplary operating environment include, but are not limited to, magnetic tape cassettes, flash memory cards, digital versatile disks, digital video tape, solid state RAM, solid state ROM, and the like. The hard disk drive 141 is typically connected to the system bus 121 through a non-removable memory interface such as interface 140, and magnetic disk drive 151 and optical disk drive 155 are typically connected to the system bus 121 by a removable memory interface, such as interface 150.

The drives and their associated computer storage media discussed above and illustrated in FIG. 1, provide storage of computer readable instructions, data structures, program modules and other data for the computer 110. In FIG. 1, for example, hard disk drive 141 is illustrated as storing operating system 144, application programs 145, other program modules 146, and program data 147. Note that these components can either be the same as or different from operating system 134, application programs 135, other program modules 136, and program data 137. Operating system 144, application programs 145, other program modules 146, and program data 147 are given different numbers here to illustrate that, at a minimum, they are different copies. A user may enter commands and information into the computer 20 through input devices such as a keyboard 162 and pointing device 161, commonly referred to as a mouse, trackball or touch pad. Other input devices (not shown) may include a microphone, joystick, game pad, satellite dish, scanner, or the like. These and other input devices are often connected to the processing unit 120 through a user input interface 160 that is coupled to the system bus, but may be connected by other interface and bus structures, such as a parallel port, game port or a universal serial bus (USB). A monitor 191 or other type of display device is also connected to the system bus 121 via an interface, such as a video interface 190. In addition to the monitor, computers may also include other peripheral output devices such as speakers 197 and printer 196, which may be connected through an output peripheral interface 190.

The computer 110 may operate in a networked environment using logical connections to one or more remote computers, such as a remote computer 180. The remote computer 180 may be a personal computer, a server, a router, a network PC, a peer device or other common network node, and typically includes many or all of the elements described above relative to the computer 110, although only a memory storage device 181 has been illustrated in FIG. 1. The logical connections depicted in FIG. 1 include a local area network (LAN) 171 and a wide area network (WAN) 173, but may also include other networks. Such networking environments are commonplace in offices, enterprise-wide computer networks, intranets and the Internet.

When used in a LAN networking environment, the computer 110 is connected to the LAN 171 through a network interface or adapter 170. When used in a WAN networking

US 9,143,561 B2

7
8

environment, the computer **110** typically includes a modem **172** or other means for establishing communications over the WAN **173**, such as the Internet. The modem **172**, which may be internal or external, may be connected to the system bus **121** via the user input interface **160**, or other appropriate mechanism. In a networked environment, program modules depicted relative to the computer **110**, or portions thereof, may be stored in the remote memory storage device. By way of example, and not limitation, FIG. **1** illustrates remote application programs **185** as residing on memory device **181**. It will be appreciated that the network connections shown are exemplary and other means of establishing a communications link between the computers may be used.

Referring now to FIG. **2**, an embodiment of the present invention can be described in the context of an exemplary computer network system **200** as illustrated. System **200** includes electronic user devices **210**, **280**, such as personal computers or workstations, that are linked via a communication medium, such as a network **220** (e.g., the Internet), to an electronic device or system, such as a server **230**. The server **230** may further be coupled, or otherwise have access, to a database **240**, electronic storage **270** and a computer system **260**. Although the embodiment illustrated in FIG. **2** includes one server **230** coupled to two user devices **210**, **280** via the network **220**, it should be recognized that embodiments of the invention may be implemented using two or more such user devices coupled to one or more such servers.

In an embodiment, each of the user devices **210**, **280** and server **230** may include all or fewer than all of the features associated with the computer **110** illustrated in and discussed with reference to FIG. **1**. User devices **210**, **280** include or are otherwise coupled to a computer screen or display **250**, **290**, respectively. User devices **210**, **280** can be used for various purposes including both network- and local-computing processes.

The user devices **210**, **280** are linked via the network **220** to server **230** so that computer programs, such as, for example, a browser or other applications, running on one or more of the user devices **210**, **280** can cooperate in two-way communication with server **230** and one or more applications running on server **230**. Server **230** may be coupled to database **240** and/or electronic storage **270** to retrieve information therefrom and to store information thereto. Additionally, the server **230** may be coupled to the computer system **260** in a manner allowing the server to delegate certain processing functions to the computer system.

Referring now to FIG. **3**, illustrated is functionality of an embodiment of the invention allowing a user (not shown) who owns or otherwise controls devices **210**, **280** to automatically maintain file synchronization between at least devices **210**, **280**, or any other user devices on which principles of the present invention are implemented. In an embodiment, an administrator (not shown) of the server **230** or other appropriate electronic device transfers a file-transfer and/or synchronization application to the user devices **210**, **280** for installation thereon. Once installed on the user devices **210**, **280**, the file-transfer application provides file-transfer clients **310**, **320** executable by the user devices **210**, **280**, respectively. Each of the file-transfer clients **310**, **320** may, but need not, include a respective mobile-agent runtime environment **330**, **340**. The mobile-agent runtime environment **330**, **340** include portions of memory of the user devices **210**, **280** dedicated to allowing a mobile object the ability to perform operations that the mobile object is programmed to carry out. Also included in the file-transfer application are user interfaces **350**, **360** that are displayable on the displays **250**, **290**, respectively. In an embodiment, the interfaces **350**, **360** allow

a user to view, access and/or organize files to be synched among the various user devices.

Generally, all files that the user desires to be synched or shared may at some point be uploaded by one or more of the user devices **210**, **280** and stored in storage **270**. Upon receiving the files to be synched, the server **230** can store such files in the storage **270** and/or transfer the files to one or more of the respective hard drives of the user devices **210**, **280**, thereby enabling each respective user device to access such files. In this manner, the server **230** is operable to treat each hard drive of the respective user devices **210**, **280** as a local document cache for files received by the server. Typically, the server **230** will store one or more of the received files to the storage **270** only if the destination user device is offline or otherwise temporarily not in communication with the server **230**. Upon resuming communication with the destination user device, the server **230** will transfer the temporarily stored files to the destination device.

In operation, according to an embodiment, the user may open and modify a file **370**, such as a word-processing document or other electronic file. Alternatively, the user may create a first instance of the file **370**. The user may have previously have associated, or may now associate, the file **370** with the transfer client **310**. Upon a predetermined and user-configurable triggering event, the transfer client **310** transfers the modified file **370**, or a copy of the modified file, to the server **230**. Such a triggering event may include, but be not limited to, the user saving the file, the elapsing of a predetermined amount of time during which the file has been opened, or the re-initiation of a communication session between the device **210** and the server **230**.

The file **370** is transferred to the server **230** on which is executing a synchronization application **380**, which may include a mobile-agent runtime environment. Through user configuration, the synch application **380** monitors a set of user devices to which the file **370** should be transferred to effect file synchronization. In the illustrated embodiment, this set of user devices includes the user device **280**. The synch application **380** polls the device **280** to determine whether the device **280** is in communication with the server **230**. If the device **280** is in communication with the server **230**, the synch application **380** transfers the file **370** to the device **280**, whereupon the transfer client **320** resident on the device **280** replaces the previous version of the file **370**, previously cached on the device **280**, with the latest version of the file **370** modified on the user device **210**. If the device **280** is not currently in communication with the server **230**, the synch application **380** may store the file **370** in the storage **270** until such time as communication between the device **280** and server **230** is reestablished. As illustrated in FIG. **3**, a similar reverse-direction synchronization process may be performed by the synch application **380** and the transfer clients **310**, **320** with regard to a file **315** modified on device **280** and synchronized to device **210**.

In an embodiment, the user interfaces **350**, **360** may include a list of the customer's documents and related metadata, as well as any one-to-one or one-to-many relationships between the documents and metadata. An embodiment can always provide customers with an accurate "picture" of their document collection, regardless of whether their devices physically contain the documents. As alluded to earlier, a problem with distributed file systems and FTP is the latency between a file being put onto a file system and it showing up on a remote machine. To prevent this problem, an embodiment directory is decoupled from the movement of files. An embodiment's directory update system updates at a higher priority than the documents to be synchronized. This feature

US 9,143,561 B2

9 | 10

ensures that when a customer browses or searches through his set of documents, they appear even if they have not yet been cached locally on the user device. An indicator signifying a document's availability may be prominently displayed adjacent to the document's representation so that customers are aware of the document's availability.

An embodiment may include a stand-alone application that allows customers to find and manage documents associated with transfer clients **310**, **320** by visualizing relationships between documents and their metadata. It allows customers to tag documents with any number of identifiers. Customers can relate both documents and tags with each other in any number of user-specified one-to-one and one-to-many relationships, and an embodiment provides a user interface to browse and search on these relationships. To mitigate the customers' learning curve, an embodiment can implement relationships common to contemporary file systems, including a folder hierarchy. In addition to this, an embodiment provides direct support for methods that the customer uses to organize documents by manifesting them as user interface idioms. This is unlike conventional document filing systems which require the customer to work within a strict folder metaphor for organization.

Some alternate methods that an embodiment supports for organizing documents include:

Allow customers to organize their documents by application. Many times customers remember the application used to create a document instead of the document's name or its location in a hierarchy.

Allow customers to organize their documents by most recent access. Customers are likely to access a document they've accessed in the near past. Usually, such documents are part of a task that the customer is actively working.

Allow customers to organize their documents by project or subproject.

Allow customers to organize their documents by people. Many times, especially in the context of a collaboration, a document is directly related to one or more people other than the customer.

Allow the customer to organize their document by process stage. Documents may represent one or more stages of a process. Customers need a method for organizing documents by process stage, and a mechanism for moving the document through a set of predefined stages.

Allow customers to organize their documents by any of the aforementioned methods concurrently. These organization methods are not mutually exclusive.

An embodiment presents an interface that allows a customer to locate one or more documents associated with the transfer clients **310**, **320** and open such document into a separate software application. Since this interface is intended to be used from within the separate application, that application may need to know how to invoke such interface. Advantageously, this invocation behavior can be provided to the application using the application's plug-in API.

An embodiment presents an interface that allows a customer to synchronize a currently opened document according to processes described elsewhere herein. This interface can be invoked within an application and can be made available to the application in the manner described above in connection with the application's plug-in API.

Some files associated with the transfer clients **310**, **320** are dependent on other files associated with the transfer clients **310**, **320**. For example, a desktop publishing document may include images that are stored in files separate from the main document. Previous file-synching solutions treat these files as

separate. Because of this, for example, a document synchronized from the device **210** to the device **280** may be opened by the user of the device **280** before the image files have been fully transferred to the device **280**. This causes the document to fail to open, or break, since the image files don't exist or are incomplete. An embodiment prevents this by: (1) always ensuring the file catalog (e.g., the stand-alone application that allows customers to find and manage documents associated with transfer clients **310**, **320**, as discussed above herein) is synchronized before any file data is synchronized, and (2) pausing any file access by any program until the file contents have been fully synchronized. In such an embodiment, if a user attempts, using a software program, to open a file whose related files haven't yet finished transferring to the local (hard drive) cache, if that software attempts to open the related files, the software program is blocked by an embodiment until the requested files are downloaded and ready to access.

Other file sending and synchronizing software requires the user to upload their data to a storage device owned by the operator of the service. An embodiment treats storage as a participant in the synchronization process; this means that the user can choose the service or device where their files will be stored. The file transfer/synching is abstracted from the storage system allowing any storage to be used. An embodiment treats storage like any other synch target, such as a desktop computer, or a cell phone. As such, any device owned or otherwise controlled by the user and running a synch application, such as synch application **380**, as provided in an embodiment of the invention can perform the storage and/or synching functions described elsewhere herein. That is, the user device **280** or user device **210**, rather than the server **230**, may perform such functions.

While a preferred embodiment of the invention has been illustrated and described, as noted above, many changes can be made without departing from the spirit and scope of the invention. For example, as an alternative to the approach described with reference to FIG. **3**, wherein the transfer clients **310**, **320** function to "push" modified or created files to the synch application **380**, the synch application **380** may instead function to periodically "pull" or otherwise actively retrieve such files from the transfer clients **310**, **320** Instead, the invention should be determined entirely by reference to the claims that follow.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

**1**. A system, comprising:

a first electronic device configured to selectively execute a first application, the first electronic device being in communication with a second electronic device and a third electronic device, each associated with a user wherein the first electronic device is configured to:

receive from a second application executable on the second electronic device a copy of a first electronic file automatically transferred from the second application when the user modifies a content of the first electronic file; and

wherein the first electronic device is further configured to receive from a third application executable on the third electronic device a copy of a second electronic file automatically transferred from the third application when the user modifies a content of the second electronic file; and

wherein the first application is further configured to automatically transfer the modified first electronic file copy to the third electronic device to replace an older version of the first electronic file stored on the third electronic device with the modified first electronic file copy having the content modified by the user; and

US 9,143,561 B2

11

automatically transfer the modified second electronic file copy to the second electronic device to replace an older version of the second electronic file stored on the second electronic device with the modified second electronic file copy having the content modified by the user;

wherein the second application automatically transfers the copy of the modified first electronic file to the first electronic device upon determining that a save operation has been performed on the modified first electronic file.

**2**. The system of claim **1** wherein at least one of the second and third applications comprises a runtime environment for mobile-agent objects.

**3**. The system of claim **1** wherein the first application is configured to store the modified first electronic file copy to a memory device associated with the first electronic device.

**4**. The system of claim **3**, wherein the first application is configured to store the modified first electronic file copy to the memory device associated with the first electronic device when the third electronic device is not in communication with the first electronic device.

**5**. The system of claim **1** wherein the second application is operable to create a first mobile object, the first mobile object being operable to create a proxy object at the first electronic device.

**6**. The system of claim **5** wherein the first mobile object is operable to provide the copy of the modified first electronic file to the proxy object.

**7**. The system of claim **6** wherein the proxy object is operable to store the copy of the modified first electronic file in a storage device coupled to the first electronic device.

**8**. A method implementable in an electronic system having a storage component, the electronic system being coupled to a first electronic device having stored thereon a first electronic file and a second electronic device having stored thereon a second electronic file, the first electronic device and the second electronic device each being associated with a user, the method comprising:

receiving from the first electronic device a copy of a first electronic file modified by the user, the copy of the modified first electronic file being automatically pro-

12

vided to the electronic system by the first electronic device when a content of the first electronic file is modified by the user;

receiving from the second electronic device a copy of a second electronic file modified by the user, the copy of the modified second electronic file being automatically provided to the electronic system by the second electronic device when a content of the second electronic file is modified by the user;

automatically transferring the modified first electronic file copy to the second electronic device to replace an older version of the first electronic file stored on the second electronic device with the modified first electronic file copy having the content modified by the user; and

automatically transferring the modified second electronic file copy to the first electronic device to replace an older version of the second electronic file stored on the first electronic device with the modified second electronic file copy having the content modified by the user;

wherein the first electronic device automatically transfers the copy of the modified first electronic file to the electronic system upon determining that a save operation has been performed on the modified first electronic file.

**9**. The method of claim **8** wherein at least one of the first and second electronic devices includes a runtime environment for mobile-agent objects.

**10**. The method of claim **8**, wherein the electronic system is configured to store the modified first electronic file copy to the storage component.

**11**. The method of claim **10** wherein the electronic system is configured to store the modified first electronic file copy to the storage component when the second electronic device is not in communication with the electronic system.

**12**. The method of claim **8** wherein the first electronic device is operable to create a first mobile object, the first mobile object being operable to create a proxy object at the electronic system.

**13**. The method of claim **12** wherein the first mobile object is operable to provide the copy of the modified first electronic file to the proxy object.

\* \* \* \* \*

# EXHIBIT 2

US010067942B2

(12) **United States Patent**
Manzano

(10) Patent No.: **US 10,067,942 B2**
(45) Date of Patent: *Sep. 4, 2018

(54) **ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK**

(71) Applicant: **Topia Technology, Inc.**, Tacoma, WA (US)

(72) Inventor: **Michael R. Manzano**, Seattle, WA (US)

(73) Assignee: **TOPIA TECHNOLOGY**, Tacoma, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 345 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/860,289**

(22) Filed: **Sep. 21, 2015**

(65) **Prior Publication Data**

US 2016/0012067 A1        Jan. 14, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 12/267,852, filed on Nov. 10, 2008, now Pat. No. 9,143,561.

(Continued)

(51) **Int. Cl.**
*G06F 17/30* (2006.01)
*G06F 15/16* (2006.01)
*H04L 29/08* (2006.01)

(52) **U.S. Cl.**
CPC ........ *G06F 17/30082* (2013.01); *G06F 15/16* (2013.01); *G06F 17/30* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .. G06F 17/30; G06F 17/132; G06F 17/30017; G06F 17/30067; G06F 17/3007;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,600,834 A        2/1997  Howard
5,806,078 A  *  9/1998  Hug ................... G06F 17/2288
707/999.202

(Continued)

FOREIGN PATENT DOCUMENTS

EP              1130511            9/2001
WO        WO 98/56149      * 12/1998
WO        WO 2007047302        4/2007

OTHER PUBLICATIONS

U.S. Office Action dated Aug. 13, 2014 for U.S. Appl. No. 11/739,083.

(Continued)

*Primary Examiner* — Srirama Channavajjala
(74) *Attorney, Agent, or Firm* — Pillsbury Winthrop Shaw Pittman LLP

(57)        **ABSTRACT**

A system includes a first application executable on a first electronic device. The system further includes a second application executable on a second electronic device in communication with the first electronic device. The second electronic device is configured to store a first electronic file. Subsequent to a user modifying the first electronic file, the second application is operable to automatically transfer the modified first electronic file, or a copy thereof, to the first electronic device. The system further includes a third application executable on a third electronic device in communication with the first electronic device. The third electronic device is configured to store a second electronic file. Subsequent to the user modifying the second electronic file, the third application is operable to automatically transfer the modified second electronic file, or a copy thereof, to the first electronic device. The first application is operable to automatically transfer the modified first electronic file or copy to the third electronic device, and automatically transfer the

(Continued)





# US 10,067,942 B2

Page 2

modified second electronic file or copy to the second electronic device.

**18 Claims, 3 Drawing Sheets**

## Related U.S. Application Data

(60) Provisional application No. 60/986,896, filed on Nov. 9, 2007.

(52) **U.S. Cl.**
CPC ...... *G06F 17/301* (2013.01); *G06F 17/30088* (2013.01); *G06F 17/30091* (2013.01); *G06F 17/30165* (2013.01); *G06F 17/30174* (2013.01); *H04L 67/1095* (2013.01)

(58) **Field of Classification Search**
CPC ............. G06F 17/3023; G06F 17/2288; G06F 17/30091; G06F 17/30176; G06F 17/30194; G06F 8/71; G06F 17/30082; G06F 17/30165; G06F 17/301; G06F 17/30174; G06F 17/30088
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,909,581 A * | 6/1999 | Park | G06F 8/65 717/170 |
| 6,026,414 A | 2/2000 | Anglin | |
| 6,154,817 A | 11/2000 | Mohan et al. | |
| 6,260,069 B1 | 7/2001 | Anglin | |
| 6,449,624 B1 | 9/2002 | Hammack et al. | |
| 6,463,463 B1 | 10/2002 | Godfrey et al. | |
| 6,504,994 B2 | 1/2003 | Kawamura et al. | |
| 6,505,200 B1 | 1/2003 | Ims et al. | |
| 6,606,646 B2 | 8/2003 | Feigenbaum | |
| 6,611,849 B1 | 8/2003 | Raff et al. | |
| 6,671,700 B1 | 12/2003 | Creemer et al. | |
| 6,708,221 B1 | 3/2004 | Mendez et al. | |
| 6,757,696 B2 | 6/2004 | Multer et al. | |
| 6,760,759 B1 | 7/2004 | Chan | |
| 6,810,405 B1 | 10/2004 | Larue et al. | |
| 6,829,622 B2 | 12/2004 | Beyda | |
| 6,874,037 B1 | 3/2005 | Abram et al. | |
| 6,931,454 B2 | 8/2005 | Deshpande et al. | |
| 6,990,522 B2 | 1/2006 | Wu | |
| 7,024,428 B1 | 4/2006 | Huang et al. | |
| 7,054,594 B2 | 5/2006 | Bloch et al. | |
| 7,065,658 B1 | 6/2006 | Baraban et al. | |
| 7,089,307 B2 | 8/2006 | Zintel et al. | |
| 7,136,934 B2 | 11/2006 | Carter et al. | |
| 7,155,488 B1 | 12/2006 | Lunsford et al. | |
| 7,224,973 B2 | 5/2007 | Tsutazawa et al. | |
| 7,243,163 B1 | 7/2007 | Friend et al. | |
| 7,260,646 B1 | 8/2007 | Stefanik et al. | |
| 7,269,433 B2 | 9/2007 | Vargas et al. | |
| 7,290,244 B2 | 10/2007 | Peck et al. | |
| 7,325,038 B1 | 1/2008 | Wang | |
| 7,340,534 B2 | 3/2008 | Cameron et al. | |
| 7,398,327 B2 | 7/2008 | Lee | |
| 7,415,615 B2 | 8/2008 | Skygebjer | |
| 7,457,631 B2 | 11/2008 | Yach et al. | |
| 7,467,353 B2 | 12/2008 | Kurlander et al. | |
| 7,483,925 B2 | 1/2009 | Koskimies et al. | |
| 7,526,575 B2 | 4/2009 | Rabbers et al. | |
| 7,574,711 B2 | 8/2009 | Zondervan et al. | |
| 7,584,186 B2 | 9/2009 | Chen et al. | |
| 7,587,446 B1 | 9/2009 | Onyon et al. | |
| 7,613,773 B2 | 11/2009 | Watt | |
| 7,639,116 B2 | 12/2009 | Saunders | |
| 7,657,271 B2 | 2/2010 | Kim | |
| 7,680,885 B2 | 3/2010 | Schauser et al. | |
| 7,752,166 B2 | 7/2010 | Quinlan et al. | |
| 7,761,414 B2 | 7/2010 | Freedman | |
| 7,788,303 B2 | 8/2010 | Mikesell et al. | |
| 7,895,334 B1 | 2/2011 | Tu et al. | |
| 7,987,420 B1 | 7/2011 | Kloba et al. | |
| 8,009,966 B2 | 8/2011 | Bloom et al. | |
| 8,112,549 B2 | 2/2012 | Srinivasan et al. | |
| 8,244,288 B2 | 8/2012 | Chipchase | |
| 8,321,534 B1 | 11/2012 | Roskind et al. | |
| 8,370,423 B2 | 2/2013 | Ozzie et al. | |
| 8,386,558 B2 | 2/2013 | Schleifer et al. | |
| 9,143,561 B2 * | 9/2015 | Manzano | G06F 17/30174 |
| 2002/0026478 A1 | 2/2002 | Rodgers et al. | |
| 2002/0035697 A1 * | 3/2002 | McCurdy | G06F 17/30011 726/3 |
| 2002/0087588 A1 | 7/2002 | McBride et al. | |
| 2003/0028514 A1 * | 2/2003 | Lord | G06F 11/2064 |
| 2003/0028542 A1 | 2/2003 | Muttik et al. | |
| 2003/0038842 A1 | 2/2003 | Peck et al. | |
| 2003/0078946 A1 * | 4/2003 | Costello | G06F 11/2064 |
| 2003/0125057 A1 | 7/2003 | Pesola | |
| 2003/0135565 A1 | 7/2003 | Estrada | |
| 2004/0049345 A1 | 3/2004 | McDonough et al. | |
| 2004/0093361 A1 | 5/2004 | Therrien et al. | |
| 2004/0107225 A1 | 6/2004 | Rudoff | |
| 2004/0133629 A1 * | 7/2004 | Reynolds | G06F 17/30902 709/202 |
| 2004/0158817 A1 * | 8/2004 | Okachi | G06F 8/65 717/122 |
| 2004/0172424 A1 | 9/2004 | Edelstein et al. | |
| 2005/0091316 A1 | 4/2005 | Ponce et al. | |
| 2005/0097225 A1 | 5/2005 | Glatt et al. | |
| 2005/0220080 A1 | 10/2005 | Ronkainen et al. | |
| 2006/0010150 A1 | 1/2006 | Shaath et al. | |
| 2006/0058907 A1 | 3/2006 | Suderman | |
| 2006/0074868 A1 * | 4/2006 | Wolfish | G06Q 20/322 |
| 2006/0129627 A1 * | 6/2006 | Phillips | H04L 63/10 709/200 |
| 2006/0143129 A1 * | 6/2006 | Holm | G06F 8/61 705/52 |
| 2006/0168118 A1 * | 7/2006 | Godlin | G06F 17/30212 709/218 |
| 2006/0189348 A1 | 8/2006 | Montulli et al. | |
| 2007/0014314 A1 | 1/2007 | O'Neil | |
| 2007/0016629 A1 * | 1/2007 | Reinsch | G06F 8/71 |
| 2007/0027936 A1 * | 2/2007 | Stakutis | G06F 11/1451 |
| 2007/0100913 A1 | 5/2007 | Sumner et al. | |
| 2007/0180084 A1 * | 8/2007 | Mohanty | G06F 11/1451 709/223 |
| 2007/0191057 A1 | 8/2007 | Kamada | |
| 2007/0238440 A1 | 10/2007 | Sengupta et al. | |
| 2008/0005114 A1 * | 1/2008 | Li | G06F 17/30209 |
| 2008/0005280 A1 | 1/2008 | Adams | |
| 2008/0086494 A1 | 4/2008 | Heller et al. | |
| 2008/0168526 A1 | 7/2008 | Robbin et al. | |
| 2008/0288578 A1 | 11/2008 | Silfverberg | |
| 2009/0013009 A1 * | 1/2009 | Nakayama | G06F 11/1453 |
| 2009/0063711 A1 | 3/2009 | Finkelstein | |
| 2013/0226871 A1 | 8/2013 | Sarnowski | |

## OTHER PUBLICATIONS

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; < https://web.archive.org/web/20040804020435/http://www.foldershare.com:80/>; Aug. 4, 2004.
FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030808183932/http://www.foldershare.com:80/>; Aug. 8, 2003.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040814015727/http://www.foldershare.com:80/>; Aug. 14, 2004.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040820052105/http://www.foldershare.com:80/>; Aug. 20, 2004.

**US 10,067,942 B2**

Page 3

(56)    **References Cited**

OTHER PUBLICATIONS

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041211020957/http://foldershare.com :80/>; Dec. 11, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041217041726/http://foldershare.com:80/>; Dec. 17, 2004.

FolderShare; Your Smart File Transfer Solution; <https://web.archive.org/web/20031220151508/http://www.foldershare.com:80/>; Dec. 20, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041230211050/http://www.foldershare.com:80/>; Dec. 30, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040701113739/http://foldershare.com:80/>; Jul. 1, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040711062548/http://www.foldershare.com:80/>; Jul. 11, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030722054342/http://foldershare.com:80/>; Jul. 22, 2003.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040730030655/http://www.foldershare.com:80/>; Jul. 30, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040603205113/http://www.foldershare.com:80/>; Jun. 3, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040613161906/http://www.foldershare.com:80/>; Jun. 13, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040629075057/http://www.foldershare.com:80/>; Jun. 29, 2004.

FolderShare—Secure Remote Access VPN Solution; Your Smart File Transfer & Real-time File Mirroring Solution; <https://web.archive.org/web/20040316235151/http://foldershare.com:80/>; Mar. 16, 2004.

FolderShare—Secure Remote Access VPN Solution; Your Smart File Transfer & Real-time File Mirroring Solution; <https://web.archive.org/web/20040325034239/http://www.foldershare.com:80/>; Mar. 25, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040512211417/http://www.foldershare.com:80/>; May 12, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030531180252/http://www.foldershare.com:80/>; May 31, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?: <https://web.archive.org/web/20041104031510/http://www.foldershare.com:80/>; Nov. 4, 2004.

FolderShar—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041117092357/http://www.foldershare.com:80/>; Nov. 17, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041123085254/http://www.foldershare.com:80/>; Nov. 23, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20031128143634/http://foldershare.com:80/>; Nov. 28, 2003.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20031001071631/http://foldershare.com:80/>; Oct. 1, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041012083127/http://www.foldershare.com:80/>; Oct. 12, 2004.

FolderShare—Secure Remote Access VPM Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041029085820/http://www.foldershare.com:80/>; Oct. 29, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040901034646/http://www.foldershare.com:80/>; Sep. 1, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040909075254/http://www.foldershare.com:80/>; Sep. 9, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030920051943/http://www.foldershare.com:80/>; Sep. 20, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040924032146/http://www.foldershare.com:80/>; Sep. 24, 2004.

* cited by examiner



FIG. 1



FIG. 2



FIG. 3

US 10,067,942 B2

1

# ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/267,852, filed Nov. 10, 2008, which claims priority to U.S. Provisional Application No. 60/986,896 entitled "ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK" and filed Nov. 9, 2007, the contents of which are hereby incorporated by reference in their entirety.

## FIELD OF THE INVENTION

This invention relates generally to computer-implemented processes and, more specifically, to sharing of electronic files among electronic devices.

## BACKGROUND OF THE INVENTION

Users of modern computing systems are increasingly finding themselves in constantly-connected, high-speed networked environments. The Web continues to be a killer application, second only to email, on the Internet. Further, customers are increasingly using more than one computing device; a customer may have a desktop computer at home, one at work, and a constantly connected "smart phone". Due to the confluence of these two trends, file management across these devices has become a problem.

Although modern devices are easily connected, they do not provide the customer a seamless environment; the customer must manually handle many aspects of that connection. With regards to file management, customers must manually move files between their devices using some protocol like email, ftp, or by posting them on the Web. These practices lead to problems that include:

The proliferation of redundant file copies. This proliferation creates a confusing environment where the customer is unclear where the "official" or newest version of a file exists.

The creation of an error-prone environment. Some documents, such as those associated with word processing and desktop publishing, externally reference other files. Copying such a document can break these references causing errors that the customer has to handle manually. An example of such a document is a desktop publishing document that contains a reference to an image. If that image file is not transferred along with the desktop publishing file, the image will appear as a broken link.

Unnecessary complexity. Because devices tend to have their own filing system, customers must manage a different filing model on each of his devices. For example, instead of having a single "Movies" folder, he may have to deal with many "Movies" folders, which may be in different locations on each of his devices. Each device may also have its own security model, further complicating the matter.

That a customer has to manually move files around to ensure their accessibility on his devices is unnecessary, and is an indicator of a lack of customer-focused design in modern file systems. File systems in use today are direct offspring of systems used when graphical customer interfaces were nonexistent. Modern file system customer interfaces, such as Windows® Explorer and Mac OS X's Finder are just now starting to provide experiences that are more in line to a customer's workflow. Whereas, before, these interfaces were concerned with representing files with abstracted icons, the file's actual contents are becoming paramount in how files are organized and presented.

Problems still exist with how these newer customer interfaces are implemented. They are not completely integrated with applications, suffer from performance problems, and do not generally work well outside of a device's local file system.

There are several solutions to this problem that are in one way or another inadequate to the task:

Remote Desktop software allows a customer to remotely "see" his desktop. Remote desktop software screen-scrapes a remote machine's screen (a "server") and displays it on a screen local to the customer (a "client"). Remote desktop gives a customer access to not only his files, but also to his applications. However, this approach requires that the host machine be turned on and connected to the internet at all times. Consequently, this approach would not be appropriate for mobile hosts such as laptops. Remote desktop does not use the resources of a local machine. For full accessibility, the customer would have to keep all files and application on the host machine as any files stored on a client are not guaranteed to be accessible.

Distributed File Systems, like remote desktop software, place data on an always-connected host machine. Unlike remote desktop software, the host machine is not one on which the customer performs computing tasks. The host machine is used as a storage mechanism, and any computation performed on that machine serves to supports its use as such. Distributed file systems generally provide the right functionality for customers to share files between their devices. However, distributed file systems are usually deployed as a shared resource; that is, other customers have access to it. Because of this sharing, a customer's files may be buried deep in a filing structure, and it may not always be immediately evident to customers what kind of access they have to a particular file. Further, to use a distributed file system, the customer must always be connected to it. Files stored on a distributed file system are generally inaccessible if the customer's machine is not connected to it, unless the customer has copied or moved the files to his machine's local hard drive. However, doing so immediately creates the problem of having two filing systems for the same file, creating a mental burden on the customer.

Additionally, accessing a file located on a distributed file system tends to be slower than accessing files on the local hard drive. Modern applications are usually written to assume that the files they access are located locally, and thus are not optimized to access remote files. When these applications are used with remote files, they can lose performance by an order of magnitude. This problem can be fixed by automatically caching often-used files on the local file system, and only synchronizing them when they have been changed. However, this separate synchronization step introduces another problem: because the synchronization process can be lengthy, the customer is never entirely sure if the file he is remotely accessing is the latest version of the file, versus an earlier one that has been marked to be updated. Further, the directory may not reflect the existence of the file at all until synchronization finishes.

FTP is similar to a distributed file system with regards to files being hosted on a remote server. However FTP generally does manifest as a "disk drive" on the customer's desktop; the customer must use special FTP client software

US 10,067,942 B2

3

to access an FTP server. It shares the same problem as distributed file systems, with the additional problem of weak integration with applications. Applications can generally write and read files directly to and from a distributed file system. This is not the case with FTP, as the customer has to manually use the client software to perform these operations as a separate task.

Email was originally invented for messaging. From the beginning, the model it employs to make files accessible remotely is necessarily inefficient. Email's model for making files accessible is in the form of an email "attachment". Attachments are so named because they piggy-back on a message sent from one customer to another. A customer can make a file remotely available using email by attaching the file to an email and sending it to himself. He can then retrieve the file from a remote location by accessing the message on the email server. Email used in this way is even worse than FTP as the process is even more manual: a customer must find the message containing the file before he can even access it. Further, the location in which the attachment lives is read only. If the customer, for example, were to open the file, change it, then save it back out, the results would be ambiguous to the user because the email application, not the user, specified its location. Usually, the saved file would end up buried in an email file cache in an undisclosed area of the file system.

Flash Drives and External Disk Drives, although seemingly the most "primitive" way to ensure file availability, avoid all the problems related to network latency. However, these devices must be physically connected to the computer on which the files will be accessed. These restrictions preclude the customer from employing several effective work-flows including: using more than one computer to complete a single task (the files can only be accessed on one computer) and setting up an automated backup (the computer running the backup can't guarantee that the storage device will be connected come backup time). Further, to ensure full availability of the files, the customer must carry the device with them at all times, and must follow the associated protocols for mounting and dismounting the device.

Other problems with the prior art not described above can also be overcome using the teachings of embodiments of the present invention, as would be readily apparent to one of ordinary skill in the art after reading this disclosure.

SUMMARY OF THE INVENTION

In an embodiment, a system includes a first application executable on a first electronic device. The system further includes a second application executable on a second electronic device in communication with the first electronic device. The second electronic device is configured to store a first electronic file. Subsequent to a user modifying the first electronic file, the second application is operable to automatically transfer the modified first electronic file, or a copy thereof, to the first electronic device. The system further includes a third application executable on a third electronic device in communication with the first electronic device. The third electronic device is configured to store a second electronic file. Subsequent to the user modifying the second electronic file, the third application is operable to automatically transfer the modified second electronic file, or a copy thereof, to the first electronic device. The first application is operable to automatically transfer the modified first electronic file or copy to the third electronic device, and auto-

4

matically transfer the modified second electronic file or copy to the second electronic device.

BRIEF DESCRIPTION OF THE DRAWING

Preferred and alternative embodiments of the present invention are described in detail below with reference to the following drawings.

FIG. 1 is a schematic view of an exemplary operating environment in which an embodiment of the invention can be implemented;

FIG. 2 is a functional block diagram of an exemplary operating environment in which an embodiment of the invention can be implemented; and

FIG. 3 is a functional block diagram illustrating file sharing and/or synchronization according to an embodiment of the invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

An embodiment of the invention leverages remote programming concepts by utilizing processes called mobile agents (sometimes referred to as mobile objects or agent objects). Generally speaking, these concepts provide the ability for an object (the mobile agent object) existing on a first ("host") computer system to transplant itself to a second ("remote host") computer system while preserving its current execution state. The operation of a mobile agent object is described briefly below.

The instructions of the mobile agent object, its preserved execution state, and other objects owned by the mobile agent object are packaged, or "encoded," to generate a string of data that is configured so that the string of data can be transported by all standard means of communication over a computer network. Once transported to the remote host, the string of data is decoded to generate a computer process, still called the mobile agent object, within the remote host system. The decoded mobile agent object includes those objects encoded as described above and remains in its preserved execution state. The remote host computer system resumes execution of the mobile agent object which is now operating in the remote host environment.

While now operating in the new environment, the instructions of the mobile agent object are executed by the remote host to perform operations of any complexity, including defining, creating, and manipulating data objects and interacting with other remote host computer objects.

File transfer and/or synchronization, according to an embodiment, may be accomplished using some or all of the concepts described in commonly owned U.S. patent application Ser. No. 11/739,083, entitled "Electronic File Sharing," the entirety of which is incorporated by reference as if fully set forth herein.

FIG. 1 illustrates an example of a suitable computing system environment 100 in which one or more embodiments of the invention may be implemented. The computing system environment 100 is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality of the invention. Neither should the computing environment 100 be interpreted as having any dependency or requirement relating to any one or combination of components illustrated in the exemplary operating environment 100.

Embodiments of the invention are operational with numerous other general purpose or special purpose computing system environments or configurations. Examples of

5

well known computing systems, environments, and/or configurations that may be suitable for use with the invention include, but are not limited to, personal computers, server computers, hand-held or laptop devices, multiprocessor systems, microprocessor-based systems, set top boxes, programmable consumer electronics, network PCs, minicomputers, mainframe computers, distributed computing environments that include any of the above systems or devices, and the like.

Embodiments of the invention may be described in the general context of computer-executable instructions, such as program modules, being executed by a computer and/or by computer-readable media on which such instructions or modules can be stored. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types. The invention may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in both local and remote computer storage media including memory storage devices.

With reference to FIG. **1**, an exemplary system for implementing the invention includes a general purpose computing device in the form of a computer **110**. Components of computer **110** may include, but are not limited to, a processing unit **120**, a system memory **130**, and a system bus **121** that couples various system components including the system memory to the processing unit **120**. The system bus **121** may be any of several types of bus structures including a memory bus or memory controller, a peripheral bus, and a local bus using any of a variety of bus architectures. By way of example, and not limitation, such architectures include Industry Standard Architecture (ISA) bus, Micro Channel Architecture (MCA) bus, Enhanced ISA (EISA) bus, Video Electronics Standards Association (VESA) local bus, and Peripheral Component Interconnect (PCI) bus also known as Mezzanine bus.

Computer **110** typically includes a variety of computer readable media. Computer readable media can be any available media that can be accessed by computer **110** and includes both volatile and nonvolatile media, removable and non-removable media. By way of example, and not limitation, computer readable media may comprise computer storage media and communication media. Computer storage media includes both volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules or other data. Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical disk storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can accessed by computer **110**. Communication media typically embodies computer readable instructions, data structures, program modules or other data in a modulated data signal such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" means a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal. By way of example, and not limitation, communication media includes wired media such as a wired network or direct-wired connection, and wireless media such as

6

acoustic, RF, infrared and other wireless media. Combinations of the any of the above should also be included within the scope of computer readable media.

The system memory **130** includes computer storage media in the form of volatile and/or nonvolatile memory such as read only memory (ROM) **131** and random access memory (RAM) **132**. A basic input/output system **133** (BIOS), containing the basic routines that help to transfer information between elements within computer **110**, such as during start-up, is typically stored in ROM **131**. RAM **132** typically contains data and/or program modules that are immediately accessible to and/or presently being operated on by processing unit **120**. By way of example, and not limitation, FIG. **1** illustrates operating system **134**, application programs **135**, other program modules **136**, and program data **137**.

The computer **110** may also include other removable/non-removable, volatile/nonvolatile computer storage media. By way of example only, FIG. **1** illustrates a hard disk drive **140** that reads from or writes to non-removable, nonvolatile magnetic media, a magnetic disk drive **151** that reads from or writes to a removable, nonvolatile magnetic disk **152**, and an optical disk drive **155** that reads from or writes to a removable, nonvolatile optical disk **156** such as a CD ROM or other optical media. Other removable/non-removable, volatile/nonvolatile computer storage media that can be used in the exemplary operating environment include, but are not limited to, magnetic tape cassettes, flash memory cards, digital versatile disks, digital video tape, solid state RAM, solid state ROM, and the like. The hard disk drive **141** is typically connected to the system bus **121** through a non-removable memory interface such as interface **140**, and magnetic disk drive **151** and optical disk drive **155** are typically connected to the system bus **121** by a removable memory interface, such as interface **150**.

The drives and their associated computer storage media discussed above and illustrated in FIG. **1**, provide storage of computer readable instructions, data structures, program modules and other data for the computer **110**. In FIG. **1**, for example, hard disk drive **141** is illustrated as storing operating system **144**, application programs **145**, other program modules **146**, and program data **147**. Note that these components can either be the same as or different from operating system **134**, application programs **135**, other program modules **136**, and program data **137**. Operating system **144**, application programs **145**, other program modules **146**, and program data **147** are given different numbers here to illustrate that, at a minimum, they are different copies. A user may enter commands and information into the computer **20** through input devices such as a keyboard **162** and pointing device **161**, commonly referred to as a mouse, trackball or touch pad. Other input devices (not shown) may include a microphone, joystick, game pad, satellite dish, scanner, or the like. These and other input devices are often connected to the processing unit **120** through a user input interface **160** that is coupled to the system bus, but may be connected by other interface and bus structures, such as a parallel port, game port or a universal serial bus (USB). A monitor **191** or other type of display device is also connected to the system bus **121** via an interface, such as a video interface **190**. In addition to the monitor, computers may also include other peripheral output devices such as speakers **197** and printer **196**, which may be connected through an output peripheral interface **190**.

The computer **110** may operate in a networked environment using logical connections to one or more remote computers, such as a remote computer **180**. The remote computer **180** may be a personal computer, a server, a router,

7

8

a network PC, a peer device or other common network node, and typically includes many or all of the elements described above relative to the computer **110**, although only a memory storage device **181** has been illustrated in FIG. **1**. The logical connections depicted in FIG. **1** include a local area network (LAN) **171** and a wide area network (WAN) **173**, but may also include other networks. Such networking environments are commonplace in offices, enterprise-wide computer networks, intranets and the Internet.

When used in a LAN networking environment, the computer **110** is connected to the LAN **171** through a network interface or adapter **170**. When used in a WAN networking environment, the computer **110** typically includes a modem **172** or other means for establishing communications over the WAN **173**, such as the Internet. The modem **172**, which may be internal or external, may be connected to the system bus **121** via the user input interface **160**, or other appropriate mechanism. In a networked environment, program modules depicted relative to the computer **110**, or portions thereof, may be stored in the remote memory storage device. By way of example, and not limitation, FIG. **1** illustrates remote application programs **185** as residing on memory device **181**. It will be appreciated that the network connections shown are exemplary and other means of establishing a communications link between the computers may be used.

Referring now to FIG. **2**, an embodiment of the present invention can be described in the context of an exemplary computer network system **200** as illustrated. System **200** includes electronic user devices **210**, **280**, such as personal computers or workstations, that are linked via a communication medium, such as a network **220** (e.g., the Internet), to an electronic device or system, such as a server **230**. The server **230** may further be coupled, or otherwise have access, to a database **240**, electronic storage **270** and a computer system **260**. Although the embodiment illustrated in FIG. **2** includes one server **230** coupled to two user devices **210**, **280** via the network **220**, it should be recognized that embodiments of the invention may be implemented using two or more such user devices coupled to one or more such servers.

In an embodiment, each of the user devices **210**, **280** and server **230** may include all or fewer than all of the features associated with the computer **110** illustrated in and discussed with reference to FIG. **1**. User devices **210**, **280** include or are otherwise coupled to a computer screen or display **250**, **290**, respectively. User devices **210**, **280** can be used for various purposes including both network- and local-computing processes.

The user devices **210**, **280** are linked via the network **220** to server **230** so that computer programs, such as, for example, a browser or other applications, running on one or more of the user devices **210**, **280** can cooperate in two-way communication with server **230** and one or more applications running on server **230**. Server **230** may be coupled to database **240** and/or electronic storage **270** to retrieve information therefrom and to store information thereto. Additionally, the server **230** may be coupled to the computer system **260** in a manner allowing the server to delegate certain processing functions to the computer system.

Referring now to FIG. **3**, illustrated is functionality of an embodiment of the invention allowing a user (not shown) who owns or otherwise controls devices **210**, **280** to automatically maintain file synchronization between at least devices **210**, **280**, or any other user devices on which principles of the present invention are implemented. In an embodiment, an administrator (not shown) of the server **230** or other appropriate electronic device transfers a file-transfer and/or synchronization application to the user devices **210**, **280** for installation thereon. Once installed on the user devices **210**, **280**, the file-transfer application provides file-transfer clients **310**, **320** executable by the user devices **210**, **280**, respectively. Each of the file-transfer clients **310**, **320** may, but need not, include a respective mobile-agent run-time environment **330**, **340**. The mobile-agent runtime environment **330**, **340** include portions of memory of the user devices **210**, **280** dedicated to allowing a mobile object the ability to perform operations that the mobile object is programmed to carry out. Also included in the file-transfer application are user interfaces **350**, **360** that are displayable on the displays **250**, **290**, respectively. In an embodiment, the interfaces **350**, **360** allow a user to view, access and/or organize files to be synched among the various user devices.

Generally, all files that the user desires to be synched or shared may at some point be uploaded by one or more of the user devices **210**, **280** and stored in storage **270**. Upon receiving the files to be synched, the server **230** can store such files in the storage **270** and/or transfer the files to one or more of the respective hard drives of the user devices **210**, **280**, thereby enabling each respective user device to access such files. In this manner, the server **230** is operable to treat each hard drive of the respective user devices **210**, **280** as a local document cache for files received by the server. Typically, the server **230** will store one or more of the received files to the storage **270** only if the destination user device is offline or otherwise temporarily not in communication with the server **230**. Upon resuming communication with the destination user device, the server **230** will transfer the temporarily stored files to the destination device.

In operation, according to an embodiment, the user may open and modify a file **370**, such as a word-processing document or other electronic file. Alternatively, the user may create a first instance of the file **370**. The user may have previously have associated, or may now associate, the file **370** with the transfer client **310**. Upon a predetermined and user-configurable triggering event, the transfer client **310** transfers the modified file **370**, or a copy of the modified file, to the server **230**. Such a triggering event may include, but be not limited to, the user saving the file, the elapsing of a predetermined amount of time during which the file has been opened, or the re-initiation of a communication session between the device **210** and the server **230**.

The file **370** is transferred to the server **230** on which is executing a synchronization application **380**, which may include a mobile-agent runtime environment. Through user configuration, the synch application **380** monitors a set of user devices to which the file **370** should be transferred to effect file synchronization. In the illustrated embodiment, this set of user devices includes the user device **280**. The synch application **380** polls the device **280** to determine whether the device **280** is in communication with the server **230**. If the device **280** is in communication with the server **230**, the synch application **380** transfers the file **370** to the device **280**, whereupon the transfer client **320** resident on the device **280** replaces the previous version of the file **370**, previously cached on the device **280**, with the latest version of the file **370** modified on the user device **210**. If the device **280** is not currently in communication with the server **230**, the synch application **380** may store the file **370** in the storage **270** until such time as communication between the device **280** and server **230** is reestablished. As illustrated in FIG. **3**, a similar reverse-direction synchronization process may be performed by the synch application **380** and the transfer clients **310**, **320** with regard to a file **315** modified on device **280** and synchronized to device **210**.

In an embodiment, the user interfaces **350**, **360** may include a list of the customer's documents and related metadata, as well as any one-to-one or one-to-many relationships between the documents and metadata. An embodiment can always provide customers with an accurate "picture" of their document collection, regardless of whether their devices physically contain the documents. As alluded to earlier, a problem with distributed file systems and FTP is the latency between a file being put onto a file system and it showing up on a remote machine. To prevent this problem, an embodiment directory is decoupled from the movement of files. An embodiment's directory update system updates at a higher priority than the documents to be synchronized. This feature ensures that when a customer browses or searches through his set of documents, they appear even if they have not yet been cached locally on the user device. An indicator signifying a document's availability may be prominently displayed adjacent to the document's representation so that customers are aware of the document's availability.

An embodiment may include a stand-alone application that allows customers to find and manage documents associated with transfer clients **310**, **320** by visualizing relationships between documents and their metadata. It allows customers to tag documents with any number of identifiers. Customers can relate both documents and tags with each other in any number of user-specified one-to-one and one-to-many relationships, and an embodiment provides a user interface to browse and search on these relationships. To mitigate the customers' learning curve, an embodiment can implement relationships common to contemporary file systems, including a folder hierarchy. In addition to this, an embodiment provides direct support for methods that the customer uses to organize documents by manifesting them as user interface idioms. This is unlike conventional document filing systems which require the customer to work within a strict folder metaphor for organization.

Some alternate methods that an embodiment supports for organizing documents include:

Allow customers to organize their documents by application. Many times customers remember the application used to create a document instead of the document's name or its location in a hierarchy.

Allow customers to organize their documents by most recent access. Customers are likely to access a document they've accessed in the near past. Usually, such documents are part of a task that the customer is actively working.

Allow customers to organize their documents by project or subproject.

Allow customers to organize their documents by people. Many times, especially in the context of a collaboration, a document is directly related to one or more people other than the customer.

Allow the customer to organize their document by process stage. Documents may represent one or more stages of a process. Customers need a method for organizing documents by process stage, and a mechanism for moving the document through a set of predefined stages.

Allow customers to organize their documents by any of the aforementioned methods concurrently. These organization methods are not mutually exclusive.

An embodiment presents an interface that allows a customer to locate one or more documents associated with the transfer clients **310**, **320** and open such document into a separate software application. Since this interface is intended to be used from within the separate application, that

application may need to know how to invoke such interface. Advantageously, this invocation behavior can be provided to the application using the application's plug-in API.

An embodiment presents an interface that allows a customer to synchronize a currently opened document according to processes described elsewhere herein. This interface can be invoked within an application and can be made available to the application in the manner described above in connection with the application's plug-in API.

Some files associated with the transfer clients **310**, **320** are dependent on other files associated with the transfer clients **310**, **320**. For example, a desktop publishing document may include images that are stored in files separate from the main document. Previous file-synching solutions treat these files as separate. Because of this, for example, a document synchronized from the device **210** to the device **280** may be opened by the user of the device **280** before the image files have been fully transferred to the device **280**. This causes the document to fail to open, or break, since the image files don't exist or are incomplete. An embodiment prevents this by: (1) always ensuring the file catalog (e.g., the stand-alone application that allows customers to find and manage documents associated with transfer clients **310**, **320**, as discussed above herein) is synchronized before any file data is synchronized, and (2) pausing any file access by any program until the file contents have been fully synchronized. In such an embodiment, if a user attempts, using a software program, to open a file whose related files haven't yet finished transferring to the local (hard drive) cache, if that software attempts to open the related files, the software program is blocked by an embodiment until the requested files are downloaded and ready to access.

Other file sending and synchronizing software requires the user to upload their data to a storage device owned by the operator of the service. An embodiment treats storage as a participant in the synchronization process; this means that the user can choose the service or device where their files will be stored. The file transfer/synching is abstracted from the storage system allowing any storage to be used. An embodiment treats storage like any other synch target, such as a desktop computer, or a cell phone. As such, any device owned or otherwise controlled by the user and running a synch application, such as synch application **380**, as provided in an embodiment of the invention can perform the storage and/or synching functions described elsewhere herein. That is, the user device **280** or user device **210**, rather than the server **230**, may perform such functions.

While a preferred embodiment of the invention has been illustrated and described, as noted above, many changes can be made without departing from the spirit and scope of the invention. For example, as an alternative to the approach described with reference to FIG. **3**, wherein the transfer clients **310**, **320** function to "push" modified or created files to the synch application **380**, the synch application **380** may instead function to periodically "pull" or otherwise actively retrieve such files from the transfer clients **310**, **320** Instead, the invention should be determined entirely by reference to the claims that follow.

What is claimed is:

1. A system comprising:

a first electronic device, associated with a user, configured to:

receive, via a first application at the first electronic device, a copy of a modified first electronic file from a second application at a second electronic device associated with the user, wherein the modified first electronic file copy is automatically received from

US 10,067,942 B2

11

12

the second application responsive to the user modifying a content of the first electronic file;

determine whether the first electronic device is in communication with a third electronic device;

automatically send, via the first application, the modified first electronic file copy to a third application at the third electronic device responsive to the determination that the first electronic device is in communication with the third electronic device and responsive to receiving the modified first electronic file copy from the second electronic device;

receive, via the first application, a copy of a modified second electronic file from the third application at the third electronic device associated with the user, wherein the modified second electronic file copy is automatically received from the third application responsive to the user modifying a content of the second electronic file;

determine whether the first electronic device is in communication with the second electronic device; and

automatically send, via the first application, the modified second electronic file copy to the second application at the second electronic device responsive to the determination that the first electronic device is in communication with the second electronic device and responsive to receiving the modified second electronic file copy from the third electronic device, wherein, responsive to sending the modified first electronic file copy to the third electronic device, an older version of the first electronic file stored on the third electronic device is automatically caused to be replaced with the modified first electronic file copy such that the modified first electronic file copy is stored on the third electronic device in lieu of the older version of the first electronic file, and

wherein, responsive to sending the modified second electronic file copy to the second electronic device, an older version of the second electronic file stored on the second electronic device is automatically caused to be replaced with the modified second electronic file copy such that the modified second electronic file copy is stored on the second electronic device in lieu of the older version of the second electronic file.

2. The system of claim 1, wherein at least one of the second application or the third application comprises a runtime environment for mobile-agent objects.

3. The system of claim 1, wherein the first electronic device is configured to:

store, via the first application, the modified first electronic file copy to a memory device associated with the first electronic device.

4. The system of claim 3, wherein the modified first electronic file copy is stored on the memory device associated with the first electronic device in lieu of an older version of the first electronic file copy that was stored on the memory device associated with the first electronic device.

5. The system of claim 3, wherein the modified first electronic file copy is stored on the memory device associated with the first electronic device responsive to a determination that the first electronic device is not in communication with the third electronic device.

6. The system of claim 5, wherein the first electronic device is configured to:

responsive to resuming communication with the third electronic device, automatically transfer, via the first

application, the modified first electronic file copy to the third electronic device to cause the older version of the first electronic file stored on the third electronic device to be replaced with the modified first electronic file copy.

7. The system of claim 1, wherein the second application is operable to create a first mobile object, and wherein the first mobile object is operable to create a proxy object at the first electronic device.

8. The system of claim 7, wherein the first mobile object is operable to provide the modified first electronic file copy to the proxy object.

9. The system of claim 8, wherein the proxy object is operable to store the modified first electronic file copy on a memory device associated with the first electronic device.

10. A method comprising:

receiving, via a first application at a first electronic device, a copy of a modified first electronic file from a second application at a second electronic device associated with a user, wherein the modified first electronic file copy is automatically received from the second application responsive to the user modifying a content of the first electronic file;

determining whether the first electronic device is in communication with a third electronic device;

automatically sending, via the first application, the modified first electronic file copy to a third application at the third electronic device responsive to the determination that the first electronic device is in communication with the third electronic device and responsive to receiving the modified first electronic file copy from the second electronic device;

receiving, via the first application, a copy of a modified second electronic file from the third application at the third electronic device associated with the user, wherein the modified second electronic file copy is automatically received from the third application responsive to the user modifying a content of the second electronic file;

determining whether the first electronic device is in communication with the second electronic device; and

automatically sending, via the first application, the modified second electronic file copy to the second application at the second electronic device responsive to the determination that the first electronic device is in communication with the second electronic device and responsive to receiving the modified second electronic file copy from the third electronic device,

wherein, responsive to sending the modified first electronic file copy to the third electronic device, an older version of the first electronic file stored on the third electronic device is automatically caused to be replaced with the modified first electronic file copy such that the modified first electronic file copy is stored on the third electronic device in lieu of the older version of the first electronic file, and

wherein, responsive to sending the modified second electronic file copy to the second electronic device, an older version of the second electronic file stored on the second electronic device is automatically caused to be replaced with the modified second electronic file copy such that the modified second electronic file copy is stored on the second electronic device in lieu of the older version of the second electronic file.

11. The method of claim 10, wherein at least one of the second application or the third application comprises a runtime environment for mobile-agent objects.

US 10,067,942 B2

13

14

**12**. The method of claim **10**, further comprising:

storing, via the first application, the modified first electronic file copy to a memory device associated with the first electronic device.

**13**. The method of claim **12**, wherein the modified first electronic file copy is stored on the memory device associated with the first electronic device in lieu of an older version of the first electronic file copy that was stored on the memory device associated with the first electronic device.

**14**. The method of claim **12**, wherein the modified first electronic file copy is stored on the memory device associated with the first electronic device responsive to a determination that the first electronic device is not in communication with the third electronic device.

**15**. The method of claim **14**, further comprising:

responsive to resuming communication with the third electronic device, automatically transferring, via the first application, the modified first electronic file copy to the third electronic device to cause the older version of the first electronic file stored on the third electronic device to be replaced with the modified first electronic file copy.

**16**. The method of claim **10**, wherein the second application is operable to create a first mobile object, and wherein the first mobile object is operable to create a proxy object at the first electronic device.

**17**. The method of claim **16**, wherein the first mobile object is operable to provide the modified first electronic file copy to the proxy object.

**18**. The method of claim **17**, wherein the proxy object is operable to store the modified first electronic file copy on a memory device associated with the first electronic device.

*　*　*　*　*

# EXHIBIT 3

US010289607B2

(12) **United States Patent**
Manzano

(10) **Patent No.: US 10,289,607 B2**
(45) **Date of Patent: *May 14, 2019**

(54) **ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK**

(71) Applicant: **TOPIA TECHNOLOGY, INC.,** Tacoma, WA (US)

(72) Inventor: **Michael R. Manzano**, Seattle, WA (US)

(73) Assignee: **TOPIA TECHNOLOGY, INC.,** Tacoma, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/017,348**

(22) Filed: **Jun. 25, 2018**

(65) **Prior Publication Data**

US 2018/0307698 A1    Oct. 25, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 14/860,289, filed on Sep. 21, 2015, now Pat. No. 10,067,942, which is a (Continued)

(51) **Int. Cl.**
*G06F 16/00* (2019.01)
*G06F 16/11* (2019.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ *G06F 16/122* (2019.01); *G06F 15/16* (2013.01); *G06F 16/00* (2019.01); *G06F 16/128* (2019.01);
(Continued)

(58) **Field of Classification Search**
CPC ......... G06F 17/30082; G06F 17/30067; G06F 17/3023; G06F 17/30194; G06F 17/30174;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,600,834 A    2/1997  Howard
5,675,802 A  * 10/1997  Allen ........................ G06F 8/71
                                                        707/999.202

(Continued)

FOREIGN PATENT DOCUMENTS

EP            1 130 511 A2    9/2001
WO    WO 98/56149 A1    12/1998
WO    WO 2007/047302 A2    4/2007

OTHER PUBLICATIONS

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; < https://web.archive.org/web/20040804020435/http://www.foldershare.com:80/>; Aug. 4, 2004.
(Continued)

*Primary Examiner* — Srirama Channavajjala
(74) *Attorney, Agent, or Firm* — Pillsbury Winthrop Shaw Pittman LLP

(57)    **ABSTRACT**

In certain embodiments, automatic modification-triggered transfer of a file among two or more computer systems associated with a user. In some embodiments, a copy of a first file may be received, via a first application at a first computer system, from a second application at a second computer system associated with a user. The first file copy may be automatically received from the second application responsive to the user modifying a content of the first file, where the first file copy is a version of the first file that is generated from the user modifying the content of the first file. Responsive to receiving the first file copy from the
(Continued)



second computer system, the first file copy may be auto-matically transferred via the first application to a third computer system associated with the user to replace an older version of the first file stored on the third computer system.

**21 Claims, 3 Drawing Sheets**

**Related U.S. Application Data**

continuation of application No. 12/267,852, filed on Nov. 10, 2008, now Pat. No. 9,143,561.

(60) Provisional application No. 60/986,896, filed on Nov. 9, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 15/16* | (2006.01) |
| *G06F 16/13* | (2019.01) |
| *G06F 16/14* | (2019.01) |
| *G06F 16/176* | (2019.01) |
| *G06F 16/178* | (2019.01) |
| *H04L 29/08* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *G06F 16/13* (2019.01); *G06F 16/14* (2019.01); *G06F 16/176* (2019.01); *G06F 16/178* (2019.01); *H04L 67/1095* (2013.01)

(58) **Field of Classification Search**
CPC .. G06F 17/30362; G06F 16/122; G06F 16/10; G06F 16/16; G06F 16/13 14; G06F 16/128; G06F 16/176; G06F 16/178
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,806,078 A | 9/1998 | Hug | |
| 5,909,581 A | 6/1999 | Park | |
| 5,920,867 A * | 7/1999 | Van Huben ....... G06F 17/30362 |
| 6,026,414 A | 2/2000 | Anglin | |
| 6,154,817 A | 11/2000 | Mohan et al. | |
| 6,260,069 B1 | 7/2001 | Anglin | |
| 6,449,624 B1 | 9/2002 | Hammack et al. | |
| 6,463,463 B1 | 10/2002 | Godfrey et al. | |
| 6,504,994 B2 | 1/2003 | Kawamura et al. | |
| 6,505,200 B1 | 1/2003 | Ims et al. | |
| 6,526,418 B1 * | 2/2003 | Midgley ............ G06F 11/1451 |
| | | | 707/640 |
| 6,606,646 B2 | 8/2003 | Feigenbaum | |
| 6,611,849 B1 | 8/2003 | Raff et al. | |
| 6,671,700 B1 | 12/2003 | Creemer et al. | |
| 6,708,221 B1 | 3/2004 | Mendez et al. | |
| 6,757,696 B2 | 6/2004 | Multer et al. | |
| 6,757,893 B1 * | 6/2004 | Haikin ....................... G06F 8/71 |
| | | | 717/170 |
| 6,760,759 B1 | 7/2004 | Chan | |
| 6,810,405 B1 | 10/2004 | Larue et al. | |
| 6,829,622 B2 | 12/2004 | Beyda | |
| 6,874,037 B1 | 3/2005 | Abram et al. | |
| 6,931,454 B2 | 8/2005 | Deshpande et al. | |
| 6,990,522 B2 | 1/2006 | Wu | |
| 7,024,428 B1 | 4/2006 | Huang et al. | |
| 7,054,594 B2 | 5/2006 | Bloch et al. | |
| 7,065,658 B1 | 6/2006 | Baraban et al. | |
| 7,089,307 B2 | 8/2006 | Zintel et al. | |
| 7,136,934 B2 | 11/2006 | Carter et al. | |
| 7,155,488 B1 | 12/2006 | Lunsford et al. | |
| 7,224,973 B2 | 5/2007 | Tsutazawa et al. | |
| 7,243,163 B1 | 7/2007 | Friend et al. | |
| 7,260,646 B1 | 8/2007 | Stefanik et al. | |
| 7,269,433 B2 | 9/2007 | Vargas et al. | |

| | | | |
|---|---|---|---|
| 7,290,244 B2 | 10/2007 | Peck et al. | |
| 7,325,038 B1 * | 1/2008 | Wang .................... G06F 9/543 |
| | | | 707/999.01 |
| 7,340,534 B2 | 3/2008 | Cameron et al. | |
| 7,398,327 B2 | 7/2008 | Lee | |
| 7,415,588 B2 | 8/2008 | Hong et al. | |
| 7,415,615 B2 | 8/2008 | Skygebjer | |
| 7,457,631 B2 | 11/2008 | Yach et al. | |
| 7,467,353 B2 | 12/2008 | Kurlander et al. | |
| 7,483,925 B2 | 1/2009 | Koskimies et al. | |
| 7,526,575 B2 | 4/2009 | Rabbers et al. | |
| 7,574,711 B2 | 8/2009 | Zondervan et al. | |
| 7,584,186 B2 | 9/2009 | Chen et al. | |
| 7,587,446 B1 | 9/2009 | Onyon et al. | |
| 7,613,773 B2 | 11/2009 | Watt | |
| 7,639,116 B2 | 12/2009 | Saunders | |
| 7,657,271 B2 | 2/2010 | Kim | |
| 7,680,885 B2 | 3/2010 | Schauser et al. | |
| 7,752,166 B2 | 7/2010 | Quinlan et al. | |
| 7,761,414 B2 | 7/2010 | Freedman | |
| 7,788,303 B2 | 8/2010 | Mikesell et al. | |
| 7,895,334 B1 | 2/2011 | Tu et al. | |
| 7,987,420 B1 | 7/2011 | Kloba et al. | |
| 8,009,966 B2 | 8/2011 | Bloom et al. | |
| 8,112,549 B2 | 2/2012 | Srinivasan et al. | |
| 8,244,288 B2 | 8/2012 | Chipchase | |
| 8,321,534 B1 | 11/2012 | Roskind et al. | |
| 8,370,423 B2 | 2/2013 | Ozzie et al. | |
| 8,386,558 B2 | 2/2013 | Schleifer et al. | |
| 8,565,729 B2 | 10/2013 | Moseler et al. | |
| 8,595,182 B1 * | 11/2013 | Nelson ................ H04L 67/1095 |
| | | | 707/602 |
| 9,143,561 B2 * | 9/2015 | Manzano .......... G06F 17/30174 |
| 10,067,942 B2 * | 9/2018 | Manzano .......... G06F 17/30082 |
| 2002/0026478 A1 | 2/2002 | Rodgers et al. | |
| 2002/0035697 A1 | 3/2002 | McCurdy | |
| 2002/0055942 A1 * | 5/2002 | Reynolds ............... G06F 21/64 |
| 2002/0087588 A1 | 7/2002 | McBride et al. | |
| 2002/0143795 A1 * | 10/2002 | Fletcher .................. G06F 8/61 |
| 2003/0028514 A1 | 2/2003 | Lord | |
| 2003/0028542 A1 | 2/2003 | Muttik et al. | |
| 2003/0038842 A1 | 2/2003 | Peck et al. | |
| 2003/0078946 A1 | 4/2003 | Costello | |
| 2003/0125072 A1 | 7/2003 | Pesola | |
| 2003/0135565 A1 | 7/2003 | Estrada | |
| 2003/0233241 A1 * | 12/2003 | Marsh .................... G06F 16/48 |
| | | | 725/14 |
| 2004/0049345 A1 | 3/2004 | McDonough et al. | |
| 2004/0093361 A1 | 5/2004 | Therrien et al. | |
| 2004/0107225 A1 | 6/2004 | Rudolf | |
| 2004/0133629 A1 | 7/2004 | Reynolds | |
| 2004/0158817 A1 | 8/2004 | Okachi | |
| 2004/0172424 A1 | 9/2004 | Edelstein et al. | |
| 2005/0027757 A1 * | 2/2005 | Kiessig .................. G06F 16/10 |
| 2005/0091316 A1 | 4/2005 | Ponce et al. | |
| 2005/0097225 A1 | 5/2005 | Glatt et al. | |
| 2005/0165722 A1 * | 7/2005 | Cannon ............. G06F 11/1451 |
| 2005/0192966 A1 * | 9/2005 | Hilbert .................. H04L 51/22 |
| 2005/0220080 A1 | 10/2005 | Ronkainen et al. | |
| 2006/0004698 A1 * | 1/2006 | Pyhälammi ............ G06F 16/44 |
| 2006/0010150 A1 | 1/2006 | Shaath et al. | |
| 2006/0058907 A1 | 3/2006 | Suderman | |
| 2006/0074985 A1 | 4/2006 | Wolfish | |
| 2006/0129627 A1 | 6/2006 | Phillips | |
| 2006/0136446 A1 * | 6/2006 | Hughes ................. G06F 16/10 |
| 2006/0143129 A1 | 6/2006 | Holm | |
| 2006/0168118 A1 | 7/2006 | Godlin | |
| 2006/0189348 A1 | 8/2006 | Montulli et al. | |
| 2007/0014314 A1 | 1/2007 | O'Neil | |
| 2007/0016629 A1 | 1/2007 | Reinsch | |
| 2007/0022158 A1 * | 1/2007 | Vasa ................. H04M 1/72522 |
| | | | 709/204 |
| 2007/0027936 A1 | 2/2007 | Stakutis | |
| 2007/0100913 A1 | 5/2007 | Sumner et al. | |
| 2007/0180084 A1 * | 8/2007 | Mohanty ............. G06F 11/1451 |
| | | | 709/223 |
| 2007/0191057 A1 | 8/2007 | Kamada | |
| 2007/0238440 A1 | 10/2007 | Sengupta et al. | |
| 2008/0005114 A1 | 1/2008 | Li | |

US 10,289,607 B2

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2008/0005280 A1 | 1/2008 | Adams | |
| 2008/0086494 A1 | 4/2008 | Heller et al. | |
| 2008/0168526 A1 | 7/2008 | Robbin et al. | |
| 2008/0288578 A1 | 11/2008 | Silfverberg | |
| 2009/0013009 A1 | 1/2009 | Nakayama | |
| 2009/0037718 A1* | 2/2009 | Ganesh | G06F 9/4416 |
| | | | 713/2 |
| 2009/0063711 A1 | 3/2009 | Finkelstein | |
| 2009/0282050 A1 | 11/2009 | Thomas et al. | |
| 2012/0192064 A1* | 7/2012 | Antebi | G06F 17/2288 |
| | | | 715/255 |
| 2013/0226871 A1 | 8/2013 | Sarnowski | |
| 2013/0226872 A1* | 8/2013 | Barefoot | G06F 17/30575 |
| | | | 707/638 |
| 2014/0053227 A1* | 2/2014 | Ruppin | G06F 21/10 |
| | | | 726/1 |

OTHER PUBLICATIONS

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030808183932/http://www.foldershare.com:80/>; Aug. 8, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040814015727/http://www.foldershare.com:80/>; Aug. 14, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040820052105/http://www.foldershare.com:80/>; Aug. 20, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041211020957/http://foldershare.com:80/>; Dec. 11, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041217041726/http://www.foldershare.com:80/>; Dec. 17, 2004.

FolderShare; Your Smart File Transfer Solution; <https://web.archive.org/web/20031220151508/http://www.foldershare.com:80/>; Dec. 20, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041230211050/http://www.foldershare.com:80/>; Dec. 30, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040701113739/http://foldershare.com:80/>; Jul. 1, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040711062548/http://www.foldershare.com:80/>; Jul. 11, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030722054342/http://foldershare.com:80/>; Jul. 22, 2003.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040730030655/http://www.foldershare.com:80/>; Jul. 30, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040603205113/http://www.foldershare.com:80/>; Jun. 3, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040613161906/http://www.foldershare.com:80/>; Jun. 13, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040629075057/http://www.foldershare.com:80/>; Jun. 29, 2004.

FolderShare—Secure Remote Access VPN Solution; Your Smart File Transfer & Real-time File Mirroring Solution; <https://web.archive.org/web/20040316235151/http://foldershare.com:80/>; Mar. 16, 2004.

FolderShare—Secure Remote Access VPN Solution; Your Smart File Transfer & Real-time File Mirroring Solution; <https://web.archive.org/web/20040325034239/http://www.foldershare.com:80/>; Mar. 25, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040512211417/http://www.foldershare.com:80/>; May 12, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030531180252/http://www.foldershare.com:80/>; May 31, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041104031510/http://www.foldershare.com:80/>; Nov. 4, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041117092357/http://www.foldershare.com:80/>; Nov. 17, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041123085254/http://www.foldershare.com:80/>; Nov. 23, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20031128143634/http://foldershare.com:80/>; Nov. 28, 2003.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20031001071631/http://foldershare.com:80/>; Oct. 1, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041012083127/http://www.foldershare.com:80/>; Oct. 12, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041029085820/http://www.foldershare.com:80/>; Oct. 29, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040901034646/http://www.foldershare.com:80/>; Sep. 1, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040909075254/http://www.foldershare.com:80/>; Sep. 9, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030920051943/http://www.foldershare.com:80/>; Sep. 20, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040924032146/http://www.foldershare.com:80/>; Sep. 24, 2004.

Marshall, M., "The Y Combinator List," Venture Beat, Aug. 2007, Retrieved from the Internet: URL: <https://venturebeat.com/2007/08/16/the-y-combinator-list/>, 4 pages.

Jarvis, A., "Dropbox pitch deck to raise seed capital investment, " Medium, Mar. 2018, Retrieved from the Internet: URL: <https://medium.com/@adjblog/dropbox-pitch-deck-to-raise-seed-capital-investment-6a6cd6517e56>, 12 pages.

* cited by examiner



FIG. 1



FIG. 2



FIG. 3

US 10,289,607 B2

1

# ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/860,289, filed Sep. 21, 2015, which is a continuation of U.S. patent application Ser. No. 12/267,852, filed Nov. 10, 2008, which claims priority to U.S. Provisional Application No. 60/986,896 entitled "ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK" and filed Nov. 9, 2007, the contents of which are hereby incorporated by reference in their entirety.

## FIELD OF THE INVENTION

This invention relates generally to computer-implemented processes and, more specifically, to sharing of electronic files among computer systems.

## BACKGROUND OF THE INVENTION

Users of modern computing systems are increasingly finding themselves in constantly-connected, high-speed networked environments. The Web continues to be a killer application, second only to email, on the Internet. Further, customers are increasingly using more than one computing device; a customer may have a desktop computer at home, one at work, and a constantly connected "smart phone". Due to the confluence of these two trends, file management across these devices has become a problem.

Although modern devices are easily connected, they do not provide the customer a seamless environment; the customer must manually handle many aspects of that connection. With regards to file management, customers must manually move files between their devices using some protocol like email, ftp, or by posting them on the Web. These practices lead to problems that include:

The proliferation of redundant file copies. This proliferation creates a confusing environment where the customer is unclear where the "official" or newest version of a file exists.

The creation of an error-prone environment. Some documents, such as those associated with word processing and desktop publishing, externally reference other files. Copying such a document can break these references causing errors that the customer has to handle manually. An example of such a document is a desktop publishing document that contains a reference to an image. If that image file is not transferred along with the desktop publishing file, the image will appear as a broken link.

Unnecessary complexity. Because devices tend to have their own filing system, customers must manage a different filing model on each of his devices. For example, instead of having a single "Movies" folder, he may have to deal with many "Movies" folders, which may be in different locations on each of his devices. Each device may also have its own security model, further complicating the matter.

That a customer has to manually move files around to ensure their accessibility on his devices is unnecessary, and is an indicator of a lack of customer-focused design in modern file systems. File systems in use today are direct offspring of systems used when graphical customer interfaces were nonexistent. Modern file system customer interfaces, such as Windows® Explorer and Mac OS X's Finder are just now starting to provide experiences that are more in line to a customer's workflow. Whereas, before, these interfaces were concerned with representing files with abstracted icons, the file's actual contents are becoming paramount in how files are organized and presented.

Problems still exist with how these newer customer interfaces are implemented. They are not completely integrated with applications, suffer from performance problems, and do not generally work well outside of a device's local file system.

There are several solutions to this problem that are in one way or another inadequate to the task:

Remote Desktop software allows a customer to remotely "see" his desktop. Remote desktop software screen-scrapes a remote machine's screen (a "server") and displays it on a screen local to the customer (a "client"). Remote desktop gives a customer access to not only his files, but also to his applications. However, this approach requires that the host machine be turned on and connected to the internet at all times. Consequently, this approach would not be appropriate for mobile hosts such as laptops. Remote desktop does not use the resources of a local machine. For full accessibility, the customer would have to keep all files and application on the host machine as any files stored on a client are not guaranteed to be accessible.

Distributed File Systems, like remote desktop software, place data on an always-connected host machine. Unlike remote desktop software, the host machine is not one on which the customer performs computing tasks. The host machine is used as a storage mechanism, and any computation performed on that machine serves to supports its use as such. Distributed file systems generally provide the right functionality for customers to share files between their devices. However, distributed file systems are usually deployed as a shared resource; that is, other customers have access to it. Because of this sharing, a customer's files may be buried deep in a filing structure, and it may not always be immediately evident to customers what kind of access they have to a particular file. Further, to use a distributed file system, the customer must always be connected to it. Files stored on a distributed file system are generally inaccessible if the customer's machine is not connected to it, unless the customer has copied or moved the files to his machine's local hard drive. However, doing so immediately creates the problem of having two filing systems for the same file, creating a mental burden on the customer.

Additionally, accessing a file located on a distributed file system tends to be slower than accessing files on the local hard drive. Modern applications are usually written to assume that the files they access are located locally, and thus are not optimized to access remote files. When these applications are used with remote files, they can lose performance by an order of magnitude. This problem can be fixed by automatically caching often-used files on the local file system, and only synchronizing them when they have been changed. However, this separate synchronization step introduces another problem: because the synchronization process can be lengthy, the customer is never entirely sure if the file he is remotely accessing is the latest version of the file, versus an earlier one that has been marked to be updated. Further, the directory may not reflect the existence of the file at all until synchronization finishes.

FTP is similar to a distributed file system with regards to files being hosted on a remote server. However FTP gener-

US 10,289,607 B2

3

ally does manifest as a "disk drive" on the customer's desktop; the customer must use special FTP client software to access an FTP server. It shares the same problem as distributed file systems, with the additional problem of weak integration with applications. Applications can generally write and read files directly to and from a distributed file system. This is not the case with FTP, as the customer has to manually use the client software to perform these operations as a separate task.

Email was originally invented for messaging. From the beginning, the model it employs to make files accessible remotely is necessarily inefficient. Email's model for making files accessible is in the form of an email "attachment". Attachments are so named because they piggy-back on a message sent from one customer to another. A customer can make a file remotely available using email by attaching the file to an email and sending it to himself. He can then retrieve the file from a remote location by accessing the message on the email server. Email used in this way is even worse than FTP as the process is even more manual: a customer must find the message containing the file before he can even access it. Further, the location in which the attachment lives is read only. If the customer, for example, were to open the file, change it, then save it back out, the results would be ambiguous to the user because the email application, not the user, specified its location. Usually, the saved file would end up buried in an email file cache in an undisclosed area of the file system.

Flash Drives and External Disk Drives, although seemingly the most "primitive" way to ensure file availability, avoid all the problems related to network latency. However, these devices must be physically connected to the computer on which the files will be accessed. These restrictions preclude the customer from employing several effective work-flows including: using more than one computer to complete a single task (the files can only be accessed on one computer) and setting up an automated backup (the computer running the backup can't guarantee that the storage device will be connected come backup time). Further, to ensure full availability of the files, the customer must carry the device with them at all times, and must follow the associated protocols for mounting and dismounting the device.

Other problems with the prior art not described above can also be overcome using the teachings of embodiments of the present invention, as would be readily apparent to one of ordinary skill in the art after reading this disclosure.

SUMMARY OF THE INVENTION

In certain embodiments, automatic modification-triggered transfer of a file among two or more computer systems associated with a user. In some embodiments, a copy of a first file may be received, via a first application at a first computer system, from a second application at a second computer system associated with a user. The first file copy may be automatically received from the second application responsive to the user modifying a content of the first file, where the first file copy is a version of the first file that is generated from the user modifying the content of the first file. Responsive to receiving the first file copy from the second computer system, the first file copy may be automatically transferred via the first application to a third computer system associated with the user to replace an older version of the first file stored on the third computer system.

4

BRIEF DESCRIPTION OF THE DRAWING

Preferred and alternative embodiments of the present invention are described in detail below with reference to the following drawings.

FIG. 1 is a schematic view of an exemplary operating environment in which an embodiment of the invention can be implemented;

FIG. 2 is a functional block diagram of an exemplary operating environment in which an embodiment of the invention can be implemented; and

FIG. 3 is a functional block diagram illustrating file sharing and/or synchronization according to an embodiment of the invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

An embodiment of the invention leverages remote programming concepts by utilizing processes called mobile agents (sometimes referred to as mobile objects or agent objects). Generally speaking, these concepts provide the ability for an object (the mobile agent object) existing on a first ("host") computer system to transplant itself to a second ("remote host") computer system while preserving its current execution state. The operation of a mobile agent object is described briefly below.

The instructions of the mobile agent object, its preserved execution state, and other objects owned by the mobile agent object are packaged, or "encoded," to generate a string of data that is configured so that the string of data can be transported by all standard means of communication over a computer network. Once transported to the remote host, the string of data is decoded to generate a computer process, still called the mobile agent object, within the remote host system. The decoded mobile agent object includes those objects encoded as described above and remains in its preserved execution state. The remote host computer system resumes execution of the mobile agent object which is now operating in the remote host environment.

While now operating in the new environment, the instructions of the mobile agent object are executed by the remote host to perform operations of any complexity, including defining, creating, and manipulating data objects and interacting with other remote host computer objects.

File transfer and/or synchronization, according to an embodiment, may be accomplished using some or all of the concepts described in commonly owned U.S. patent application Ser. No. 11/739,083, entitled "Electronic File Sharing," the entirety of which is incorporated by reference as if fully set forth herein.

FIG. 1 illustrates an example of a suitable computing system environment 100 in which one or more embodiments of the invention may be implemented. The computing system environment 100 is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality of the invention. Neither should the computing environment 100 be interpreted as having any dependency or requirement relating to any one or combination of components illustrated in the exemplary operating environment 100.

Embodiments of the invention are operational with numerous other general purpose or special purpose computing system environments or configurations. Examples of well known computing systems, environments, and/or configurations that may be suitable for use with the invention include, but are not limited to, personal computers, server

US 10,289,607 B2

5

computers, hand-held or laptop devices, multiprocessor systems, microprocessor-based systems, set top boxes, programmable consumer electronics, network PCs, minicomputers, mainframe computers, distributed computing environments that include any of the above systems or devices, and the like.

Embodiments of the invention may be described in the general context of computer-executable instructions, such as program modules, being executed by a computer and/or by computer-readable media on which such instructions or modules can be stored. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types. The invention may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in both local and remote computer storage media including memory storage devices.

With reference to FIG. 1, an exemplary system for implementing the invention includes a general purpose computing device in the form of a computer 110. Components of computer 110 may include, but are not limited to, a processing unit 120, a system memory 130, and a system bus 121 that couples various system components including the system memory to the processing unit 120. The system bus 121 may be any of several types of bus structures including a memory bus or memory controller, a peripheral bus, and a local bus using any of a variety of bus architectures. By way of example, and not limitation, such architectures include Industry Standard Architecture (ISA) bus, Micro Channel Architecture (MCA) bus, Enhanced ISA (EISA) bus, Video Electronics Standards Association (VESA) local bus, and Peripheral Component Interconnect (PCI) bus also known as Mezzanine bus.

Computer 110 typically includes a variety of computer readable media. Computer readable media can be any available media that can be accessed by computer 110 and includes both volatile and nonvolatile media, removable and non-removable media. By way of example, and not limitation, computer readable media may comprise computer storage media and communication media. Computer storage media includes both volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules or other data. Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical disk storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can accessed by computer 110. Communication media typically embodies computer readable instructions, data structures, program modules or other data in a modulated data signal such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" means a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal. By way of example, and not limitation, communication media includes wired media such as a wired network or direct-wired connection, and wireless media such as acoustic, RF, infrared and other wireless media. Combinations of the any of the above should also be included within the scope of computer readable media.

6

The system memory 130 includes computer storage media in the form of volatile and/or nonvolatile memory such as read only memory (ROM) 131 and random access memory (RAM) 132. A basic input/output system 133 (BIOS), containing the basic routines that help to transfer information between elements within computer 110, such as during start-up, is typically stored in ROM 131. RAM 132 typically contains data and/or program modules that are immediately accessible to and/or presently being operated on by processing unit 120. By way of example, and not limitation, FIG. 1 illustrates operating system 134, application programs 135, other program modules 136, and program data 137.

The computer 110 may also include other removable/non-removable, volatile/nonvolatile computer storage media. By way of example only, FIG. 1 illustrates a hard disk drive 140 that reads from or writes to non-removable, nonvolatile magnetic media, a magnetic disk drive 151 that reads from or writes to a removable, nonvolatile magnetic disk 152, and an optical disk drive 155 that reads from or writes to a removable, nonvolatile optical disk 156 such as a CD ROM or other optical media. Other removable/non-removable, volatile/nonvolatile computer storage media that can be used in the exemplary operating environment include, but are not limited to, magnetic tape cassettes, flash memory cards, digital versatile disks, digital video tape, solid state RAM, solid state ROM, and the like. The hard disk drive 141 is typically connected to the system bus 121 through a non-removable memory interface such as interface 140, and magnetic disk drive 151 and optical disk drive 155 are typically connected to the system bus 121 by a removable memory interface, such as interface 150.

The drives and their associated computer storage media discussed above and illustrated in FIG. 1, provide storage of computer readable instructions, data structures, program modules and other data for the computer 110. In FIG. 1, for example, hard disk drive 141 is illustrated as storing operating system 144, application programs 145, other program modules 146, and program data 147. Note that these components can either be the same as or different from operating system 134, application programs 135, other program modules 136, and program data 137. Operating system 144, application programs 145, other program modules 146, and program data 147 are given different numbers here to illustrate that, at a minimum, they are different copies. A user may enter commands and information into the computer 20 through input devices such as a keyboard 162 and pointing device 161, commonly referred to as a mouse, trackball or touch pad. Other input devices (not shown) may include a microphone, joystick, game pad, satellite dish, scanner, or the like. These and other input devices are often connected to the processing unit 120 through a user input interface 160 that is coupled to the system bus, but may be connected by other interface and bus structures, such as a parallel port, game port or a universal serial bus (USB). A monitor 191 or other type of display device is also connected to the system bus 121 via an interface, such as a video interface 190. In addition to the monitor, computers may also include other peripheral output devices such as speakers 197 and printer 196, which may be connected through an output peripheral interface 190.

The computer 110 may operate in a networked environment using logical connections to one or more remote computers, such as a remote computer 180. The remote computer 180 may be a personal computer, a server, a router, a network PC, a peer device or other common network node, and typically includes many or all of the elements described above relative to the computer 110, although only a memory

7

storage device **181** has been illustrated in FIG. **1**. The logical connections depicted in FIG. **1** include a local area network (LAN) **171** and a wide area network (WAN) **173**, but may also include other networks. Such networking environments are commonplace in offices, enterprise-wide computer networks, intranets and the Internet.

When used in a LAN networking environment, the computer **110** is connected to the LAN **171** through a network interface or adapter **170**. When used in a WAN networking environment, the computer **110** typically includes a modem **172** or other means for establishing communications over the WAN **173**, such as the Internet. The modem **172**, which may be internal or external, may be connected to the system bus **121** via the user input interface **160**, or other appropriate mechanism. In a networked environment, program modules depicted relative to the computer **110**, or portions thereof, may be stored in the remote memory storage device. By way of example, and not limitation, FIG. **1** illustrates remote application programs **185** as residing on memory device **181**. It will be appreciated that the network connections shown are exemplary and other means of establishing a communications link between the computers may be used.

Referring now to FIG. **2**, an embodiment of the present invention can be described in the context of an exemplary computer network system **200** as illustrated. System **200** includes electronic user devices **210**, **280**, such as personal computers or workstations, that are linked via a communication medium, such as a network **220** (e.g., the Internet), to an electronic device or system, such as a server **230**. The server **230** may further be coupled, or otherwise have access, to a database **240**, electronic storage **270** and a computer system **260**. Although the embodiment illustrated in FIG. **2** includes one server **230** coupled to two user devices **210**, **280** via the network **220**, it should be recognized that embodiments of the invention may be implemented using two or more such user devices coupled to one or more such servers.

In an embodiment, each of the user devices **210**, **280** and server **230** may include all or fewer than all of the features associated with the computer **110** illustrated in and discussed with reference to FIG. **1**. User devices **210**, **280** include or are otherwise coupled to a computer screen or display **250**, **290**, respectively. User devices **210**, **280** can be used for various purposes including both network- and local-computing processes.

The user devices **210**, **280** are linked via the network **220** to server **230** so that computer programs, such as, for example, a browser or other applications, running on one or more of the user devices **210**, **280** can cooperate in two-way communication with server **230** and one or more applications running on server **230**. Server **230** may be coupled to database **240** and/or electronic storage **270** to retrieve information therefrom and to store information thereto. Additionally, the server **230** may be coupled to the computer system **260** in a manner allowing the server to delegate certain processing functions to the computer system.

Referring now to FIG. **3**, illustrated is functionality of an embodiment of the invention allowing a user (not shown) who owns or otherwise controls devices **210**, **280** to automatically maintain file synchronization between at least devices **210**, **280**, or any other user devices on which principles of the present invention are implemented. In an embodiment, an administrator (not shown) of the server **230** or other appropriate electronic device transfers a file-transfer and/or synchronization application to the user devices **210**, **280** for installation thereon. Once installed on the user devices **210**, **280**, the file-transfer application provides file-

8

transfer clients **310**, **320** executable by the user devices **210**, **280**, respectively. Each of the file-transfer clients **310**, **320** may, but need not, include a respective mobile-agent runtime environment **330**, **340**. The mobile-agent runtime environment **330**, **340** include portions of memory of the user devices **210**, **280** dedicated to allowing a mobile object the ability to perform operations that the mobile object is programmed to carry out. Also included in the file-transfer application are user interfaces **350**, **360** that are displayable on the displays **250**, **290**, respectively. In an embodiment, the interfaces **350**, **360** allow a user to view, access and/or organize files to be synched among the various user devices.

Generally, all files that the user desires to be synched or shared may at some point be uploaded by one or more of the user devices **210**, **280** and stored in storage **270**. Upon receiving the files to be synched, the server **230** can store such files in the storage **270** and/or transfer the files to one or more of the respective hard drives of the user devices **210**, **280**, thereby enabling each respective user device to access such files. In this manner, the server **230** is operable to treat each hard drive of the respective user devices **210**, **280** as a local document cache for files received by the server. Typically, the server **230** will store one or more of the received files to the storage **270** only if the destination user device is offline or otherwise temporarily not in communication with the server **230**. Upon resuming communication with the destination user device, the server **230** will transfer the temporarily stored files to the destination device.

In operation, according to an embodiment, the user may open and modify a file **370**, such as a word-processing document or other electronic file. Alternatively, the user may create a first instance of the file **370**. The user may have previously have associated, or may now associate, the file **370** with the transfer client **310**. Upon a predetermined and user-configurable triggering event, the transfer client **310** transfers the modified file **370**, or a copy of the modified file, to the server **230**. Such a triggering event may include, but be not limited to, the user saving the file, the elapsing of a predetermined amount of time during which the file has been opened, or the re-initiation of a communication session between the device **210** and the server **230**.

The file **370** is transferred to the server **230** on which is executing a synchronization application **380**, which may include a mobile-agent runtime environment. Through user configuration, the synch application **380** monitors a set of user devices to which the file **370** should be transferred to effect file synchronization. In the illustrated embodiment, this set of user devices includes the user device **280**. The synch application **380** polls the device **280** to determine whether the device **280** is in communication with the server **230**. If the device **280** is in communication with the server **230**, the synch application **380** transfers the file **370** to the device **280**, whereupon the transfer client **320** resident on the device **280** replaces the previous version of the file **370**, previously cached on the device **280**, with the latest version of the file **370** modified on the user device **210**. If the device **280** is not currently in communication with the server **230**, the synch application **380** may store the file **370** in the storage **270** until such time as communication between the device **280** and server **230** is reestablished. As illustrated in FIG. **3**, a similar reverse-direction synchronization process may be performed by the synch application **380** and the transfer clients **310**, **320** with regard to a file **315** modified on device **280** and synchronized to device **210**.

In an embodiment, the user interfaces **350**, **360** may include a list of the customer's documents and related metadata, as well as any one-to-one or one-to-many rela-

US 10,289,607 B2

9

tionships between the documents and metadata. An embodiment can always provide customers with an accurate "picture" of their document collection, regardless of whether their devices physically contain the documents. As alluded to earlier, a problem with distributed file systems and FTP is the latency between a file being put onto a file system and it showing up on a remote machine. To prevent this problem, an embodiment directory is decoupled from the movement of files. An embodiment's directory update system updates at a higher priority than the documents to be synchronized. This feature ensures that when a customer browses or searches through his set of documents, they appear even if they have not yet been cached locally on the user device. An indicator signifying a document's availability may be prominently displayed adjacent to the document's representation so that customers are aware of the document's availability.

An embodiment may include a stand-alone application that allows customers to find and manage documents associated with transfer clients 310, 320 by visualizing relationships between documents and their metadata. It allows customers to tag documents with any number of identifiers. Customers can relate both documents and tags with each other in any number of user-specified one-to-one and one-to-many relationships, and an embodiment provides a user interface to browse and search on these relationships. To mitigate the customers' learning curve, an embodiment can implement relationships common to contemporary file systems, including a folder hierarchy. In addition to this, an embodiment provides direct support for methods that the customer uses to organize documents by manifesting them as user interface idioms. This is unlike conventional document filing systems which require the customer to work within a strict folder metaphor for organization.

Some alternate methods that an embodiment supports for organizing documents include:

Allow customers to organize their documents by application. Many times customers remember the application used to create a document instead of the document's name or its location in a hierarchy.

Allow customers to organize their documents by most recent access. Customers are likely to access a document they've accessed in the near past. Usually, such documents are part of a task that the customer is actively working.

Allow customers to organize their documents by project or subproject.

Allow customers to organize their documents by people. Many times, especially in the context of a collaboration, a document is directly related to one or more people other than the customer.

Allow the customer to organize their document by process stage. Documents may represent one or more stages of a process. Customers need a method for organizing documents by process stage, and a mechanism for moving the document through a set of predefined stages.

Allow customers to organize their documents by any of the aforementioned methods concurrently. These organization methods are not mutually exclusive.

An embodiment presents an interface that allows a customer to locate one or more documents associated with the transfer clients 310, 320 and open such document into a separate software application. Since this interface is intended to be used from within the separate application, that application may need to know how to invoke such interface. Advantageously, this invocation behavior can be provided to the application using the application's plug-in API.

10

An embodiment presents an interface that allows a customer to synchronize a currently opened document according to processes described elsewhere herein. This interface can be invoked within an application and can be made available to the application in the manner described above in connection with the application's plug-in API.

Some files associated with the transfer clients 310, 320 are dependent on other files associated with the transfer clients 310, 320. For example, a desktop publishing document may include images that are stored in files separate from the main document. Previous file-synching solutions treat these files as separate. Because of this, for example, a document synchronized from the device 210 to the device 280 may be opened by the user of the device 280 before the image files have been fully transferred to the device 280. This causes the document to fail to open, or break, since the image files don't exist or are incomplete. An embodiment prevents this by: (1) always ensuring the file catalog (e.g., the stand-alone application that allows customers to find and manage documents associated with transfer clients 310, 320, as discussed above herein) is synchronized before any file data is synchronized, and (2) pausing any file access by any program until the file contents have been fully synchronized. In such an embodiment, if a user attempts, using a software program, to open a file whose related files haven't yet finished transferring to the local (hard drive) cache, if that software attempts to open the related files, the software program is blocked by an embodiment until the requested files are downloaded and ready to access.

Other file sending and synchronizing software requires the user to upload their data to a storage device owned by the operator of the service. An embodiment treats storage as a participant in the synchronization process; this means that the user can choose the service or device where their files will be stored. The file transfer/synching is abstracted from the storage system allowing any storage to be used. An embodiment treats storage like any other synch target, such as a desktop computer, or a cell phone. As such, any device owned or otherwise controlled by the user and running a synch application, such as synch application 380, as provided in an embodiment of the invention can perform the storage and/or synching functions described elsewhere herein. That is, the user device 280 or user device 210, rather than the server 230, may perform such functions.

While a preferred embodiment of the invention has been illustrated and described, as noted above, many changes can be made without departing from the spirit and scope of the invention. For example, as an alternative to the approach described with reference to FIG. 3, wherein the transfer clients 310, 320 function to "push" modified or created files to the synch application 380, the synch application 380 may instead function to periodically "pull" or otherwise actively retrieve such files from the transfer clients 310, 320 Instead, the invention should be determined entirely by reference to the claims that follow.

What is claimed is:

1. A system comprising:

a server system comprising one or more processors programmed with computer program instructions that, when executed, cause the server system to:

receive, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being a version

US 10,289,607 B2

11

of the first file that is generated from the user modifying the content of the first file;

receive, from the first client device, first metadata associated with the version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;

determine that the server system is not in communication with a second client device associated with the user;

store the copy of the first file on the server system;

automatically transfer the first metadata to the second client device based on the first priority being greater than the second priority such that the first metadata is transferred to the second client device prior to the copy of the first file being transferred to the second client device; and

automatically transfer, over a network, the copy of the first file to the second client device associated with the user to replace an older version of the first file stored on the second client device, responsive to (i) resuming communication with the second client device and (ii) receiving the copy of the first file from the first client device.

**2**. The system of claim **1**, wherein the computer program instructions, when executed, cause the server system to:

store the copy of the first file to a memory device associated with the server system, wherein the copy of the first file is stored on the memory device associated with the server system responsive to determining that the server system is not in communication with the second client device.

**3**. The system of claim **1**, wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

**4**. The system of claim **1**, wherein availability of the version of the first file is presented at the second client device based on the first metadata.

**5**. The system of claim **1**, wherein the server system is caused to:

receive a copy of a second file from the second client device associated with the user, wherein the copy of the second file is automatically received from the second client device responsive to the user modifying a content of the second file stored on the second client device, the copy of the second file being a version of the second file that is generated from the user modifying the content of the second file;

determine that the server system is in communication with the first client device associated with the user; and

automatically transfer the copy of the second file to the first client device associated with the user to replace an older version of the second file stored on the first client device, responsive to (i) determining that the server system is in communication with the first client device and (ii) receiving the copy of the second file from the second client device.

**6**. The system of claim **1**, wherein the computer program instructions, when executed, cause the server system to:

periodically perform a pull request, wherein the copy of the first file is automatically received from the first

12

client device responsive to (i) the pull request and (ii) the user modifying the content of the first file stored on the first client device.

**7**. The system of claim **1**, wherein the copy of the first file is automatically received from the first client device responsive to (i) a push request of the first client device and (ii) the user modifying the content of the first file stored on the first client device.

**8**. The system of claim **1**, wherein the copy of the first file is automatically received from a first application at the first client device, and wherein the first application comprises a runtime environment for one or more mobile-agent objects.

**9**. The system of claim **8**, wherein the first application is configured to create a first mobile object, and wherein the first mobile object is configured to create a proxy object at the server system.

**10**. The system of claim **9**, wherein the first mobile object is configured to provide the copy of the first file to the proxy object.

**11**. The system of claim **10**, wherein the proxy object is configured to store the copy of the first file on a memory device associated with the server system.

**12**. A method being implemented by a server system comprising one or more processors executing computer program instructions that, when executed, perform the method, the method comprising:

receiving, by the server system, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being a version of the first file that is generated from the user modifying the content of the first file;

receiving, by the server system, from the first client device, first metadata associated with the version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;

determining, by the server system, that the server system is not in communication with a second client device associated with the user;

store the copy of the first file on the server system;

automatically transferring, by the server system, the first metadata to the second client device based on the first priority being greater than the second priority such that the first metadata is transferred to the second client device prior to the copy of the first file being transferred to the second client device; and

automatically transferring, by the server system, over a network, the copy of the first file to the second client device associated with the user to replace an older version of the first file stored on the second client device, responsive to (i) resuming communication with the second client device and (ii) receiving the copy of the first file from the first client device.

**13**. The method of claim **12**, further comprising:

storing, by the server system, the copy of the first file to a memory device associated with the server system, wherein the copy of the first file is stored on the memory device associated with the server system responsive to determining that the server system is not in communication with the second client device.

**14**. The method of claim **12**, wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to meta-

data associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

**15**. The method of claim **12**, wherein the copy of the first file is automatically received from a first application at the first client device, wherein the first application comprises a runtime environment for one or more mobile-agent objects, and wherein the first application is configured to create a first mobile object, and the first mobile object is configured to create a proxy object at the server system and to provide the copy of the first file to the proxy object.

**16**. The method of claim **15**, wherein the proxy object is configured to store the copy of the first file on a memory device associated with the server system.

**17**. A system comprising:

a server system comprising one or more processors programmed with computer program instructions that, when executed, cause the server system to:

receive, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being a version of the first file that is generated from the user modifying the content of the first file;

receive, from the first client device, first metadata associated with the version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file, wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration;

determine that the server system is not in communication with a second client device associated with the user;

store the copy of the first file on the server system;

automatically transfer the first metadata to the second client device based on the first priority being greater than the second priority such that the first metadata is transferred to the second client device prior to the copy of the first file being transferred to the second client device; and

automatically transfer, over a network, the copy of the first file to the second client device associated with the user, responsive to (i) resuming communication with the second client device and (ii) receiving the copy of the first file from the first client device,

wherein, responsive to transferring the copy of the first file to the second client device, an older version of the first file stored on the second client device is automatically caused to be replaced with the copy of the first file such that the copy of the first file is stored on the second client device in lieu of the older version of the first file.

**18**. The system of claim **17**, wherein the copy of the first file is automatically received from a first application at the first client device, wherein the first application comprises a runtime environment for one or more mobile-agent objects, and wherein the first application is configured to create a first mobile object, the first mobile object is configured to create a proxy object at the server system and to provide the copy of the first file to the proxy object, and the proxy object is configured to store the copy of the first file on a memory device associated with the server system.

**19**. One or more non-transitory machine-readable media storing instructions that, when executed by one or more processors of a server system, cause operations comprising:

receiving, by the server system, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being a version of the first file that is generated from the user modifying the content of the first file;

receiving, by the server system, from the first client device, first metadata associated with the version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;

determining, by the server system, that the server system is not in communication with a second client device associated with the user;

storing, by the server system, the copy of the first file on the server system;

automatically transferring, by the server system, the first metadata to the second client device based on the first priority being greater than the second priority such that the first metadata is transferred to the second client device prior to the copy of the first file being transferred to the second client device; and

automatically transferring, by the server system, over a network, the copy of the first file to the second client device associated with the user to replace an older version of the first file stored on the second client device, responsive to (i) resuming communication with the second client device and (ii) receiving the copy of the first file from the first client device.

**20**. The one or more non-transitory machine-readable media of claim **19**, wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

**21**. The one or more non-transitory machine-readable media of claim **19**, wherein the copy of the first file is automatically received from a first application at the first client device, wherein the first application comprises a runtime environment for one or more mobile-agent objects, and wherein the first application is configured to create a first mobile object, the first mobile object is configured to create a proxy object at the server system and to provide the copy of the first file to the proxy object, and the proxy object is configured to store the copy of the first file on a memory device associated with the server system.

* * * * *

# EXHIBIT 4

US010642787B1

(12) **United States Patent**

Manzano

(10) Patent No.: **US 10,642,787 B1**

(45) Date of Patent: ***May 5, 2020**

(54) **PRE-FILE-TRANSFER UPDATE BASED ON PRIORITIZED METADATA**

(71) Applicant: **TOPIA TECHNOLOGY, INC.**, Tacoma, WA (US)

(72) Inventor: **Michael R. Manzano**, Seattle, WA (US)

(73) Assignee: **TOPIA TECHNOLOGY, INC.**, Tacoma, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/750,399**

(22) Filed: **Jan. 23, 2020**

**Related U.S. Application Data**

(63) Continuation of application No. 16/361,641, filed on Mar. 22, 2019, which is a continuation of application

(Continued)

(51) **Int. Cl.**
*G06F 16/00* (2019.01)
*G06F 16/11* (2019.01)

(Continued)

(52) **U.S. Cl.**
CPC ............ *G06F 16/122* (2019.01); *G06F 15/16* (2013.01); *G06F 16/00* (2019.01); *G06F 16/128* (2019.01);

(Continued)

(58) **Field of Classification Search**
CPC ...... G06F 16/178; G06F 16/27; G06F 16/128; G06F 16/182; G06F 16/1844;

(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,600,834 A 2/1997 Howard
5,806,078 A 9/1998 Hug

(Continued)

FOREIGN PATENT DOCUMENTS

EP 1 130 511 A2 9/2001
WO WO 98/56149 A1 12/1998
WO WO 2007/047302 A2 4/2007

OTHER PUBLICATIONS

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; < https://web. archive.org/web/20040804020435/http://www.foldershare.com: 80/>; Aug. 4, 2004.

(Continued)

*Primary Examiner* — Srirama Channavajjala
(74) *Attorney, Agent, or Firm* — Pillsbury Winthrop Shaw Pittman LLP

(57) **ABSTRACT**

In some embodiments, responsive to a user modifying a content of the file at a first client device (associated with the user), a server system may automatically receive a copy of the file from the first client device, where the file copy may be an updated version of the file that is generated from the user modifying the content of the file. After receiving metadata associated with the updated version of the file from the first client device, the server system may automatically transfer the metadata to a second client device associated with the user such that, before the file copy is transferred to the second client device, the transfer of the metadata to the second client device causes a file representation of the file presented on a user interface of the second client device to be updated based on the metadata.

**17 Claims, 3 Drawing Sheets**



**US 10,642,787 B1**

Page 2

## Related U.S. Application Data

No. 16/017,348, filed on Jun. 25, 2018, now Pat. No. 10,289,607, which is a continuation of application No. 14/860,289, filed on Sep. 21, 2015, now Pat. No. 10,067,942, which is a continuation of application No. 12/267,852, filed on Nov. 10, 2008, now Pat. No. 9,143,561.

(60) Provisional application No. 60/986,896, filed on Nov. 9, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *H04L 29/08* | (2006.01) |
| *G06F 16/178* | (2019.01) |
| *G06F 16/176* | (2019.01) |
| *G06F 15/16* | (2006.01) |
| *G06F 16/14* | (2019.01) |
| *G06F 16/13* | (2019.01) |

(52) **U.S. Cl.**
   CPC .............. *G06F 16/13* (2019.01); *G06F 16/14* (2019.01); *G06F 16/176* (2019.01); *G06F 16/178* (2019.01); *H04L 67/1095* (2013.01)

(58) **Field of Classification Search**
   CPC .... G06F 16/176; G06F 16/10; G06F 16/1873; G06F 16/13; G06F 16/152; G06F 16/164
   See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,909,581 | A | 6/1999 | Park |
| 6,026,414 | A | 2/2000 | Anglin |
| 6,088,693 | A | 7/2000 | Van Huben |
| 6,154,817 | A | 11/2000 | Mohan et al. |
| 6,260,069 | B1 | 7/2001 | Anglin |
| 6,449,624 | B1 | 9/2002 | Hammack et al. |
| 6,463,463 | B1 | 10/2002 | Godfrey et al. |
| 6,504,994 | B2 | 1/2003 | Kawamura et al. |
| 6,505,200 | B1 | 1/2003 | Ims et al. |
| 6,606,646 | B2 | 8/2003 | Feigenbaum |
| 6,611,849 | B1 | 8/2003 | Raff et al. |
| 6,671,700 | B1 | 12/2003 | Creemer et al. |
| 6,708,221 | B1 | 3/2004 | Mendez et al. |
| 6,757,696 | B2 | 6/2004 | Multer et al. |
| 6,760,759 | B1 | 7/2004 | Chan |
| 6,810,405 | B1 | 10/2004 | Larue et al. |
| 6,826,626 | B1 | 11/2004 | McManus |
| 6,829,622 | B2 | 12/2004 | Beyda |
| 6,874,037 | B1 | 3/2005 | Abram et al. |
| 6,931,454 | B2 | 8/2005 | Deshpande et al. |
| 6,990,522 | B2 | 1/2006 | Wu |
| 7,024,428 | B1 | 4/2006 | Huang et al. |
| 7,035,847 | B2 | 4/2006 | Brown et al. |
| 7,051,364 | B1 | 5/2006 | Tackman |
| 7,054,594 | B2 | 5/2006 | Bloch et al. |
| 7,058,667 | B2 | 6/2006 | Goldick |
| 7,065,658 | B1 | 6/2006 | Baraban et al. |
| 7,089,307 | B2 | 8/2006 | Zintel et al. |
| 7,136,934 | B2 | 11/2006 | Carter et al. |
| 7,149,760 | B1 | 12/2006 | Breuer |
| 7,155,488 | B1 | 12/2006 | Lunsford et al. |
| 7,162,501 | B2 | 1/2007 | Kupkova |
| 7,224,973 | B2 | 5/2007 | Tsutazawa et al. |
| 7,243,163 | B1 | 7/2007 | Friend et al. |
| 7,260,646 | B1 | 8/2007 | Stefanik et al. |
| 7,263,493 | B1 | 8/2007 | Provost |
| 7,269,433 | B2 | 9/2007 | Vargas et al. |
| 7,290,244 | B2 | 10/2007 | Peck et al. |
| 7,325,038 | B1 | 1/2008 | Wang |
| 7,340,534 | B2 | 3/2008 | Cameron et al. |
| 7,398,327 | B2 | 7/2008 | Lee |
| 7,415,588 | B2 | 8/2008 | Hong et al. |
| 7,415,615 | B2 | 8/2008 | Skygebjer |
| 7,457,631 | B2 | 11/2008 | Yach et al. |
| 7,467,353 | B2 | 12/2008 | Kurlander et al. |
| 7,483,925 | B2 | 1/2009 | Koskimies et al. |
| 7,526,575 | B2 | 4/2009 | Rabbers et al. |
| 7,529,778 | B1 * | 5/2009 | Dewey ................ G06F 11/1451 |
| 7,574,711 | B2 | 8/2009 | Zondervan et al. |
| 7,584,186 | B2 | 9/2009 | Chen et al. |
| 7,587,446 | B1 | 9/2009 | Onyon et al. |
| 7,613,773 | B2 | 11/2009 | Watt |
| 7,639,116 | B2 | 12/2009 | Saunders |
| 7,657,271 | B2 | 2/2010 | Kim |
| 7,680,838 | B1 | 3/2010 | Shaw |
| 7,680,885 | B2 | 3/2010 | Schauser et al. |
| 7,707,165 | B1 * | 4/2010 | Jiang ...................... G06F 16/10 |
| | | | 707/806 |
| 7,752,166 | B2 | 7/2010 | Quinlan et al. |
| 7,761,414 | B2 | 7/2010 | Freedman |
| 7,788,303 | B2 | 8/2010 | Mikesell et al. |
| 7,885,925 | B1 | 2/2011 | Strong et al. |
| 7,895,334 | B1 | 2/2011 | Tu et al. |
| 7,987,420 | B1 | 7/2011 | Kloba et al. |
| 8,009,966 | B2 | 8/2011 | Bloom et al. |
| 8,019,900 | B1 | 9/2011 | Sekar et al. |
| 8,112,549 | B2 | 2/2012 | Srinivasan et al. |
| 8,244,288 | B2 | 8/2012 | Chipchase |
| 8,321,534 | B1 | 11/2012 | Roskind et al. |
| 8,370,423 | B2 | 2/2013 | Ozzie et al. |
| 8,386,558 | B2 | 2/2013 | Schleifer et al. |
| 8,504,519 | B1 * | 8/2013 | Sachs ........................ G06F 8/71 |
| | | | 707/616 |
| 8,565,729 | B2 | 10/2013 | Moseler et al. |
| 8,874,534 | B2 * | 10/2014 | March ................. G06F 11/1435 |
| | | | 707/695 |
| 9,143,561 | B2 * | 9/2015 | Manzano ............ H04L 67/1095 |
| 10,067,942 | B2 * | 9/2018 | Manzano ............ H04L 67/1095 |
| 10,289,607 | B2 * | 5/2019 | Manzano ............ H04L 67/1095 |
| 2002/0026478 | A1 | 2/2002 | Rodgers et al. |
| 2002/0035697 | A1 | 3/2002 | McCurdy |
| 2002/0087588 | A1 | 7/2002 | McBride et al. |
| 2002/0194382 | A1 | 12/2002 | Kausik |
| 2003/0028514 | A1 | 2/2003 | Lord |
| 2003/0028542 | A1 | 2/2003 | Muttik et al. |
| 2003/0038842 | A1 | 2/2003 | Peck et al. |
| 2003/0078946 | A1 | 4/2003 | Costello |
| 2003/0115547 | A1 | 6/2003 | Ohwada |
| 2003/0125057 | A1 | 7/2003 | Pesola |
| 2003/0135565 | A1 | 7/2003 | Estrada |
| 2004/0031027 | A1 * | 2/2004 | Hiltgen ...................... G06F 8/65 |
| | | | 717/170 |
| 2004/0049345 | A1 | 3/2004 | McDonough et al. |
| 2004/0093361 | A1 | 5/2004 | Therrien et al. |
| 2004/0107225 | A1 | 6/2004 | Rudoff |
| 2004/0133629 | A1 | 7/2004 | Reynolds |
| 2004/0158817 | A1 | 8/2004 | Okachi |
| 2004/0172424 | A1 | 9/2004 | Edelstein et al. |
| 2005/0091316 | A1 | 4/2005 | Ponce et al. |
| 2005/0097225 | A1 | 5/2005 | Glatt et al. |
| 2005/0210371 | A1 | 9/2005 | Pollock |
| 2005/0220080 | A1 | 10/2005 | Ronkainen et al. |
| 2005/0223047 | A1 | 10/2005 | Shah et al. |
| 2006/0010150 | A1 | 1/2006 | Shaath et al. |
| 2006/0058907 | A1 | 3/2006 | Suderman |
| 2006/0074985 | A1 | 4/2006 | Wolfish |
| 2006/0101064 | A1 | 5/2006 | Strong et al. |
| 2006/0129627 | A1 | 6/2006 | Phillips |
| 2006/0143129 | A1 | 6/2006 | Holm |
| 2006/0168118 | A1 | 7/2006 | Godlin |
| 2006/0189348 | A1 | 8/2006 | Montulli et al. |
| 2007/0014314 | A1 | 1/2007 | O'Neil |
| 2007/0016629 | A1 | 1/2007 | Reinsch |
| 2007/0027936 | A1 | 2/2007 | Stakutis |
| 2007/0100913 | A1 | 5/2007 | Summer et al. |
| 2007/0180084 | A1 * | 8/2007 | Mohanty ............ G06F 11/1451 |
| | | | 709/223 |
| 2007/0191057 | A1 | 8/2007 | Kamada |
| 2007/0238440 | A1 | 10/2007 | Sengupta et al. |
| 2008/0005114 | A1 | 1/2008 | Li |
| 2008/0005195 | A1 | 1/2008 | Li |

**US 10,642,787 B1**

Page 3

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2008/0005280 | A1 | 1/2008 | Adams |
| 2008/0086494 | A1 | 4/2008 | Heller et al. |
| 2008/0168526 | A1 | 7/2008 | Robbin et al. |
| 2008/0288578 | A1 | 11/2008 | Silfverberg |
| 2009/0013009 | A1 | 1/2009 | Nakayama |
| 2009/0024922 | A1 | 1/2009 | Markowitz et al. |
| 2009/0063711 | A1 | 3/2009 | Finkelstein |
| 2009/0282050 | A1 | 11/2009 | Thomas et al. |
| 2013/0226871 | A1 | 8/2013 | Sarnowski |

OTHER PUBLICATIONS

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030808183932/http://www.foldershare.com:80/>; Aug. 8, 2003.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040814015727/http://www.foldershare.com:80/>; Aug. 14, 2004.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040820052105/http://www.foldershare.com:80/>; Aug. 20, 2004.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041211020957/http://foldershare.com:80/>; Dec. 11, 2004.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041217041726/http://foldershare.com:80/>; Dec. 17, 2004.
FolderShare; Your Smart File Transfer Solution; <https://web.archive.org/web/20031220151508/http://www.foldershare.com:80/>; Dec. 20, 2003.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041230211050/http://www.foldershare.com:80/>; Dec. 30, 2004.
FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040701113739/http://foldershare.com:80/>; Jul. 1, 2004.
FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040711062548/http://www.foldershare.com:80/>; Jul. 11, 2004.
FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030722054342/http://foldershare.com:80/>; Jul. 22, 2003.
FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040730030655/http://www.foldershare.com:80/>; Jul. 30, 2004.
FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040603205113/http://www.foldershare.com:80/>; Jun. 3, 2004.
FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040613161906/http://www.foldershare.com:80/>; Jun. 13, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040629075057/http://www.foldershare.com:80/>; Jun. 29, 2004.
FolderShare—Secure Remote Access VPN Solution; Your Smart File Transfer & Real-time File Mirroring Solution; <https://web.archive.org/web/20040316235151/http://foldershare.com:80/>; Mar. 16, 2004.
FolderShare—Secure Remote Access VPN Solution; Your Smart File Transfer & Real-time File Mirroring Solution; <https://web.archive.org/web/20040325034239/http://www.foldershare.com:80/>; Mar. 25, 2004.
FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040512211417/http://www.foldershare.com:80/>; May 12, 2004.
FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030531180252/http://www.foldershare.com:80/>; May 31, 2003.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041104031510/http://www.foldershare.com:80/>; Nov. 4, 2004.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?;<https://web.archive.org/web/20041117092357/http://www.foldershare.com:80/>; Nov. 17, 2004.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041123085254/http://www.foldershare.com:80/>; Nov. 23, 2004.
FolderShare; Your Files Anywhere; <https://web.archive.org/web/20031128143634/http://foldershare.com:80/>; Nov. 28, 2003.
FolderShare; Your Files Anywhere; <https://web.archive.org/web/20031001071631/http://foldershare.com:80/>; Oct. 1, 2003.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041012083127/http://www.foldershare.com:80/>; Oct. 12, 2004.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041029085820/http://www.foldershare.com:80/>; Oct. 29, 2004.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040901034646/http://www.foldershare.com:80/>; Sep. 1, 2004.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?;<https://web.archive.org/web/20040909075254/http://www.foldershare.com:80/>; Sep. 9, 2004.
FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030920051943/http://www.foldershare.com:80/>; Sep. 20, 2003.
FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?;<https://web.archive.org/web/20040924032146/http://www.foldershare.com:80/>; Sep. 24, 2004.
Marshall, M., "The Y Combinator List," Venture Beat, Aug. 2007, Retrieved from the Internet: URL: <https://venturebeat.com/2007/08/16/the-y-combinator-list/>, 4 pages.
Jarvis, A., "Dropbox pitch deck to raise seed capital investment," Medium, Mar. 2018, Retrieved from the Internet: URL: <https://medium.com/@adjblog/dropbox-pitch-deck-to-raise-seed-capital-investment-6a6cd6517e56>, 12 pages.

* cited by examiner



FIG. 1

FIG. 2



FIG. 3

US 10,642,787 B1

**1**

## PRE-FILE-TRANSFER UPDATE BASED ON PRIORITIZED METADATA

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application. Ser. No. 16/361,641, filed Mar. 22, 2019, which is a continuation of U.S. patent application Ser. No. 16/017,348, filed Jun. 25, 2018, which is a continuation of U.S. patent application Ser. No. 14/860,289, filed Sep. 21, 2015, now U.S. Pat. No. 10,067,942, which is a continuation of U.S. patent application Ser. No. 12/267,852, filed Nov. 10, 2008, now U.S. Pat. No. 9,143,561, which claims priority to U.S. Provisional Application No. 60/986,896 entitled "ARCHI-TECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK" and filed Nov. 9, 2007, the contents of which are hereby incorporated by reference in their entirety.

### FIELD OF THE INVENTION

This invention relates generally to computer-implemented processes and, more specifically, to sharing of electronic files among computer systems.

### BACKGROUND OF THE INVENTION

Users of modern computing systems are increasingly finding themselves in constantly-connected, high-speed net-worked environments. The Web continues to be a killer application, second only to email, on the Internet. Further, customers are increasingly using more than one computing device; a customer may have a desktop computer at home, one at work, and a constantly connected "smart phone". Due to the confluence of these two trends, file management across these devices has become a problem.

Although modern devices are easily connected, they do not provide the customer a seamless environment; the cus-tomer must manually handle many aspects of that connec-tion. With regards to file management, customers must manually move files between their devices using some protocol like email, ftp, or by posting them on the Web. These practices lead to problems that include:

The proliferation of redundant file copies. This prolifera-tion creates a confusing environment where the cus-tomer is unclear where the "official" or newest version of a file exists.

The creation of an error-prone environment. Some docu-ments, such as those associated with word processing and desktop publishing, externally reference other files. Copying such a document can break these references causing errors that the customer has to handle manu-ally. An example of such a document is a desktop publishing document that contains a reference to an image. If that image file is not transferred along with the desktop publishing file, the image will appear as a broken link.

Unnecessary complexity. Because devices tend to have their own filing system, customers must manage a different filing model on each of his devices. For example, instead of having a single "Movies" folder, he may have to deal with many "Movies" folders, which may be in different locations on each of his devices. Each device may also have its own security model, further complicating the matter.

**2**

That a customer has to manually move files around to ensure their accessibility on his devices is unnecessary, and is an indicator of a lack of customer-focused design in modern file systems. File systems in use today are direct offspring of systems used when graphical customer inter-faces were nonexistent. Modern file system customer inter-faces, such as Windows® Explorer and Mac OS X's Finder are just now starting to provide experiences that are more in line to a customer's workflow. Whereas, before, these inter-faces were concerned with representing files with abstracted icons, the file's actual contents are becoming paramount in how files are organized and presented.

Problems still exist with how these newer customer interfaces are implemented. They are not completely inte-grated with applications, suffer from performance problems, and do not generally work well outside of a device's local file system.

There are several solutions to this problem that are in one way or another inadequate to the task:

Remote Desktop software allows a customer to remotely "see" his desktop. Remote desktop software screen-scrapes a remote machine's screen (a "server") and displays it on a screen local to the customer (a "client"). Remote desktop gives a customer access to not only his files, but also to his applications. However, this approach requires that the host machine be turned on and connected to the internet at all times. Consequently, this approach would not be appropriate for mobile hosts such as laptops. Remote desktop does not use the resources of a local machine. For full accessibility, the customer would have to keep all files and application on the host machine as any files stored on a client are not guaranteed to be accessible.

Distributed File Systems, like remote desktop software, place data on an always-connected host machine. Unlike remote desktop software, the host machine is not one on which the customer performs computing tasks. The host machine is used as a storage mechanism, and any compu-tation performed on that machine serves to supports its use as such. Distributed file systems generally provide the right functionality for customers to share files between their devices. However, distributed file systems are usually deployed as a shared resource; that is, other customers have access to it. Because of this sharing, a customer's files may be buried deep in a filing structure, and it may not always be immediately evident to customers what kind of access they have to a particular file. Further, to use a distributed file system, the customer must always be connected to it. Files stored on a distributed file system are generally inaccessible if the customer's machine is not connected to it, unless the customer has copied or moved the files to his machine's local hard drive. However, doing so immediately creates the problem of having two filing systems for the same file, creating a mental burden on the customer.

Additionally, accessing a file located on a distributed file system tends to be slower than accessing files on the local hard drive. Modern applications are usually written to assume that the files they access are located locally, and thus are not optimized to access remote files. When these appli-cations are used with remote files, they can lose performance by an order of magnitude. This problem can be fixed by automatically caching often-used files on the local file system, and only synchronizing them when they have been changed. However, this separate synchronization step intro-duces another problem: because the synchronization process can be lengthy, the customer is never entirely sure if the file he is remotely accessing is the latest version of the file, versus an earlier one that has been marked to be updated.

US 10,642,787 B1

**3**

Further, the directory may not reflect the existence of the file at all until synchronization finishes.

FTP is similar to a distributed file system with regards to files being hosted on a remote server. However FTP generally does manifest as a "disk drive" on the customer's desktop; the customer must use special FTP client software to access an FTP server. It shares the same problem as distributed file systems, with the additional problem of weak integration with applications. Applications can generally write and read files directly to and from a distributed file system. This is not the case with FTP, as the customer has to manually use the client software to perform these operations as a separate task.

Email was originally invented for messaging. From the beginning, the model it employs to make files accessible remotely is necessarily inefficient. Email's model for making files accessible is in the form of an email "attachment". Attachments are so named because they piggy-back on a message sent from one customer to another. A customer can make a file remotely available using email by attaching the file to an email and sending it to himself. He can then retrieve the file from a remote location by accessing the message on the email server. Email used in this way is even worse than FTP as the process is even more manual: a customer must find the message containing the file before he can even access it. Further, the location in which the attachment lives is read only. If the customer, for example, were to open the file, change it, then save it back out, the results would be ambiguous to the user because the email application, not the user, specified its location. Usually, the saved file would end up buried in an email file cache in an undisclosed area of the file system.

Flash Drives and External Disk Drives, although seemingly the most "primitive" way to ensure file availability, avoid all the problems related to network latency. However, these devices must be physically connected to the computer on which the files will be accessed. These restrictions preclude the customer from employing several effective work-flows including: using more than one computer to complete a single task (the files can only be accessed on one computer) and setting up an automated backup (the computer running the backup can't guarantee that the storage device will be connected come backup time). Further, to ensure full availability of the files, the customer must carry the device with them at all times, and must follow the associated protocols for mounting and dismounting the device.

Other problems with the prior art not described above can also be overcome using the teachings of embodiments of the present invention, as would be readily apparent to one of ordinary skill in the art after reading this disclosure.

SUMMARY OF THE INVENTION

In certain embodiments, automatic modification-triggered transfer of a file among two or more computer systems associated with a user. In some embodiments, a copy of a first file may be received, via a first application at a first computer system, from a second application at a second computer system associated with a user. The first file copy may be automatically received from the second application responsive to the user modifying a content of the first file, where the first file copy is a version of the first file that is generated from the user modifying the content of the first file. Responsive to receiving the first file copy from the second computer system, the first file copy may be automatically transferred via the first application to a third

**4**

computer system associated with the user to replace an older version of the first file stored on the third computer system.

In some embodiments, responsive to a user modifying a content of the file at a first client device (associated with the user), a server system may automatically receive a copy of the file from the first client device, where the file copy may be an updated version of the file that is generated from the user modifying the content of the file. After receiving metadata associated with the updated version of the file from the first client device, the server system may automatically transfer the metadata to a second client device associated with the user such that, before the file copy is transferred to the second client device, the transfer of the metadata to the second client device causes a file representation of the file presented on a user interface of the second client device to be updated based on the metadata.

BRIEF DESCRIPTION OF THE DRAWING

Preferred and alternative embodiments of the present invention are described in detail below with reference to the following drawings.

FIG. 1 is a schematic view of an exemplary operating environment in which an embodiment of the invention can be implemented;

FIG. 2 is a functional block diagram of an exemplary operating environment in which an embodiment of the invention can be implemented; and

FIG. 3 is a functional block diagram illustrating file sharing and/or synchronization according to an embodiment of the invention.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

An embodiment of the invention leverages remote programming concepts by utilizing processes called mobile agents (sometimes referred to as mobile objects or agent objects). Generally speaking, these concepts provide the ability for an object (the mobile agent object) existing on a first ("host") computer system to transplant itself to a second ("remote host") computer system while preserving its current execution state. The operation of a mobile agent object is described briefly below.

The instructions of the mobile agent object, its preserved execution state, and other objects owned by the mobile agent object are packaged, or "encoded," to generate a string of data that is configured so that the string of data can be transported by all standard means of communication over a computer network. Once transported to the remote host, the string of data is decoded to generate a computer process, still called the mobile agent object, within the remote host system. The decoded mobile agent object includes those objects encoded as described above and remains in its preserved execution state. The remote host computer system resumes execution of the mobile agent object which is now operating in the remote host environment.

While now operating in the new environment, the instructions of the mobile agent object are executed by the remote host to perform operations of any complexity, including defining, creating, and manipulating data objects and interacting with other remote host computer objects.

File transfer and/or synchronization, according to an embodiment, may be accomplished using some or all of the concepts described in commonly owned U.S. patent appli-

US 10,642,787 B1

5

cation Ser. No. 11/739,083, entitled "Electronic File Sharing," the entirety of which is incorporated by reference as if fully set forth herein.

FIG. **1** illustrates an example of a suitable computing system environment **100** in which one or more embodiments of the invention may be implemented. The computing system environment **100** is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality of the invention. Neither should the computing environment **100** be interpreted as having any dependency or requirement relating to any one or combination of components illustrated in the exemplary operating environment **100**.

Embodiments of the invention are operational with numerous other general purpose or special purpose computing system environments or configurations. Examples of well known computing systems, environments, and/or configurations that may be suitable for use with the invention include, but are not limited to, personal computers, server computers, hand-held or laptop devices, multiprocessor systems, microprocessor-based systems, set top boxes, programmable consumer electronics, network PCs, minicomputers, mainframe computers, distributed computing environments that include any of the above systems or devices, and the like.

Embodiments of the invention may be described in the general context of computer-executable instructions, such as program modules, being executed by a computer and/or by computer-readable media on which such instructions or modules can be stored. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types. The invention may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in both local and remote computer storage media including memory storage devices.

With reference to FIG. **1**, an exemplary system for implementing the invention includes a general purpose computing device in the form of a computer **110**. Components of computer **110** may include, but are not limited to, a processing unit **120**, a system memory **130**, and a system bus **121** that couples various system components including the system memory to the processing unit **120**. The system bus **121** may be any of several types of bus structures including a memory bus or memory controller, a peripheral bus, and a local bus using any of a variety of bus architectures. By way of example, and not limitation, such architectures include Industry Standard Architecture (ISA) bus, Micro Channel Architecture (MCA) bus, Enhanced ISA (EISA) bus, Video Electronics Standards Association (VESA) local bus, and Peripheral Component Interconnect (PCI) bus also known as Mezzanine bus.

Computer **110** typically includes a variety of computer readable media. Computer readable media can be any available media that can be accessed by computer **110** and includes both volatile and nonvolatile media, removable and non-removable media. By way of example, and not limitation, computer readable media may comprise computer storage media and communication media. Computer storage media includes both volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules or other data. Computer storage media includes, but is not limited to,

6

RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical disk storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can accessed by computer **110**. Communication media typically embodies computer readable instructions, data structures, program modules or other data in a modulated data signal such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" means a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal. By way of example, and not limitation, communication media includes wired media such as a wired network or direct-wired connection, and wireless media such as acoustic, RF, infrared and other wireless media. Combinations of the any of the above should also be included within the scope of computer readable media.

The system memory **130** includes computer storage media in the form of volatile and/or nonvolatile memory such as read only memory (ROM) **131** and random access memory (RAM) **132**. A basic input/output system **133** (BIOS), containing the basic routines that help to transfer information between elements within computer **110**, such as during start-up, is typically stored in ROM **131**. RAM **132** typically contains data and/or program modules that are immediately accessible to and/or presently being operated on by processing unit **120**. By way of example, and not limitation, FIG. **1** illustrates operating system **134**, application programs **135**, other program modules **136**, and program data **137**.

The computer **110** may also include other removable/non-removable, volatile/nonvolatile computer storage media. By way of example only, FIG. **1** illustrates a hard disk drive **140** that reads from or writes to non-removable, nonvolatile magnetic media, a magnetic disk drive **151** that reads from or writes to a removable, nonvolatile magnetic disk **152**, and an optical disk drive **155** that reads from or writes to a removable, nonvolatile optical disk **156** such as a CD ROM or other optical media. Other removable/non-removable, volatile/nonvolatile computer storage media that can be used in the exemplary operating environment include, but are not limited to, magnetic tape cassettes, flash memory cards, digital versatile disks, digital video tape, solid state RAM, solid state ROM, and the like. The hard disk drive **141** is typically connected to the system bus **121** through a non-removable memory interface such as interface **140**, and magnetic disk drive **151** and optical disk drive **155** are typically connected to the system bus **121** by a removable memory interface, such as interface **150**.

The drives and their associated computer storage media discussed above and illustrated in FIG. **1**, provide storage of computer readable instructions, data structures, program modules and other data for the computer **110**. In FIG. **1**, for example, hard disk drive **141** is illustrated as storing operating system **144**, application programs **145**, other program modules **146**, and program data **147**. Note that these components can either be the same as or different from operating system **134**, application programs **135**, other program modules **136**, and program data **137**. Operating system **144**, application programs **145**, other program modules **146**, and program data **147** are given different numbers here to illustrate that, at a minimum, they are different copies. A user may enter commands and information into the computer **20** through input devices such as a keyboard **162** and pointing device **161**, commonly referred to as a mouse, trackball or touch pad. Other input devices (not shown) may include a

US 10,642,787 B1

7

microphone, joystick, game pad, satellite dish, scanner, or the like. These and other input devices are often connected to the processing unit 120 through a user input interface 160 that is coupled to the system bus, but may be connected by other interface and bus structures, such as a parallel port, game port or a universal serial bus (USB). A monitor 191 or other type of display device is also connected to the system bus 121 via an interface, such as a video interface 190. In addition to the monitor, computers may also include other peripheral output devices such as speakers 197 and printer 196, which may be connected through an output peripheral interface 190.

The computer 110 may operate in a networked environment using logical connections to one or more remote computers, such as a remote computer 180. The remote computer 180 may be a personal computer, a server, a router, a network PC, a peer device or other common network node, and typically includes many or all of the elements described above relative to the computer 110, although only a memory storage device 181 has been illustrated in FIG. 1. The logical connections depicted in FIG. 1 include a local area network (LAN) 171 and a wide area network (WAN) 173, but may also include other networks. Such networking environments are commonplace in offices, enterprise-wide computer networks, intranets and the Internet.

When used in a LAN networking environment, the computer 110 is connected to the LAN 171 through a network interface or adapter 170. When used in a WAN networking environment, the computer 110 typically includes a modem 172 or other means for establishing communications over the WAN 173, such as the Internet. The modem 172, which may be internal or external, may be connected to the system bus 121 via the user input interface 160, or other appropriate mechanism. In a networked environment, program modules depicted relative to the computer 110, or portions thereof, may be stored in the remote memory storage device. By way of example, and not limitation, FIG. 1 illustrates remote application programs 185 as residing on memory device 181. It will be appreciated that the network connections shown are exemplary and other means of establishing a communications link between the computers may be used.

Referring now to FIG. 2, an embodiment of the present invention can be described in the context of an exemplary computer network system 200 as illustrated. System 200 includes electronic user devices 210, 280, such as personal computers or workstations, that are linked via a communication medium, such as a network 220 (e.g., the Internet), to an electronic device or system, such as a server 230. The server 230 may further be coupled, or otherwise have access, to a database 240, electronic storage 270 and a computer system 260. Although the embodiment illustrated in FIG. 2 includes one server 230 coupled to two user devices 210, 280 via the network 220, it should be recognized that embodiments of the invention may be implemented using two or more such user devices coupled to one or more such servers.

In an embodiment, each of the user devices 210, 280 and server 230 may include all or fewer than all of the features associated with the computer 110 illustrated in and discussed with reference to FIG. 1. User devices 210, 280 include or are otherwise coupled to a computer screen or display 250, 290, respectively. User devices 210, 280 can be used for various purposes including both network- and local-computing processes.

The user devices 210, 280 are linked via the network 220 to server 230 so that computer programs, such as, for example, a browser or other applications, running on one or

8

more of the user devices 210, 280 can cooperate in two-way communication with server 230 and one or more applications running on server 230. Server 230 may be coupled to database 240 and/or electronic storage 270 to retrieve information therefrom and to store information thereto. Additionally, the server 230 may be coupled to the computer system 260 in a manner allowing the server to delegate certain processing functions to the computer system.

Referring now to FIG. 3, illustrated is functionality of an embodiment of the invention allowing a user (not shown) who owns or otherwise controls devices 210, 280 to automatically maintain file synchronization between at least devices 210, 280, or any other user devices on which principles of the present invention are implemented. In an embodiment, an administrator (not shown) of the server 230 or other appropriate electronic device transfers a file-transfer and/or synchronization application to the user devices 210, 280 for installation thereon. Once installed on the user devices 210, 280, the file-transfer application provides file-transfer clients 310, 320 executable by the user devices 210, 280, respectively. Each of the file-transfer clients 310, 320 may, but need not, include a respective mobile-agent runtime environment 330, 340. The mobile-agent runtime environment 330, 340 include portions of memory of the user devices 210, 280 dedicated to allowing a mobile object the ability to perform operations that the mobile object is programmed to carry out. Also included in the file-transfer application are user interfaces 350, 360 that are displayable on the displays 250, 290, respectively. In an embodiment, the interfaces 350, 360 allow a user to view, access and/or organize files to be synched among the various user devices.

Generally, all files that the user desires to be synched or shared may at some point be uploaded by one or more of the user devices 210, 280 and stored in storage 270. Upon receiving the files to be synched, the server 230 can store such files in the storage 270 and/or transfer the files to one or more of the respective hard drives of the user devices 210, 280, thereby enabling each respective user device to access such files. In this manner, the server 230 is operable to treat each hard drive of the respective user devices 210, 280 as a local document cache for files received by the server. Typically, the server 230 will store one or more of the received files to the storage 270 only if the destination user device is offline or otherwise temporarily not in communication with the server 230. Upon resuming communication with the destination user device, the server 230 will transfer the temporarily stored files to the destination device.

In operation, according to an embodiment, the user may open and modify a file 370, such as a word-processing document or other electronic file. Alternatively, the user may create a first instance of the file 370. The user may have previously have associated, or may now associate, the file 370 with the transfer client 310. Upon a predetermined and user-configurable triggering event, the transfer client 310 transfers the modified file 370, or a copy of the modified file, to the server 230. Such a triggering event may include, but not limited to, the user saving the file, the elapsing of a predetermined amount of time during which the file has been opened, or the re-initiation of a communication session between the device 210 and the server 230.

The file 370 is transferred to the server 230 on which is executing a synchronization application 380, which may include a mobile-agent runtime environment. Through user configuration, the synch application 380 monitors a set of user devices to which the file 370 should be transferred to effect file synchronization. In the illustrated embodiment, this set of user devices includes the user device 280. The

US 10,642,787 B1

9

synch application **380** polls the device **280** to determine whether the device **280** is in communication with the server **230**. If the device **280** is in communication with the server **230**, the synch application **380** transfers the file **370** to the device **280**, whereupon the transfer client **320** resident on the device **280** replaces the previous version of the file **370**, previously cached on the device **280**, with the latest version of the file **370** modified on the user device **210**. If the device **280** is not currently in communication with the server **230**, the synch application **380** may store the file **370** in the storage **270** until such time as communication between the device **280** and server **230** is reestablished. As illustrated in FIG. **3**, a similar reverse-direction synchronization process may be performed by the synch application **380** and the transfer clients **310**, **320** with regard to a file **315** modified on device **280** and synchronized to device **210**.

In an embodiment, the user interfaces **350**, **360** may include a list of the customer's documents and related metadata, as well as any one-to-one or one-to-many relationships between the documents and metadata. An embodiment can always provide customers with an accurate "picture" of their document collection, regardless of whether their devices physically contain the documents. As alluded to earlier, a problem with distributed file systems and FTP is the latency between a file being put onto a file system and it showing up on a remote machine. To prevent this problem, an embodiment directory is decoupled from the movement of files. An embodiment's directory update system updates at a higher priority than the documents to be synchronized. This feature ensures that when a customer browses or searches through his set of documents, they appear even if they have not yet been cached locally on the user device. An indicator signifying a document's availability may be prominently displayed adjacent to the document's representation so that customers are aware of the document's availability.

An embodiment may include a stand-alone application that allows customers to find and manage documents associated with transfer clients **310**, **320** by visualizing relationships between documents and their metadata. It allows customers to tag documents with any number of identifiers. Customers can relate both documents and tags with each other in any number of user-specified one-to-one and one-to-many relationships, and an embodiment provides a user interface to browse and search on these relationships. To mitigate the customers' learning curve, an embodiment can implement relationships common to contemporary file systems, including a folder hierarchy. In addition to this, an embodiment provides direct support for methods that the customer uses to organize documents by manifesting them as user interface idioms. This is unlike conventional document filing systems which require the customer to work within a strict folder metaphor for organization.

Some alternate methods that an embodiment supports for organizing documents include:

Allow customers to organize their documents by application. Many times customers remember the application used to create a document instead of the document's name or its location in a hierarchy.

Allow customers to organize their documents by most recent access. Customers are likely to access a document they've accessed in the near past. Usually, such documents are part of a task that the customer is actively working.

Allow customers to organize their documents by project or subproject.

Allow customers to organize their documents by people. Many times, especially in the context of a collabora-

10

tion, a document is directly related to one or more people other than the customer.

Allow the customer to organize their document by process stage. Documents may represent one or more stages of a process. Customers need a method for organizing documents by process stage, and a mechanism for moving the document through a set of predefined stages.

Allow customers to organize their documents by any of the aforementioned methods concurrently. These organization methods are not mutually exclusive.

An embodiment presents an interface that allows a customer to locate one or more documents associated with the transfer clients **310**, **320** and open such document into a separate software application. Since this interface is intended to be used from within the separate application, that application may need to know how to invoke such interface. Advantageously, this invocation behavior can be provided to the application using the application's plug-in API.

An embodiment presents an interface that allows a customer to synchronize a currently opened document according to processes described elsewhere herein. This interface can be invoked within an application and can be made available to the application in the manner described above in connection with the application's plug-in API.

Some files associated with the transfer clients **310**, **320** are dependent on other files associated with the transfer clients **310**, **320**. For example, a desktop publishing document may include images that are stored in files separate from the main document. Previous file-synching solutions treat these files as separate. Because of this, for example, a document synchronized from the device **210** to the device **280** may be opened by the user of the device **280** before the image files have been fully transferred to the device **280**. This causes the document to fail to open, or break, since the image files don't exist or are incomplete. An embodiment prevents this by: (1) always ensuring the file catalog (e.g., the stand-alone application that allows customers to find and manage documents associated with transfer clients **310**, **320**, as discussed above herein) is synchronized before any file data is synchronized, and (2) pausing any file access by any program until the file contents have been fully synchronized. In such an embodiment, if a user attempts, using a software program, to open a file whose related files haven't yet finished transferring to the local (hard drive) cache, if that software attempts to open the related files, the software program is blocked by an embodiment until the requested files are downloaded and ready to access.

Other file sending and synchronizing software requires the user to upload their data to a storage device owned by the operator of the service. An embodiment treats storage as a participant in the synchronization process; this means that the user can choose the service or device where their files will be stored. The file transfer/synching is abstracted from the storage system allowing any storage to be used. An embodiment treats storage like any other synch target, such as a desktop computer, or a cell phone. As such, any device owned or otherwise controlled by the user and running a synch application, such as synch application **380**, as provided in an embodiment of the invention can perform the storage and/or synching functions described elsewhere herein. That is, the user device **280** or user device **210**, rather than the server **230**, may perform such functions.

While a preferred embodiment of the invention has been illustrated and described, as noted above, many changes can be made without departing from the spirit and scope of the invention. For example, as an alternative to the approach

US 10,642,787 B1

11

described with reference to FIG. **3**, wherein the transfer clients **310**, **320** function to "push" modified or created files to the synch application **380**, the synch application **380** may instead function to periodically "pull" or otherwise actively retrieve such files from the transfer clients **310**, **320** Instead, the invention should be determined entirely by reference to the claims that follow.

What is claimed is:

**1**. A system comprising:

a server system comprising one or more processors programmed with computer program instructions that, when executed, cause the server system to:

receive, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being an updated version of the first file that is generated from the user modifying the content of the first file;

receive, over a network, from the first client device, first metadata associated with the updated version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file; and

automatically transfer, based on the first priority being greater than the second priority, the first metadata over a network to a second client device associated with the user such that the first metadata is transferred to the second client device before the copy of the first file is transferred to the second client device,

wherein, before the copy of the first file is transferred to the second client device:

(i) the transfer of the first metadata to the second client device causes a file representation of the first file presented on a user interface of the second client device to be updated based on the first metadata, and

(ii) instead of the updated file representation of the first file representing a version of the first file currently stored on the second client device, the updated file representation represents the updated version of the first file that is currently stored on the first client device and not currently stored on the second client device, and

wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

**2**. The system of claim **1**, wherein, before the copy of the first file is transferred to the second client device, the transfer of the first metadata to the second client device causes a graphical availability indication of the updated version of the first file to be presented on the user interface of the second client device based on the first metadata.

**3**. The system of claim **1**, wherein the computer program instructions, when executed, cause the server system to:

receive a copy of a second file from the second client device associated with the user, wherein the copy of the second file is automatically received from the second client device responsive to the user modifying a content

12

of the second file stored on the second client device, the copy of the second file being an updated version of the second file that is generated from the user modifying the content of the second file;

determine that the server system is in communication with the first client device associated with the user; and

automatically transfer the copy of the second file to the first client device associated with the user to replace an older version of the second file stored on the first client device, responsive to (i) determining that the server system is in communication with the first client device and (ii) receiving the copy of the second file from the second client device.

**4**. The system of claim **1**, wherein the copy of the first file is automatically received from the first client device responsive to (i) a push request of the first client device and (ii) the user modifying the content of the first file stored on the first client device.

**5**. The system of claim **1**, wherein the copy of the first file is automatically received from a first application at the first client device, and wherein the first application comprises a runtime environment for one or more mobile-agent objects.

**6**. The system of claim **5**, wherein the first application is configured to create a first mobile object, and wherein the first mobile object is configured to create a proxy object at the server system.

**7**. The system of claim **6**, wherein the first mobile object is configured to provide the copy of the first file to the proxy object, and wherein the proxy object is configured to store the copy of the first file on a memory device associated with the server system.

**8**. A method being implemented by a server system comprising one or more processors executing computer program instructions that, when executed, perform the method, the method comprising:

receiving, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being an updated version of the first file that is generated from the user modifying the content of the first file;

receiving, over a network, from the first client device, first metadata associated with the updated version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file; and

automatically transferring, based on the first priority being greater than the second priority, the first metadata over a network to a second client device associated with the user such that the first metadata is transferred to the second client device before the copy of the first file is transferred to the second client device,

wherein, before the copy of the first file is transferred to the second client device:

(i) the transfer of the first metadata to the second client device causes a file representation of the first file presented on a user interface of the second client device to be updated based on the first metadata, and

(ii) the updated file representation represents the updated version of the first file that is currently stored on the first client device and not currently stored on the second client device, and

wherein at least one of the server system or the first client device comprises a priority assignment configuration to

13

14

assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

**9**. The method of claim **8**, wherein, before the copy of the first file is transferred to the second client device, the transfer of the first metadata to the second client device causes a graphical availability indication of the updated version of the first file to be presented on the user interface of the second client device based on the first metadata.

**10**. The method of claim **8**, further comprising:

receiving a copy of a second file from the second client device associated with the user, wherein the copy of the second file is automatically received from the second client device responsive to the user modifying a content of the second file stored on the second client device, the copy of the second file being an updated version of the second file that is generated from the user modifying the content of the second file;

determining that the server system is in communication with the first client device associated with the user; and

automatically transferring the copy of the second file to the first client device associated with the user to replace an older version of the second file stored on the first client device, responsive to (i) determining that the server system is in communication with the first client device and (ii) receiving the copy of the second file from the second client device.

**11**. The method of claim **8**, wherein the copy of the first file is automatically received from the first client device responsive to (i) a push request of the first client device and (ii) the user modifying the content of the first file stored on the first client device.

**12**. The method of claim **8**, wherein the copy of the first file is automatically received from a first application at the first client device, wherein the first application comprises a runtime environment for one or more mobile-agent objects, wherein the first application is configured to create a first mobile object, wherein the first mobile object is configured to create a proxy object at the server system, wherein the first mobile object is configured to provide the copy of the first file to the proxy object, and wherein the proxy object is configured to store the copy of the first file on a memory device associated with the server system.

**13**. One or more non-transitory machine-readable media storing instructions that, when executed by one or more processors of a server system, cause operations comprising:

receiving, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being an updated version of the first file that is generated from the user modifying the content of the first file;

receiving, over a network, from the first client device, first metadata associated with the updated version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file; and

automatically transferring, based on the first priority being greater than the second priority, the first metadata over a network to a second client device associated

with the user such that the first metadata is transferred to the second client device before the copy of the first file is transferred to the second client device,

wherein, before the copy of the first file is transferred to the second client device:

(i) the transfer of the first metadata to the second client device causes a file representation of the first file presented on a user interface of the second client device to be updated based on the first metadata, and

(ii) the updated file representation represents the updated version of the first file that is currently stored on the first client device and not currently stored on the second client device, and

wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

**14**. The media of claim **13**, wherein, before the copy of the first file is transferred to the second client device, the transfer of the first metadata to the second client device causes an availability indication of the updated version of the first file to be presented on the user interface of the second client device based on the first metadata.

**15**. The media of claim **13**, the operations further comprising:

receiving a copy of a second file from the second client device associated with the user, wherein the copy of the second file is automatically received from the second client device responsive to the user modifying a content of the second file stored on the second client device, the copy of the second file being an updated version of the second file that is generated from the user modifying the content of the second file;

determining that the server system is in communication with the first client device associated with the user; and

automatically transferring the copy of the second file to the first client device associated with the user to replace an older version of the second file stored on the first client device, responsive to (i) determining that the server system is in communication with the first client device and (ii) receiving the copy of the second file from the second client device.

**16**. The media of claim **13**, wherein the copy of the first file is automatically received from the first client device responsive to (i) a push request of the first client device and (ii) the user modifying the content of the first file stored on the first client device.

**17**. The media of claim **13**, wherein the copy of the first file is automatically received from a first application at the first client device, wherein the first application comprises a runtime environment for one or more mobile-agent objects, wherein the first application is configured to create a first mobile object, wherein the first mobile object is configured to create a proxy object at the server system, wherein the first mobile object is configured to provide the copy of the first file to the proxy object, and wherein the proxy object is configured to store the copy of the first file on a memory device associated with the server system.

\* \* \* \* \*

# EXHIBIT 5

US010754823B2

(12) **United States Patent**

Manzano

(10) Patent No.: **US 10,754,823 B2**

(45) **Date of Patent:** *Aug. 25, 2020**

(54) **PRE-FILE-TRANSFER AVAILABILITY INDICATION BASED ON PRIORITIZED METADATA**

(71) Applicant: **TOPIA TECHNOLOGY, INC.**, Tacoma, WA (US)

(72) Inventor: **Michael R. Manzano**, Seattle, WA (US)

(73) Assignee: **TOPIA TECHNOLOGY, INC.**, Tacoma, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/750,435**

(22) Filed: **Jan. 23, 2020**

(65) **Prior Publication Data**

US 2020/0159695 A1    May 21, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 16/361,641, filed on Mar. 22, 2019, which is a continuation of application

(Continued)

(51) **Int. Cl.**
*G06F 16/00* (2019.01)
*G06F 16/11* (2019.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ *G06F 16/122* (2019.01); *G06F 15/16* (2013.01); *G06F 16/00* (2019.01); *G06F 16/128* (2019.01);
(Continued)

(58) **Field of Classification Search**
CPC ...... G06F 16/213; G06F 16/583; G06F 16/68; G06F 16/14; G06F 16/1873; G06F 16/27;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,600,834 A    2/1997 Howard
5,806,078 A    9/1998 Hug
(Continued)

FOREIGN PATENT DOCUMENTS

EP        1 130 511 A2    9/2001
WO      WO 98/56149 A1    12/1998
WO      WO 2007/047302 A2    4/2007

OTHER PUBLICATIONS

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; < https://web. archive.org/web/20040804020435/http://www.foldershare.com: 80/>; Aug. 4, 2004.

(Continued)

*Primary Examiner* — Srirama Channavajjala
(74) *Attorney, Agent, or Firm* — Pillsbury Winthrop Shaw Pittman LLP

(57) **ABSTRACT**

In some embodiments, responsive to a user modifying a content of the file at a first client device (associated with the user), a server system may automatically receive a copy of the file from the first client device, where the file copy may be an updated version of the file that is generated from the user modifying the content of the file. After receiving metadata associated with the updated version of the file from the first client device, the server system may automatically transfer the metadata to a second client device associated with the user such that, before the file copy is transferred to the second client device, the transfer of the metadata to the second client device causes a graphical availability indication of the updated version of the file to be presented (e.g., proximate a file icon representing the file) at the second client device based on the metadata.

**17 Claims, 3 Drawing Sheets**



**US 10,754,823 B2**

Page 2

## Related U.S. Application Data

No. 16/017,348, filed on Jun. 25, 2018, now Pat. No. 10,289,607, which is a continuation of application No. 14/860,289, filed on Sep. 21, 2015, now Pat. No. 10,067,942, which is a continuation of application No. 12/267,852, filed on Nov. 10, 2008, now Pat. No. 9,143,561.

(60) Provisional application No. 60/986,896, filed on Nov. 9, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 15/16* | (2006.01) |
| *G06F 16/13* | (2019.01) |
| *G06F 16/14* | (2019.01) |
| *G06F 16/176* | (2019.01) |
| *G06F 16/178* | (2019.01) |
| *G06F 16/18* | (2019.01) |
| *H04L 29/08* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *G06F 16/13* (2019.01); *G06F 16/14* (2019.01); *G06F 16/176* (2019.01); *G06F 16/178* (2019.01); *G06F 16/1873* (2019.01); *H04L 67/1095* (2013.01)

(58) **Field of Classification Search**
CPC ............. G06F 16/122; G06F 16/13–14; G06F 16/128; G06F 16/176; G06F 16/178
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,909,581 | A | 6/1999 | Park |
| 6,026,414 | A | 2/2000 | Anglin |
| 6,088,693 | A | 7/2000 | Van Huben |
| 6,154,817 | A | 11/2000 | Mohan et al. |
| 6,260,069 | B1 | 7/2001 | Anglin |
| 6,449,624 | B1 | 9/2002 | Hammack et al. |
| 6,463,463 | B1 | 10/2002 | Godfrey et al. |
| 6,504,994 | B2 | 1/2003 | Kawamura et al. |
| 6,505,200 | B1 | 1/2003 | Ims et al. |
| 6,606,646 | B2 | 8/2003 | Feigenbaum |
| 6,611,849 | B1 | 8/2003 | Raff et al. |
| 6,671,700 | B1 | 12/2003 | Creemer et al. |
| 6,708,221 | B1 | 3/2004 | Mendez et al. |
| 6,757,696 | B2 | 6/2004 | Multer et al. |
| 6,760,759 | B1 | 7/2004 | Chan |
| 6,810,405 | B1 | 10/2004 | Larue et al. |
| 6,826,626 | B1 | 11/2004 | McManus |
| 6,829,622 | B2 | 12/2004 | Beyda |
| 6,874,037 | B1 | 3/2005 | Abram et al. |
| 6,931,454 | B2 | 8/2005 | Deshpande et al. |
| 6,990,522 | B2 | 1/2006 | Wu |
| 7,024,428 | B1 | 4/2006 | Huang et al. |
| 7,035,847 | B2 | 4/2006 | Brown et al. |
| 7,051,364 | B1 | 5/2006 | Tackman |
| 7,054,594 | B2 | 5/2006 | Bloch et al. |
| 7,058,667 | B2 | 6/2006 | Goldick |
| 7,065,658 | B1 | 6/2006 | Baraban et al. |
| 7,089,307 | B2 | 8/2006 | Zintel et al. |
| 7,136,934 | B2 | 11/2006 | Carter et al. |
| 7,149,760 | B1 | 12/2006 | Breuer |
| 7,155,488 | B1 | 12/2006 | Lunsford et al. |
| 7,162,501 | B2 | 1/2007 | Kupkova |
| 7,224,973 | B2 | 5/2007 | Tsutazawa et al. |
| 7,243,163 | B1 | 7/2007 | Friend et al. |
| 7,260,646 | B1 | 8/2007 | Stefanik et al. |
| 7,263,493 | B1 | 8/2007 | Provost |
| 7,269,433 | B2 | 9/2007 | Vargas et al. |
| 7,290,244 | B2 | 10/2007 | Peck et al. |
| 7,325,038 | B1 | 1/2008 | Wang |
| 7,340,534 | B2 | 3/2008 | Cameron et al. |

| | | | | |
|---|---|---|---|---|
| 7,398,327 | B2 | 7/2008 | Lee | |
| 7,415,588 | B2 | 8/2008 | Hong et al. | |
| 7,415,615 | B2 | 8/2008 | Skygebjer | |
| 7,457,631 | B2 | 11/2008 | Yach et al. | |
| 7,467,353 | B2 | 12/2008 | Kurlander et al. | |
| 7,483,925 | B2 | 1/2009 | Koskimies et al. | |
| 7,526,575 | B2 | 4/2009 | Rabbers et al. | |
| 7,574,711 | B2 | 8/2009 | Zondervan et al. | |
| 7,584,186 | B2 | 9/2009 | Chen et al. | |
| 7,587,446 | B1 | 9/2009 | Onyon et al. | |
| 7,613,773 | B2 | 11/2009 | Watt | |
| 7,639,116 | B2 | 12/2009 | Saunders | |
| 7,657,271 | B2 | 2/2010 | Kim | |
| 7,680,838 | B1 | 3/2010 | Shaw | |
| 7,680,885 | B2 | 3/2010 | Schauser et al. | |
| 7,752,166 | B2 | 7/2010 | Quinlan et al. | |
| 7,761,414 | B2 | 7/2010 | Freedman | |
| 7,788,303 | B2 | 8/2010 | Mikesell et al. | |
| 7,885,925 | B1 | 2/2011 | Strong et al. | |
| 7,895,334 | B1 | 2/2011 | Tu et al. | |
| 7,987,420 | B1 | 7/2011 | Kloba et al. | |
| 8,009,966 | B2 | 8/2011 | Bloom et al. | |
| 8,019,900 | B1 | 9/2011 | Sekar et al. | |
| 8,112,549 | B2 | 2/2012 | Srinivasan et al. | |
| 8,208,792 | B2 * | 6/2012 | Morioka | G11B 27/034 |
| | | | | 386/248 |
| 8,244,288 | B2 | 8/2012 | Chipchase | |
| 8,321,534 | B1 | 11/2012 | Roskind et al. | |
| 8,370,423 | B2 | 2/2013 | Ozzie et al. | |
| 8,386,558 | B2 | 2/2013 | Schleifer et al. | |
| 8,565,729 | B2 | 10/2013 | Moseler et al. | |
| 9,143,561 | B2 | 9/2015 | Manzano | G06F 16/176 |
| 10,067,942 | B2 * | 9/2018 | Manzano | G06F 15/16 |
| 10,289,607 | B2 * | 5/2019 | Manzano | G06F 16/176 |
| 2002/0026478 | A1 | 2/2002 | Rodgers et al. | |
| 2002/0035697 | A1 | 3/2002 | McCurdy | |
| 2002/0087588 | A1 | 7/2002 | McBride et al. | |
| 2002/0184318 | A1 * | 12/2002 | Pineau | H04L 29/06 |
| | | | | 709/206 |
| 2002/0194382 | A1 | 12/2002 | Kausik | |
| 2003/0028514 | A1 | 2/2003 | Lord | |
| 2003/0028542 | A1 | 2/2003 | Muttik et al. | |
| 2003/0038842 | A1 | 2/2003 | Peck et al. | |
| 2003/0074376 | A1 * | 4/2003 | Benayoun | G06F 16/10 |
| 2003/0078946 | A1 | 4/2003 | Costello | |
| 2003/0115547 | A1 | 6/2003 | Ohwada | |
| 2003/0125057 | A1 | 7/2003 | Pesola | |
| 2003/0135565 | A1 | 7/2003 | Estrada | |
| 2004/0003013 | A1 * | 1/2004 | Coulthard | H04L 67/2823 |
| 2004/0049345 | A1 | 3/2004 | McDonough et al. | |
| 2004/0093361 | A1 | 5/2004 | Therrien et al. | |
| 2004/0107225 | A1 | 6/2004 | Rudoff | |
| 2004/0133629 | A1 | 7/2004 | Reynolds | |
| 2004/0158817 | A1 | 8/2004 | Okachi | |
| 2004/0172424 | A1 | 9/2004 | Edelstein et al. | |
| 2005/0091316 | A1 | 4/2005 | Ponce et al. | |
| 2005/0097225 | A1 | 5/2005 | Glatt et al. | |
| 2005/0177602 | A1 * | 8/2005 | Kaler | H04L 63/04 |
| 2005/0210371 | A1 | 9/2005 | Pollock | |
| 2005/0220080 | A1 | 10/2005 | Ronkainen et al. | |
| 2005/0223047 | A1 | 10/2005 | Shah et al. | |
| 2006/0010150 | A1 | 1/2006 | Shaath et al. | |
| 2006/0026567 | A1 * | 2/2006 | McVoy | G06F 16/213 |
| | | | | 717/120 |
| 2006/0058907 | A1 | 3/2006 | Suderman | |
| 2006/0074985 | A1 | 4/2006 | Wolfish | |
| 2006/0101064 | A1 | 5/2006 | Strong et al. | |
| 2006/0129627 | A1 | 6/2006 | Phillips | |
| 2006/0143129 | A1 | 6/2006 | Holm | |
| 2006/0168118 | A1 | 7/2006 | Godlin | |
| 2006/0189348 | A1 | 8/2006 | Montulli et al. | |
| 2006/0224626 | A1 * | 10/2006 | Lakshminath | G06F 16/1873 |
| 2007/0014314 | A1 | 1/2007 | O'Neil | |
| 2007/0016771 | A1 | 1/2007 | Reinsch | |
| 2007/0027936 | A1 | 2/2007 | Stakutis | |
| 2007/0100913 | A1 | 5/2007 | Sumner et al. | |
| 2007/0124334 | A1 * | 5/2007 | Pepin | G06F 8/73 |
| 2007/0180084 | A1 * | 8/2007 | Mohanty | G06F 11/1451 |
| | | | | 709/223 |

## US 10,754,823 B2
Page 3

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2007/0191057 | A1 | 8/2007 | Kamada |
| 2007/0203927 | A1* | 8/2007 | Cave ...................... G06F 16/14 |
| 2007/0238440 | A1 | 10/2007 | Sengupta et al. |
| 2008/0005114 | A1 | 1/2008 | Li |
| 2008/0005195 | A1 | 1/2008 | Li |
| 2008/0005280 | A1 | 1/2008 | Adams |
| 2008/0086494 | A1 | 4/2008 | Heller et al. |
| 2008/0168526 | A1 | 7/2008 | Robbin et al. |
| 2008/0288578 | A1 | 11/2008 | Silfverberg |
| 2009/0013009 | A1 | 1/2009 | Nakayama |
| 2009/0024922 | A1 | 1/2009 | Markowitz et al. |
| 2009/0063711 | A1 | 3/2009 | Finkelstein |
| 2009/0282050 | A1 | 11/2009 | Thomas et al. |
| 2013/0226871 | A1 | 8/2013 | Sarnowski |
| 2016/0125058 | A1* | 5/2016 | Jain ...................... G06F 16/27<br>707/639 |

OTHER PUBLICATIONS

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030808183932/http://www.foldershare.com:80/>; Aug. 8, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040814015727/http://www.foldershare.com:80/>; Aug. 14, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040820052105/http://www.foldershare.com:80/>; Aug. 20, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041211020957/http://foldershare.com:80/>; Dec. 11, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041217041726/http://www.foldershare.com:80/>; Dec. 17, 2004.

FolderShare; Your Smart File Transfer Solution; <https://web.archive.org/web/20031220151508/http://www.foldershare.com:80/>; Dec. 20, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?;<https://web.archive.org/web/20041230211050/http://www.foldershare.com:80/>; Dec. 30, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040701113739/http://foldershare.com:80/>; Jul. 1, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040711062548/http://www.foldershare.com:80/>; Jul. 11, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030722054342/http://foldershare.com:80/>; Jul. 22, 2003.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040730030655/http://www.foldershare.com:80/>; Jul. 30, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040603205113/http://www.foldershare.com:80/>; Jun. 3, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040613161906/http://www.foldershare.com:80/>; Jun. 13, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040629075057/http://www.foldershare.com:80/>; Jun. 29, 2004.

FolderShare—Secure Remote Access VPN Solution; Your Smart File Transfer & Real-time File Mirroring Solution; <https://web.archive.org/web/20040316235151/http://foldershare.com:80/>; Mar. 16, 2004.

FolderShare—Secure Remote Access VPN Solution; Your Smart File Transfer & Real-time File Mirroring Solution; <https://web.archive.org/web/20040325034239/http://www.foldershare.com:80/>; Mar. 25, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040512211417/http://www.foldershare.com:80/>; May 12, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030531180252/http://www.foldershare.com:80/>; May 31, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041104031510/http://www.foldershare.com:80/>; Nov. 4, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041117092357/http://www.foldershare.com:80/>; Nov. 17, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041123085254/http://www.foldershare.com:80/>; Nov. 23, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20031128143634/http://foldershare.com:80/>; Nov. 28, 2003.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20031001071631/http://foldershare.com:80/>; Oct. 1, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041012083127/http://www.foldershare.com:80/>; Oct. 12, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041029085820/http://www.foldershare.com:80/>; Oct. 29, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040901034646/http://www.foldershare.com:80/>; Sep. 1, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040909075254/http://www.foldershare.com:80/>; Sep. 9, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030920051943/http://www.foldershare.com:80/>; Sep. 20, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040924032146/http://www.foldershare.com:80/>; Sep. 24, 2004.

Marshall, M., "The Y Combinator List," Venture Beat, Aug. 2007, Retrieved from the Internet: URL: <https://venturebeat.com/2007/08/16/the-y-combinator-list/>, 4 pages.

Jarvis, A., "Dropbox pitch deck to raise seed capital investment," Medium, Mar. 2018, Retrieved from the Internet: URL: <https://medium.com/@adjblog/dropbox-pitch-deck-to-raise-seed-capital-investment-6a6cd6517e56>, 12 pages.

* cited by examiner



FIG. 1



FIG. 2



FIG. 3

US 10,754,823 B2

1

# PRE-FILE-TRANSFER AVAILABILITY INDICATION BASED ON PRIORITIZED METADATA

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/361,641, filed Mar. 22, 2019, which is a continuation of U.S. patent application Ser. No. 16/017,348, filed Jun. 25, 2018, which is a continuation of U.S. patent application Ser. No. 14/860,289, filed Sep. 21, 2015, now U.S. Pat. No. 10,067,942, which is a continuation of U.S. patent application Ser. No. 12/267,852, filed Nov. 10, 2008, now U.S. Pat. No. 9,143,561, which claims priority to U.S. Provisional Application Ser. No. 60/986,896 entitled "ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK" and filed Nov. 9, 2007, the contents of which are hereby incorporated by reference in their entirety.

## FIELD OF THE INVENTION

This invention relates generally to computer-implemented processes and, more specifically, to sharing of electronic files among computer systems.

## BACKGROUND OF THE INVENTION

Users of modern computing systems are increasingly finding themselves in constantly-connected, high-speed networked environments. The Web continues to be a killer application, second only to email, on the Internet. Further, customers are increasingly using more than one computing device; a customer may have a desktop computer at home, one at work, and a constantly connected "smart phone". Due to the confluence of these two trends, file management across these devices has become a problem.

Although modern devices are easily connected, they do not provide the customer a seamless environment; the customer must manually handle many aspects of that connection. With regards to file management, customers must manually move files between their devices using some protocol like email, ftp, or by posting them on the Web. These practices lead to problems that include:

The proliferation of redundant file copies. This proliferation creates a confusing environment where the customer is unclear where the "official" or newest version of a file exists.

The creation of an error-prone environment. Some documents, such as those associated with word processing and desktop publishing, externally reference other files. Copying such a document can break these references causing errors that the customer has to handle manually. An example of such a document is a desktop publishing document that contains a reference to an image. If that image file is not transferred along with the desktop publishing file, the image will appear as a broken link.

Unnecessary complexity. Because devices tend to have their own filing system, customers must manage a different filing model on each of his devices. For example, instead of having a single "Movies" folder, he may have to deal with many "Movies" folders, which may be in different locations on each of his devices. Each device may also have its own security model, further complicating the matter.

2

That a customer has to manually move files around to ensure their accessibility on his devices is unnecessary, and is an indicator of a lack of customer-focused design in modern file systems. File systems in use today are direct offspring of systems used when graphical customer interfaces were nonexistent. Modern file system customer interfaces, such as Windows® Explorer and Mac OS X's Finder are just now starting to provide experiences that are more in line to a customer's workflow. Whereas, before, these interfaces were concerned with representing files with abstracted icons, the file's actual contents are becoming paramount in how files are organized and presented.

Problems still exist with how these newer customer interfaces are implemented. They are not completely integrated with applications, suffer from performance problems, and do not generally work well outside of a device's local file system.

There are several solutions to this problem that are in one way or another inadequate to the task:

Remote Desktop software allows a customer to remotely "see" his desktop. Remote desktop software screen-scrapes a remote machine's screen (a "server") and displays it on a screen local to the customer (a "client"). Remote desktop gives a customer access to not only his files, but also to his applications. However, this approach requires that the host machine be turned on and connected to the internet at all times. Consequently, this approach would not be appropriate for mobile hosts such as laptops. Remote desktop does not use the resources of a local machine. For full accessibility, the customer would have to keep all files and application on the host machine as any files stored on a client are not guaranteed to be accessible.

Distributed File Systems, like remote desktop software, place data on an always-connected host machine. Unlike remote desktop software, the host machine is not one on which the customer performs computing tasks. The host machine is used as a storage mechanism, and any computation performed on that machine serves to supports its use as such. Distributed file systems generally provide the right functionality for customers to share files between their devices. However, distributed file systems are usually deployed as a shared resource; that is, other customers have access to it. Because of this sharing, a customer's files may be buried deep in a filing structure, and it may not always be immediately evident to customers what kind of access they have to a particular file. Further, to use a distributed file system, the customer must always be connected to it. Files stored on a distributed file system are generally inaccessible if the customer's machine is not connected to it, unless the customer has copied or moved the files to his machine's local hard drive. However, doing so immediately creates the problem of having two filing systems for the same file, creating a mental burden on the customer.

Additionally, accessing a file located on a distributed file system tends to be slower than accessing files on the local hard drive. Modern applications are usually written to assume that the files they access are located locally, and thus are not optimized to access remote files. When these applications are used with remote files, they can lose performance by an order of magnitude. This problem can be fixed by automatically caching often-used files on the local file system, and only synchronizing them when they have been changed. However, this separate synchronization step introduces another problem: because the synchronization process can be lengthy, the customer is never entirely sure if the file he is remotely accessing is the latest version of the file, versus an earlier one that has been marked to be updated.

US 10,754,823 B2

3

Further, the directory may not reflect the existence of the file at all until synchronization finishes.

FTP is similar to a distributed file system with regards to files being hosted on a remote server. However FTP generally does manifest as a "disk drive" on the customer's desktop; the customer must use special FTP client software to access an FTP server. It shares the same problem as distributed file systems, with the additional problem of weak integration with applications. Applications can generally write and read files directly to and from a distributed file system. This is not the case with FTP, as the customer has to manually use the client software to perform these operations as a separate task.

Email was originally invented for messaging. From the beginning, the model it employs to make files accessible remotely is necessarily inefficient. Email's model for making files accessible is in the form of an email "attachment". Attachments are so named because they piggy-back on a message sent from one customer to another. A customer can make a file remotely available using email by attaching the file to an email and sending it to himself. He can then retrieve the file from a remote location by accessing the message on the email server. Email used in this way is even worse than FTP as the process is even more manual: a customer must find the message containing the file before he can even access it. Further, the location in which the attachment lives is read only. If the customer, for example, were to open the file, change it, then save it back out, the results would be ambiguous to the user because the email application, not the user, specified its location. Usually, the saved file would end up buried in an email file cache in an undisclosed area of the file system.

Flash Drives and External Disk Drives, although seemingly the most "primitive" way to ensure file availability, avoid all the problems related to network latency. However, these devices must be physically connected to the computer on which the files will be accessed. These restrictions preclude the customer from employing several effective work-flows including: using more than one computer to complete a single task (the files can only be accessed on one computer) and setting up an automated backup (the computer running the backup can't guarantee that the storage device will be connected come backup time). To ensure full availability of the files, the customer must carry the device with them at all times, and must follow the associated protocols for mounting and dismounting the device.

Other problems with the prior art not described above can also be overcome using the teachings of embodiments of the present invention, as would be readily apparent to one of ordinary skill in the art after reading this disclosure.

## SUMMARY OF THE INVENTION

In certain embodiments, automatic modification-triggered transfer of a file among two or more computer systems associated with a user. In some embodiments, a copy of a first file may be received, via a first application at a first computer system, from a second application at a second computer system associated with a user. The first file copy may be automatically received from the second application responsive to the user modifying a content of the first file, where the first file copy is a version of the first file that is generated from the user modifying the content of the first file. Responsive to receiving the first file copy from the second computer system, the first file copy may be automatically transferred via the first application to a third

4

computer system associated with the user to replace an older version of the first file stored on the third computer system.

In some embodiments, responsive to a user modifying a content of the file at a first client device (associated with the user), a server system may automatically receive a copy of the file from the first client device, where the file copy may be an updated version of the file that is generated from the user modifying the content of the file. After receiving metadata associated with the updated version of the file from the first client device, the server system may automatically transfer the metadata to a second client device associated with the user such that, before the file copy is transferred to the second client device, the transfer of the metadata to the second client device causes a graphical availability indication of the updated version of the file to be presented (e.g., proximate a file icon representing the file) at the second client device based on the metadata.

## BRIEF DESCRIPTION OF THE DRAWING

Preferred and alternative embodiments of the present invention are described in detail below with reference to the following drawings.

FIG. 1 is a schematic view of an exemplary operating environment in which an embodiment of the invention can be implemented;

FIG. 2 is a functional block diagram of an exemplary operating environment in which an embodiment of the invention can be implemented; and

FIG. 3 is a functional block diagram illustrating file sharing and/or synchronization according to an embodiment of the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

An embodiment of the invention leverages remote programming concepts by utilizing processes called mobile agents (sometimes referred to as mobile objects or agent objects). Generally speaking, these concepts provide the ability for an object (the mobile agent object) existing on a first ("host") computer system to transplant itself to a second ("remote host") computer system while preserving its current execution state. The operation of a mobile agent object is described briefly below.

The instructions of the mobile agent object, its preserved execution state, and other objects owned by the mobile agent object are packaged, or "encoded," to generate a string of data that is configured so that the string of data can be transported by all standard means of communication over a computer network. Once transported to the remote host, the string of data is decoded to generate a computer process, still called the mobile agent object, within the remote host system. The decoded mobile agent object includes those objects encoded as described above and remains in its preserved execution state. The remote host computer system resumes execution of the mobile agent object which is now operating in the remote host environment.

While now operating in the new environment, the instructions of the mobile agent object are executed by the remote host to perform operations of any complexity, including defining, creating, and manipulating data objects and interacting with other remote host computer objects.

File transfer and/or synchronization, according to an embodiment, may be accomplished using some or all of the concepts described in commonly owned U.S. patent appli-

US 10,754,823 B2

5

cation Ser. No. 11/739,083, entitled "Electronic File Sharing," the entirety of which is incorporated by reference as if fully set forth herein.

FIG. **1** illustrates an example of a suitable computing system environment **100** in which one or more embodiments of the invention may be implemented. The computing system environment **100** is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality of the invention. Neither should the computing environment **100** be interpreted as having any dependency or requirement relating to any one or combination of components illustrated in the exemplary operating environment **100**.

Embodiments of the invention are operational with numerous other general purpose or special purpose computing system environments or configurations. Examples of well known computing systems, environments, and/or configurations that may be suitable for use with the invention include, but are not limited to, personal computers, server computers, hand-held or laptop devices, multiprocessor systems, microprocessor-based systems, set top boxes, programmable consumer electronics, network PCs, minicomputers, mainframe computers, distributed computing environments that include any of the above systems or devices, and the like.

Embodiments of the invention may be described in the general context of computer-executable instructions, such as program modules, being executed by a computer and/or by computer-readable media on which such instructions or modules can be stored. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types. The invention may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in both local and remote computer storage media including memory storage devices.

With reference to FIG. **1**, an exemplary system for implementing the invention includes a general purpose computing device in the form of a computer **110**. Components of computer **110** may include, but are not limited to, a processing unit **120**, a system memory **130**, and a system bus **121** that couples various system components including the system memory to the processing unit **120**. The system bus **121** may be any of several types of bus structures including a memory bus or memory controller, a peripheral bus, and a local bus using any of a variety of bus architectures. By way of example, and not limitation, such architectures include Industry Standard Architecture (ISA) bus, Micro Channel Architecture (MCA) bus, Enhanced ISA (EISA) bus, Video Electronics Standards Association (VESA) local bus, and Peripheral Component Interconnect (PCI) bus also known as Mezzanine bus.

Computer **110** typically includes a variety of computer readable media. Computer readable media can be any available media that can be accessed by computer **110** and includes both volatile and nonvolatile media, removable and non-removable media. By way of example, and not limitation, computer readable media may comprise computer storage media and communication media. Computer storage media includes both volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules or other data. Computer storage media includes, but is not limited to,

6

RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical disk storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can accessed by computer **110**. Communication media typically embodies computer readable instructions, data structures, program modules or other data in a modulated data signal such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" means a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal. By way of example, and not limitation, communication media includes wired media such as a wired network or direct-wired connection, and wireless media such as acoustic, RF, infrared and other wireless media. Combinations of the any of the above should also be included within the scope of computer readable media.

The system memory **130** includes computer storage media in the form of volatile and/or nonvolatile memory such as read only memory (ROM) **131** and random access memory (RAM) **132**. A basic input/output system **133** (BIOS), containing the basic routines that help to transfer information between elements within computer **110**, such as during start-up, is typically stored in ROM **131**. RAM **132** typically contains data and/or program modules that are immediately accessible to and/or presently being operated on by processing unit **120**. By way of example, and not limitation, FIG. **1** illustrates operating system **134**, application programs **135**, other program modules **136**, and program data **137**.

The computer **110** may also include other removable/non-removable, volatile/nonvolatile computer storage media. By way of example only, FIG. **1** illustrates a hard disk drive **140** that reads from or writes to non-removable, nonvolatile magnetic media, a magnetic disk drive **151** that reads from or writes to a removable, nonvolatile magnetic disk **152**, and an optical disk drive **155** that reads from or writes to a removable, nonvolatile optical disk **156** such as a CD ROM or other optical media. Other removable/non-removable, volatile/nonvolatile computer storage media that can be used in the exemplary operating environment include, but are not limited to, magnetic tape cassettes, flash memory cards, digital versatile disks, digital video tape, solid state RAM, solid state ROM, and the like. The hard disk drive **141** is typically connected to the system bus **121** through a non-removable memory interface such as interface **140**, and magnetic disk drive **151** and optical disk drive **155** are typically connected to the system bus **121** by a removable memory interface, such as interface **150**.

The drives and their associated computer storage media discussed above and illustrated in FIG. **1**, provide storage of computer readable instructions, data structures, program modules and other data for the computer **110**. In FIG. **1**, for example, hard disk drive **141** is illustrated as storing operating system **144**, application programs **145**, other program modules **146**, and program data **147**. Note that these components can either be the same as or different from operating system **134**, application programs **135**, other program modules **136**, and program data **137**. Operating system **144**, application programs **145**, other program modules **146**, and program data **147** are given different numbers here to illustrate that, at a minimum, they are different copies. A user may enter commands and information into the computer **20** through input devices such as a keyboard **162** and pointing device **161**, commonly referred to as a mouse, trackball or touch pad. Other input devices (not shown) may include a

US 10,754,823 B2

7

microphone, joystick, game pad, satellite dish, scanner, or the like. These and other input devices are often connected to the processing unit **120** through a user input interface **160** that is coupled to the system bus, but may be connected by other interface and bus structures, such as a parallel port, game port or a universal serial bus (USB). A monitor **191** or other type of display device is also connected to the system bus **121** via an interface, such as a video interface **190**. In addition to the monitor, computers may also include other peripheral output devices such as speakers **197** and printer **196**, which may be connected through an output peripheral interface **190**.

The computer **110** may operate in a networked environment using logical connections to one or more remote computers, such as a remote computer **180**. The remote computer **180** may be a personal computer, a server, a router, a network PC, a peer device or other common network node, and typically includes many or all of the elements described above relative to the computer **110**, although only a memory storage device **181** has been illustrated in FIG. **1**. The logical connections depicted in FIG. **1** include a local area network (LAN) **171** and a wide area network (WAN) **173**, but may also include other networks. Such networking environments are commonplace in offices, enterprise-wide computer networks, intranets and the Internet.

When used in a LAN networking environment, the computer **110** is connected to the LAN **171** through a network interface or adapter **170**. When used in a WAN networking environment, the computer **110** typically includes a modem **172** or other means for establishing communications over the WAN **173**, such as the Internet. The modem **172**, which may be internal or external, may be connected to the system bus **121** via the user input interface **160**, or other appropriate mechanism. In a networked environment, program modules depicted relative to the computer **110**, or portions thereof, may be stored in the remote memory storage device. By way of example, and not limitation, FIG. **1** illustrates remote application programs **185** as residing on memory device **181**. It will be appreciated that the network connections shown are exemplary and other means of establishing a communications link between the computers may be used.

Referring now to FIG. **2**, an embodiment of the present invention can be described in the context of an exemplary computer network system **200** as illustrated. System **200** includes electronic user devices **210**, **280**, such as personal computers or workstations, that are linked via a communication medium, such as a network **220** (e.g., the Internet), to an electronic device or system, such as a server **230**. The server **230** may further be coupled, or otherwise have access, to a database **240**, electronic storage **270** and a computer system **260**. Although the embodiment illustrated in FIG. **2** includes one server **230** coupled to two user devices **210**, **280** via the network **220**, it should be recognized that embodiments of the invention may be implemented using two or more such user devices coupled to one or more such servers.

In an embodiment, each of the user devices **210**, **280** and server **230** may include all or fewer than all of the features associated with the computer **110** illustrated in and discussed with reference to FIG. **1**. User devices **210**, **280** include or are otherwise coupled to a computer screen or display **250**, **290**, respectively. User devices **210**, **280** can be used for various purposes including both network- and local-computing processes.

The user devices **210**, **280** are linked via the network **220** to server **230** so that computer programs, such as, for example, a browser or other applications, running on one or

8

more of the user devices **210**, **280** can cooperate in two-way communication with server **230** and one or more applications running on server **230**. Server **230** may be coupled to database **240** and/or electronic storage **270** to retrieve information therefrom and to store information thereto. Additionally, the server **230** may be coupled to the computer system **260** in a manner allowing the server to delegate certain processing functions to the computer system.

Referring now to FIG. **3**, illustrated is functionality of an embodiment of the invention allowing a user (not shown) who owns or otherwise controls devices **210**, **280** to automatically maintain file synchronization between at least devices **210**, **280**, or any other user devices on which principles of the present invention are implemented. In an embodiment, an administrator (not shown) of the server **230** or other appropriate electronic device transfers a file-transfer and/or synchronization application to the user devices **210**, **280** for installation thereon. Once installed on the user devices **210**, **280**, the file-transfer application provides file-transfer clients **310**, **320** executable by the user devices **210**, **280**, respectively. Each of the file-transfer clients **310**, **320** may, but need not, include a respective mobile-agent runtime environment **330**, **340**. The mobile-agent runtime environment **330**, **340** include portions of memory of the user devices **210**, **280** dedicated to allowing a mobile object the ability to perform operations that the mobile object is programmed to carry out. Also included in the file-transfer application are user interfaces **350**, **360** that are displayable on the displays **250**, **290**, respectively. In an embodiment, the interfaces **350**, **360** allow a user to view, access and/or organize files to be synched among the various user devices.

Generally, all files that the user desires to be synched or shared may at some point be uploaded by one or more of the user devices **210**, **280** and stored in storage **270**. Upon receiving the files to be synched, the server **230** can store such files in the storage **270** and/or transfer the files to one or more of the respective hard drives of the user devices **210**, **280**, thereby enabling each respective user device to access such files. In this manner, the server **230** is operable to treat each hard drive of the respective user devices **210**, **280** as a local document cache for files received by the server. Typically, the server **230** will store one or more of the received files to the storage **270** only if the destination user device is offline or otherwise temporarily not in communication with the server **230**. Upon resuming communication with the destination user device, the server **230** will transfer the temporarily stored files to the destination device.

In operation, according to an embodiment, the user may open and modify a file **370**, such as a word-processing document or other electronic file. Alternatively, the user may create a first instance of the file **370**. The user may have previously have associated, or may now associate, the file **370** with the transfer client **310**. Upon a predetermined and user-configurable triggering event, the transfer client **310** transfers the modified file **370**, or a copy of the modified file, to the server **230**. Such a triggering event may include, but not limited to, the user saving the file, the elapsing of a predetermined amount of time during which the file has been opened, or the re-initiation of a communication session between the device **210** and the server **230**.

The file **370** is transferred to the server **230** on which is executing a synchronization application **380**, which may include a mobile-agent runtime environment. Through user configuration, the synch application **380** monitors a set of user devices to which the file **370** should be transferred to effect file synchronization. In the illustrated embodiment, this set of user devices includes the user device **280**. The

US 10,754,823 B2

9

10

synch application **380** polls the device **280** to determine whether the device **280** is in communication with the server **230**. If the device **280** is in communication with the server **230**, the synch application **380** transfers the file **370** to the device **280**, whereupon the transfer client **320** resident on the device **280** replaces the previous version of the file **370**, previously cached on the device **280**, with the latest version of the file **370** modified on the user device **210**. If the device **280** is not currently in communication with the server **230**, the synch application **380** may store the file **370** in the storage **270** until such time as communication between the device **280** and server **230** is reestablished. As illustrated in FIG. **3**, a similar reverse-direction synchronization process may be performed by the synch application **380** and the transfer clients **310**, **320** with regard to a file **315** modified on device **280** and synchronized to device **210**.

In an embodiment, the user interfaces **350**, **360** may include a list of the customer's documents and related metadata, as well as any one-to-one or one-to-many relationships between the documents and metadata. An embodiment can always provide customers with an accurate "picture" of their document collection, regardless of whether their devices physically contain the documents. As alluded to earlier, a problem with distributed file systems and FTP is the latency between a file being put onto a file system and it showing up on a remote machine. To prevent this problem, an embodiment directory is decoupled from the movement of files. An embodiment's directory update system updates at a higher priority than the documents to be synchronized. This feature ensures that when a customer browses or searches through his set of documents, they appear even if they have not yet been cached locally on the user device. An indicator signifying a document's availability may be prominently displayed adjacent to the document's representation so that customers are aware of the document's availability.

An embodiment may include a stand-alone application that allows customers to find and manage documents associated with transfer clients **310**, **320** by visualizing relationships between documents and their metadata. It allows customers to tag documents with any number of identifiers. Customers can relate both documents and tags with each other in any number of user-specified one-to-one and one-to-many relationships, and an embodiment provides a user interface to browse and search on these relationships. To mitigate the customers' learning curve, an embodiment can implement relationships common to contemporary file systems, including a folder hierarchy. In addition to this, an embodiment provides direct support for methods that the customer uses to organize documents by manifesting them as user interface idioms. This is unlike conventional document filing systems which require the customer to work within a strict folder metaphor for organization.

Some alternate methods that an embodiment supports for organizing documents include:

Allow customers to organize their documents by application. Many times customers remember the application used to create a document instead of the document's name or its location in a hierarchy.

Allow customers to organize their documents by most recent access. Customers are likely to access a document they've accessed in the near past. Usually, such documents are part of a task that the customer is actively working.

Allow customers to organize their documents by project or subproject.

Allow customers to organize their documents by people. Many times, especially in the context of a collabora-

tion, a document is directly related to one or more people other than the customer.

Allow the customer to organize their document by process stage. Documents may represent one or more stages of a process. Customers need a method for organizing documents by process stage, and a mechanism for moving the document through a set of predefined stages.

Allow customers to organize their documents by any of the aforementioned methods concurrently. These organization methods are not mutually exclusive.

An embodiment presents an interface that allows a customer to locate one or more documents associated with the transfer clients **310**, **320** and open such document into a separate software application. Since this interface is intended to be used from within the separate application, that application may need to know how to invoke such interface. Advantageously, this invocation behavior can be provided to the application using the application's plug-in API.

An embodiment presents an interface that allows a customer to synchronize a currently opened document according to processes described elsewhere herein. This interface can be invoked within an application and can be made available to the application in the manner described above in connection with the application's plug-in API.

Some files associated with the transfer clients **310**, **320** are dependent on other files associated with the transfer clients **310**, **320**. For example, a desktop publishing document may include images that are stored in files separate from the main document. Previous file-synching solutions treat these files as separate. Because of this, for example, a document synchronized from the device **210** to the device **280** may be opened by the user of the device **280** before the image files have been fully transferred to the device **280**. This causes the document to fail to open, or break, since the image files don't exist or are incomplete. An embodiment prevents this by: (1) always ensuring the file catalog (e.g., the stand-alone application that allows customers to find and manage documents associated with transfer clients **310**, **320**, as discussed above herein) is synchronized before any file data is synchronized, and (2) pausing any file access by any program until the file contents have been fully synchronized. In such an embodiment, if a user attempts, using a software program, to open a file whose related files haven't yet finished transferring to the local (hard drive) cache, if that software attempts to open the related files, the software program is blocked by an embodiment until the requested files are downloaded and ready to access.

Other file sending and synchronizing software requires the user to upload their data to a storage device owned by the operator of the service. An embodiment treats storage as a participant in the synchronization process; this means that the user can choose the service or device where their files will be stored. The file transfer/synching is abstracted from the storage system allowing any storage to be used. An embodiment treats storage like any other synch target, such as a desktop computer, or a cell phone. As such, any device owned or otherwise controlled by the user and running a synch application, such as synch application **380**, as provided in an embodiment of the invention can perform the storage and/or synching functions described elsewhere herein. That is, the user device **280** or user device **210**, rather than the server **230**, may perform such functions.

While a preferred embodiment of the invention has been illustrated and described, as noted above, many changes can be made without departing from the spirit and scope of the invention. For example, as an alternative to the approach

US 10,754,823 B2

11

12

described with reference to FIG. **3**, wherein the transfer clients **310**, **320** function to "push" modified or created files to the synch application **380**, the synch application **380** may instead function to periodically "pull" or otherwise actively retrieve such files from the transfer clients **310**, **320** Instead, the invention should be determined entirely by reference to the claims that follow.

What is claimed is:

**1**. A system comprising:

a server system comprising one or more processors programmed with computer program instructions that, when executed, cause the server system to:
  receive, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being an updated version of the first file that is generated from the user modifying the content of the first file;
  receive, over a network, from the first client device, first metadata associated with the updated version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;
  automatically transfer, based on the first priority being greater than the second priority, the first metadata over a network to a second client device associated with the user such that the first metadata is transferred to the second client device before the copy of the first file is transferred to the second client device, wherein, before the copy of the first file is transferred to the second client device:
    (i) the transfer of the first metadata to the second client device causes a graphical availability indication of the updated version of the first file to be presented at the second client device based on the first metadata, and
    (ii) the graphical availability indication is presented proximate a file icon representing the first file on a user interface of the second client device, and
  wherein the graphical availability indication indicates that the updated version of the first file generated from the user modifying the content of the first file is available to be downloaded from the server system to the second client device; and
  subsequent to the transfer of the first metadata to the second client device, transfer the copy of the first file to the second client device,
  wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

**2**. The system of claim **1**, wherein, before the copy of the first file is transferred to the second client device, the transfer of the first metadata to the second client device causes a file representation of the first file presented on the user interface of the second client device to be updated based on the first metadata.

**3**. The system of claim **1**, wherein the computer program instructions, when executed, cause the server system to:
  receive a copy of a second file from the second client device associated with the user, wherein the copy of the second file is automatically received from the second client device responsive to the user modifying a content of the second file stored on the second client device, the copy of the second file being an updated version of the second file that is generated from the user modifying the content of the second file;
  determine that the server system is in communication with the first client device associated with the user; and
  automatically transfer the copy of the second file to the first client device associated with the user to replace an older version of the second file stored on the first client device, responsive to (i) determining that the server system is in communication with the first client device and (ii) receiving the copy of the second file from the second client device.

**4**. The system of claim **1**, wherein the copy of the first file is automatically received from the first client device responsive to (i) a push request of the first client device and (ii) the user modifying the content of the first file stored on the first client device.

**5**. The system of claim **1**, wherein the copy of the first file is automatically received from a first application at the first client device, and wherein the first application comprises a runtime environment for one or more mobile-agent objects.

**6**. The system of claim **5**, wherein the first application is configured to create a first mobile object, and wherein the first mobile object is configured to create a proxy object at the server system.

**7**. The system of claim **6**, wherein the first mobile object is configured to provide the copy of the first file to the proxy object, and wherein the proxy object is configured to store the copy of the first file on a memory device associated with the server system.

**8**. A method being implemented by a server system comprising one or more processors executing computer program instructions that, when executed, perform the method, the method comprising:
  receiving, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being an updated version of the first file that is generated from the user modifying the content of the first file;
  receiving, over a network, from the first client device, first metadata associated with the updated version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;
  automatically transferring, based on the first priority being greater than the second priority, the first metadata over a network to a second client device associated with the user such that the first metadata is transferred to the second client device before the copy of the first file is transferred to the second client device, wherein, before the copy of the first file is transferred to the second client device:
    (i) the transfer of the first metadata to the second client device causes a graphical availability indi-

US 10,754,823 B2

13

cation of the updated version of the first file to be presented at the second client device based on the first metadata, and

(ii) the graphical availability indication is presented proximate a graphical file representation of the first file on a user interface of the second client device, and

wherein the graphical availability indication indicates that the updated version of the first file generated from the user modifying the content of the first file is available to be downloaded from the server system to the second client device; and

subsequent to the transfer of the first metadata to the second client device, transferring the copy of the first file to the second client device,

wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

9. The method of claim 8, wherein, before the copy of the first file is transferred to the second client device, the transfer of the first metadata to the second client device causes a file representation of the first file presented on the user interface of the second client device to be updated based on the first metadata.

10. The method of claim 8, further comprising:

receiving a copy of a second file from the second client device associated with the user, wherein the copy of the second file is automatically received from the second client device responsive to the user modifying a content of the second file stored on the second client device, the copy of the second file being an updated version of the second file that is generated from the user modifying the content of the second file;

determining that the server system is in communication with the first client device associated with the user; and automatically transferring the copy of the second file to the first client device associated with the user to replace an older version of the second file stored on the first client device, responsive to (i) determining that the server system is in communication with the first client device and (ii) receiving the copy of the second file from the second client device.

11. The method of claim 8, wherein the copy of the first file is automatically received from the first client device responsive to (i) a push request of the first client device and (ii) the user modifying the content of the first file stored on the first client device.

12. The method of claim 8, wherein the copy of the first file is automatically received from a first application at the first client device, wherein the first application comprises a runtime environment for one or more mobile-agent objects, wherein the first application is configured to create a first mobile object, wherein the first mobile object is configured to create a proxy object at the server system, wherein the first mobile object is configured to provide the copy of the first file to the proxy object, and wherein the proxy object is configured to store the copy of the first file on a memory device associated with the server system.

13. One or more non-transitory machine-readable media storing instructions that, when executed by one or more processors of a server system, cause operations comprising:

14

receiving, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being an updated version of the first file that is generated from the user modifying the content of the first file;

receiving, over a network, from the first client device, first metadata associated with the updated version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;

automatically transferring, based on the first priority being greater than the second priority, the first metadata over a network to a second client device associated with the user such that the first metadata is transferred to the second client device before the copy of the first file is transferred to the second client device,

wherein, before the copy of the first file is transferred to the second client device:

(i) the transfer of the first metadata to the second client device causes an availability indication of the updated version of the first file to be presented at the second client device based on the first metadata, and

(ii) the availability indication is presented proximate a graphical file representation of the first file on a user interface of the second client device, and

wherein the availability indication indicates that the updated version of the first file generated from the user modifying the content of the first file is available to be downloaded from the server system to the second client device; and

subsequent to the transfer of the first metadata to the second client device, transferring the copy of the first file to the second client device,

wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

14. The media of claim 13, wherein, before the copy of the first file is transferred to the second client device, the transfer of the first metadata to the second client device causes a file representation of the first file presented on the user interface of the second client device to be updated based on the first metadata.

15. The media of claim 13, the operations further comprising:

receiving a copy of a second file from the second client device associated with the user, wherein the copy of the second file is automatically received from the second client device responsive to the user modifying a content of the second file stored on the second client device, the copy of the second file being an updated version of the second file that is generated from the user modifying the content of the second file;

determining that the server system is in communication with the first client device associated with the user; and automatically transferring the copy of the second file to the first client device associated with the user to replace an older version of the second file stored on the first client device, responsive to (i) determining that the

US 10,754,823 B2

15

16

server system is in communication with the first client device and (ii) receiving the copy of the second file from the second client device.

**16**. The media of claim **13**, wherein the copy of the first file is automatically received from the first client device responsive to (i) a push request of the first client device and (ii) the user modifying the content of the first file stored on the first client device.

**17**. The media of claim **13**, wherein the copy of the first file is automatically received from a first application at the first client device, wherein the first application comprises a runtime environment for one or more mobile-agent objects, wherein the first application is configured to create a first mobile object, wherein the first mobile object is configured to create a proxy object at the server system, wherein the first mobile object is configured to provide the copy of the first file to the proxy object, and wherein the proxy object is configured to store the copy of the first file on a memory device associated with the server system.

* * * * *

# EXHIBIT 6

US011003622B2

(12) **United States Patent**
Manzano

(10) Patent No.: **US 11,003,622 B2**
(45) Date of Patent: **\*May 11, 2021**

(54) **ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK**

(71) Applicant: **TOPIA TECHNOLOGY, INC.,** Tacoma, WA (US)

(72) Inventor: **Michael R. Manzano**, Seattle, WA (US)

(73) Assignee: **TOPIA TECHNOLOGY, INC.,** Tacoma, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/361,641**

(22) Filed: **Mar. 22, 2019**

(65) **Prior Publication Data**

US 2019/0220442 A1    Jul. 18, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 16/017,348, filed on Jun. 25, 2018, now Pat. No. 10,289,607, which is a
(Continued)

(51) **Int. Cl.**
**G06F 16/00** (2019.01)
**G06F 16/11** (2019.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ **G06F 16/122** (2019.01); **G06F 15/16** (2013.01); **G06F 16/00** (2019.01); **G06F 16/10** (2019.01);
(Continued)

(58) **Field of Classification Search**
CPC ...... G06F 16/00; G06F 16/178; G06F 16/182; G06F 16/10; G06F 16/1873;

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,600,834 A | 2/1997 | Howard | |
| 5,675,802 A | 10/1997 | Allen | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1 130 511 A2 | 9/2001 |
| WO | WO 98/56149 A1 | 12/1998 |
| WO | WO 2007/047302 A2 | 4/2007 |

OTHER PUBLICATIONS

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; < https://web.archive.org/web/20040804020435/http://www.foldershare.com:80/>; Aug. 4, 2004.

(Continued)

*Primary Examiner* — Srirama Channavajjala
(74) *Attorney, Agent, or Firm* — Pillsbury Winthrop Shaw Pittman LLP

(57) **ABSTRACT**

In certain embodiments, automatic modification-triggered transfer of a file among two or more computer systems associated with a user. In some embodiments, a copy of a first file may be received, via a first application at a first computer system, from a second application at a second computer system associated with a user. The first file copy may be automatically received from the second application responsive to the user modifying a content of the first file, where the first file copy is a version of the first file that is generated from the user modifying the content of the first file. Responsive to receiving the first file copy from the second computer system, the first file copy may be automatically transferred via the first application to a third computer system associated with the user to replace an older version of the first file stored on the third computer system.

**17 Claims, 3 Drawing Sheets**



US 11,003,622 B2

Page 2

## Related U.S. Application Data

continuation of application No. 14/860,289, filed on Sep. 21, 2015, now Pat. No. 10,067,942, which is a continuation of application No. 12/267,852, filed on Nov. 10, 2008, now Pat. No. 9,143,561.

(60) Provisional application No. 60/986,896, filed on Nov. 9, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 15/16* | (2006.01) |
| *G06F 16/13* | (2019.01) |
| *G06F 16/14* | (2019.01) |
| *G06F 16/176* | (2019.01) |
| *G06F 16/178* | (2019.01) |
| *G06F 16/18* | (2019.01) |
| *G06F 16/182* | (2019.01) |
| *G06F 16/10* | (2019.01) |
| *H04L 29/08* | (2006.01) |

(52) **U.S. Cl.**

CPC ............ *G06F 16/128* (2019.01); *G06F 16/13* (2019.01); *G06F 16/14* (2019.01); *G06F 16/176* (2019.01); *G06F 16/178* (2019.01); *G06F 16/182* (2019.01); *G06F 16/1873* (2019.01); *H04L 67/1095* (2013.01)

(58) **Field of Classification Search**

CPC ............ G06F 16/1756; G06F 16/1824; G06F 16/1844; G06F 16/23; G06F 8/71; G06F 11/1435; G06F 11/1448; G06F 16/273; G06F 16/275; G06F 16/128; G06F 16/122; G06F 16/16; G06F 16/13–14; G06F 16/176

See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,806,078 | A | 9/1998 | Hug |
| 5,909,581 | A | 6/1999 | Park |
| 5,920,867 | A | 7/1999 | Van Huben |
| 6,026,414 | A | 2/2000 | Anglin |
| 6,088,693 | A * | 7/2000 | Van Huben ........ G06F 16/2343 |
| 6,154,817 | A | 11/2000 | Mohan et al. |
| 6,260,069 | B1 | 7/2001 | Anglin |
| 6,449,624 | B1 | 9/2002 | Hammack et al. |
| 6,463,463 | B1 | 10/2002 | Godfrey et al. |
| 6,504,994 | B2 | 1/2003 | Kawamura et al. |
| 6,505,200 | B1 | 1/2003 | Ims et al. |
| 6,526,418 | B1 | 2/2003 | Midgley |
| 6,606,646 | B2 | 8/2003 | Feigenbaum |
| 6,611,849 | B1 | 8/2003 | Raff et al. |
| 6,671,700 | B1 | 12/2003 | Creemer et al. |
| 6,708,221 | B1 | 3/2004 | Mendez et al. |
| 6,757,696 | B2 | 6/2004 | Multer et al. |
| 6,757,893 | B1 | 6/2004 | Haikin |
| 6,760,759 | B1 | 7/2004 | Chan |
| 6,810,405 | B1 | 10/2004 | Larue et al. |
| 6,826,626 | B1 * | 11/2004 | McManus ........... G06F 16/9574 |
| | | | 709/246 |
| 6,829,622 | B2 | 12/2004 | Beyda |
| 6,874,037 | B1 | 3/2005 | Abram et al. |
| 6,931,454 | B2 | 8/2005 | Deshpande et al. |
| 6,990,522 | B2 | 1/2006 | Wu |
| 7,024,428 | B1 | 4/2006 | Huang et al. |
| 7,035,847 | B2 | 4/2006 | Brown et al. |
| 7,051,364 | B1 * | 5/2006 | Tackman ............. G06Q 50/188 |
| | | | 705/80 |
| 7,054,594 | B2 | 5/2006 | Bloch et al. |
| 7,058,667 | B2 * | 6/2006 | Goldick ............... G06F 16/10 |
| 7,065,658 | B1 | 6/2006 | Baraban et al. |

| | | | |
|---|---|---|---|
| 7,089,307 | B2 | 8/2006 | Zintel et al. |
| 7,136,934 | B2 | 11/2006 | Carter et al. |
| 7,149,760 | B1 * | 12/2006 | Breuer ..................... G06F 16/93 |
| 7,155,488 | B1 | 12/2006 | Lunsford et al. |
| 7,162,501 | B2 * | 1/2007 | Kupkova ............... G06F 16/93 |
| 7,224,973 | B2 | 5/2007 | Tsutazawa et al. |
| 7,243,163 | B1 | 7/2007 | Friend et al. |
| 7,260,646 | B1 | 8/2007 | Stefanik et al. |
| 7,263,493 | B1 * | 8/2007 | Provost .................. G06F 19/328 |
| | | | 705/2 |
| 7,269,433 | B2 | 9/2007 | Vargas et al. |
| 7,290,244 | B2 | 10/2007 | Peck et al. |
| 7,325,038 | B1 | 1/2008 | Wang |
| 7,340,534 | B2 | 3/2008 | Cameron et al. |
| 7,398,327 | B2 | 7/2008 | Lee |
| 7,415,588 | B2 | 8/2008 | Hong et al. |
| 7,415,615 | B2 | 8/2008 | Skygebjer |
| 7,457,631 | B2 | 11/2008 | Yach et al. |
| 7,467,353 | B2 | 12/2008 | Kurlander et al. |
| 7,483,925 | B2 | 1/2009 | Koskimies et al. |
| 7,526,575 | B2 | 4/2009 | Rabbers et al. |
| 7,529,778 | B1 | 5/2009 | Dewey |
| 7,574,711 | B2 | 8/2009 | Zondervan et al. |
| 7,584,186 | B2 | 9/2009 | Chen et al. |
| 7,587,446 | B1 | 9/2009 | Onyon et al. |
| 7,613,773 | B2 | 11/2009 | Watt |
| 7,639,116 | B2 | 12/2009 | Saunders |
| 7,657,271 | B2 | 2/2010 | Kim |
| 7,680,838 | B1 | 3/2010 | Shaw |
| 7,680,885 | B2 | 3/2010 | Schauser et al. |
| 7,707,165 | B1 | 4/2010 | Jiang |
| 7,752,166 | B2 | 7/2010 | Quinlan et al. |
| 7,761,414 | B2 | 7/2010 | Freedman |
| 7,788,303 | B2 | 8/2010 | Mikesell et al. |
| 7,796,779 | B1 | 9/2010 | Strong et al. |
| 7,885,925 | B1 | 2/2011 | Strong et al. |
| 7,895,334 | B1 | 2/2011 | Tu et al. |
| 7,987,420 | B1 | 7/2011 | Kloba et al. |
| 8,009,966 | B2 | 8/2011 | Bloom et al. |
| 8,019,900 | B1 | 9/2011 | Sekar et al. |
| 8,112,549 | B2 | 2/2012 | Srinivasan et al. |
| 8,208,792 | B2 | 6/2012 | Morioka |
| 8,244,288 | B2 | 8/2012 | Chipchase |
| 8,321,534 | B1 | 11/2012 | Roskind et al. |
| 8,370,423 | B2 | 2/2013 | Ozzie et al. |
| 8,386,558 | B2 | 2/2013 | Schleifer et al. |
| 8,504,519 | B1 | 8/2013 | Sachs |
| 8,565,729 | B2 | 10/2013 | Moseler et al. |
| 8,595,182 | B1 | 11/2013 | Nelson |
| 8,874,534 | B2 | 10/2014 | March |
| 9,143,561 | B2 | 9/2015 | Manzano |
| 10,067,942 | B2 | 9/2018 | Manzano |
| 10,289,607 | B2 | 5/2019 | Manzano |
| 2002/0026478 | A1 | 2/2002 | Rodgers et al. |
| 2002/0035697 | A1 | 3/2002 | McCurdy |
| 2002/0055942 | A1 | 5/2002 | Reynolds |
| 2002/0087588 | A1 | 7/2002 | McBride et al. |
| 2002/0143795 | A1 | 10/2002 | Fletcher |
| 2002/0184318 | A1 | 12/2002 | Pineau |
| 2002/0194382 | A1 * | 12/2002 | Kausik ..................... G06F 9/54 |
| | | | 709/246 |
| 2003/0028514 | A1 | 2/2003 | Lord |
| 2003/0028542 | A1 | 2/2003 | Muttik et al. |
| 2003/0038842 | A1 | 2/2003 | Peck et al. |
| 2003/0074376 | A1 | 4/2003 | Benayoun |
| 2003/0078946 | A1 | 4/2003 | Costello |
| 2003/0115547 | A1 * | 6/2003 | Ohwada .................. G06F 16/93 |
| | | | 715/229 |
| 2003/0125057 | A1 | 7/2003 | Pesola |
| 2003/0135565 | A1 | 7/2003 | Estrada |
| 2003/0233241 | A1 | 12/2003 | Marsh |
| 2004/0003013 | A1 | 1/2004 | Coulthard |
| 2004/0031027 | A1 | 2/2004 | Hiltgen |
| 2004/0049345 | A1 | 3/2004 | McDonough et al. |
| 2004/0088348 | A1 * | 5/2004 | Yeager ................. H04L 67/1068 |
| | | | 709/202 |
| 2004/0093361 | A1 | 5/2004 | Therrien et al. |
| 2004/0107225 | A1 | 6/2004 | Rudoff |
| 2004/0133629 | A1 | 7/2004 | Reynolds |

**US 11,003,622 B2**

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2004/0158817 A1 | 8/2004 | Okachi | |
| 2004/0172424 A1 | 9/2004 | Edelstein et al. | |
| 2005/0027757 A1 | 2/2005 | Kiessig | |
| 2005/0091316 A1 | 4/2005 | Ponce et al. | |
| 2005/0097225 A1 | 5/2005 | Glatt et al. | |
| 2005/0165722 A1 | 7/2005 | Cannon | |
| 2005/0177602 A1 | 8/2005 | Kaler | |
| 2005/0188051 A1* | 8/2005 | Sneh | G06F 9/44526 |
| | | | 709/213 |
| 2005/0192966 A1 | 9/2005 | Hilbert | |
| 2005/0210371 A1* | 9/2005 | Pollock | G06F 17/212 |
| | | | 715/212 |
| 2005/0220080 A1 | 10/2005 | Ronkainen et al. | |
| 2005/0223047 A1 | 10/2005 | Shah | |
| 2006/0004698 A1 | 1/2006 | Pyhalammi | |
| 2006/0010150 A1 | 1/2006 | Shaath et al. | |
| 2006/0026567 A1 | 2/2006 | McVoy | |
| 2006/0058907 A1 | 3/2006 | Suderman | |
| 2006/0074985 A1 | 4/2006 | Wolfish | |
| 2006/0101064 A1 | 5/2006 | Strong et al. | |
| 2006/0129627 A1 | 6/2006 | Phillips | |
| 2006/0136446 A1 | 6/2006 | Hughes | |
| 2006/0143129 A1 | 6/2006 | Holm | |
| 2006/0168118 A1 | 7/2006 | Godlin | |
| 2006/0189348 A1 | 8/2006 | Montulli et al. | |
| 2006/0224626 A1 | 10/2006 | Lakshminath | |
| 2007/0014314 A1 | 1/2007 | O'Neil | |
| 2007/0016629 A1 | 1/2007 | Reinsch | |
| 2007/0022158 A1 | 1/2007 | Vasa | |
| 2007/0027936 A1 | 2/2007 | Stakutis | |
| 2007/0100913 A1 | 5/2007 | Sumner et al. | |
| 2007/0124334 A1 | 5/2007 | Pepin | |
| 2007/0174246 A1* | 7/2007 | Sigurdsson | G06F 16/1787 |
| 2007/0180084 A1* | 8/2007 | Mohanty | G06F 11/1464 |
| | | | 709/223 |
| 2007/0191057 A1 | 8/2007 | Kamada | |
| 2007/0203927 A1 | 8/2007 | Cave | |
| 2007/0238440 A1 | 10/2007 | Sengupta et al. | |
| 2007/0239725 A1* | 10/2007 | Bhat | H04L 67/1095 |
| 2008/0005114 A1 | 1/2008 | Li | |
| 2008/0005195 A1 | 1/2008 | Li | |
| 2008/0005280 A1 | 1/2008 | Adams | |
| 2008/0086494 A1 | 4/2008 | Heller et al. | |
| 2008/0168526 A1 | 7/2008 | Robbin et al. | |
| 2008/0288578 A1 | 11/2008 | Silfverberg | |
| 2009/0013009 A1 | 1/2009 | Nakayama | |
| 2009/0024922 A1 | 1/2009 | Markowitz et al. | |
| 2009/0037718 A1 | 2/2009 | Ganesh | |
| 2009/0063711 A1 | 3/2009 | Finkelstein | |
| 2009/0282050 A1 | 11/2009 | Thomas et al. | |
| 2012/0192064 A1 | 7/2012 | Antebi | |
| 2013/0226871 A1 | 8/2013 | Sarnowski | |
| 2013/0226872 A1 | 8/2013 | Barefoot | |
| 2014/0053227 A1 | 2/2014 | Ruppin | |
| 2016/0125058 A1 | 5/2016 | Jain | |

OTHER PUBLICATIONS

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030808183932/http://www.foldershare.com:80/>; Aug. 8, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040814015727/http://www.foldershare.com:80/>; Aug. 14, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040820052105/http://www.foldershare.com:80/>; Aug. 20, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041211020957/http://foldershare.com:80/>; Dec. 11, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041217041726/http://foldershare.com:80/>; Dec. 17, 2004.

FolderShare; Your Smart File Transfer Solution; <https://web.archive.org/web/20031220151508/http://www.foldershare.com:80/>; Dec. 20, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041230211050/http://www.foldershare.com:80/>; Dec. 30, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040701113739/http://foldershare.com:80/>; Jul. 1, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040711062548/http://www.foldershare.com:80/>; Jul. 11, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030722054342/http://foldershare.com:80/>; Jul. 22, 2003.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040730030655/http://www.foldershare.com:80/>; Jul. 30, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040603205113/http://www.foldershare.com:80/>; Jun. 3, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040613161906/http://www.foldershare.com:80/>; Jun. 13, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040629075057/http://www.foldershare.com:80/>; Jun. 29, 2004.

FolderShare—Secure Remote Access VPN Solution; Your Smart File Transfer & Real-time File Mirroring Solution; <https://web.archive.org/web/20040316235151/http://foldershare.com:80/>; Mar. 16, 2004.

FolderShare—Secure Remote Access VPN Solution; Your Smart File Transfer & Real-time File Mirroring Solution; <https://web.archive.org/web/20040325034239/http://www.foldershare.com:80/>; Mar. 25, 2004.

FolderShare—Secure Remote Access VPN Solution; Document Management & Real-time File Mirroring Solution; <https://web.archive.org/web/20040512211417/http://www.foldershare.com:80/>; May 12, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030531180252/http://www.foldershare.com:80/>; May 31, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041104031510/http://www.foldershare.com:80/>; Nov. 4, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041117092357/http://www.foldershare.com:80/>; Nov. 17, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041123085254/http://www.foldershare.com:80/>; Nov. 23, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20031128143634/http://foldershare.com:80/>; Nov. 28, 2003.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20031001071631/http://foldershare.com:80/>; Oct. 1, 2003.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041012083127/http://www.foldershare.com:80/>; Oct. 12, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20041029085820/http://www.foldershare.com:80/>; Oct. 29, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040901034646/http://www.foldershare.com:80/>; Sep. 1, 2004.

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040909075254/http://www.foldershare.com:80/>; Sep. 9, 2004.

FolderShare; Your Files Anywhere; <https://web.archive.org/web/20030920051943/http://www.foldershare.com:80/>; Sep. 20, 2003.

**US 11,003,622 B2**

Page 4

(56)        **References Cited**

OTHER PUBLICATIONS

FolderShare—Secure Remote Access VPN Solution; Need your files on more than one computer?; <https://web.archive.org/web/20040924032146/http://www.foldershare.com:80/>; Sep. 24, 2004.

Marshall, M., "The Y Combinator List," Venture Beat, Aug. 2007, Retrieved from the Internet: URL: <https://venturebeat.com/2007/08/16/the-y-combinator-list/>, 4 pages.

Jarvis, A., "Dropbox pitch deck to raise seed capital investment," Medium, Mar. 2018, Retrieved from the Internet: URL: <https://medium.com/@adjblog/dropbox-pitch-deck-to-raise-seed-capital-investment-6a6cd6517e56>, 12 pages.

* cited by examiner



FIG. 1



FIG. 2



FIG. 3

US 11,003,622 B2

1

# ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/017,348, filed Jun. 25, 2018, which is a continuation of U.S. patent application Ser. No. 14/860,289, filed Sep. 21, 2015, now U.S. Pat. No. 10,067,942, which is a continuation of U.S. patent application Ser. No. 12/267,852, filed Nov. 10, 2008, now U.S. Pat. No. 9,143,561, which claims priority to U.S. Provisional Application No. 60/986,896 entitled "ARCHITECTURE FOR MANAGEMENT OF DIGITAL FILES ACROSS DISTRIBUTED NETWORK" and filed Nov. 9, 2007, the contents of which are hereby incorporated by reference in their entirety.

## FIELD OF THE INVENTION

This invention relates generally to computer-implemented processes and, more specifically, to sharing of electronic files among computer systems.

## BACKGROUND OF THE INVENTION

Users of modern computing systems are increasingly finding themselves in constantly-connected, high-speed networked environments. The Web continues to be a killer application, second only to email, on the Internet. Further, customers are increasingly using more than one computing device; a customer may have a desktop computer at home, one at work, and a constantly connected "smart phone". Due to the confluence of these two trends, file management across these devices has become a problem.

Although modern devices are easily connected, they do not provide the customer a seamless environment; the customer must manually handle many aspects of that connection. With regards to file management, customers must manually move files between their devices using some protocol like email, ftp, or by posting them on the Web. These practices lead to problems that include:

The proliferation of redundant file copies. This proliferation creates a confusing environment where the customer is unclear where the "official" or newest version of a file exists.

The creation of an error-prone environment. Some documents, such as those associated with word processing and desktop publishing, externally reference other files. Copying such a document can break these references causing errors that the customer has to handle manually. An example of such a document is a desktop publishing document that contains a reference to an image. If that image file is not transferred along with the desktop publishing file, the image will appear as a broken link.

Unnecessary complexity. Because devices tend to manage their own filing system, customers must manage a different filing model on each of his devices. For example, instead of having a single "Movies" folder, he may have to deal with many "Movies" folders, which may be in different locations on each of his devices. Each device may also have its own security model, further complicating the matter.

That a customer has to manually move files around to ensure their accessibility on his devices is unnecessary, and

2

is an indicator of a lack of customer-focused design in modern file systems. File systems in use today are direct offspring of systems used when graphical customer interfaces were nonexistent. Modern file system customer interfaces, such as Windows® Explorer and Mac OS X's Finder are just now starting to provide experiences that are more in line to a customer's workflow. Whereas, before, these interfaces were concerned with representing files with abstracted icons, the file's actual contents are becoming paramount in how files are organized and presented.

Problems still exist with how these newer customer interfaces are implemented. They are not completely integrated with applications, suffer from performance problems, and do not generally work well outside of a device's local file system.

There are several solutions to this problem that are in one way or another inadequate to the task:

Remote Desktop software allows a customer to remotely "see" his desktop. Remote desktop software screen-scrapes a remote machine's screen (a "server") and displays it on a screen local to the customer (a "client"). Remote desktop gives a customer access to not only his files, but also to his applications. However, this approach requires that the host machine be turned on and connected to the internet at all times. Consequently, this approach would not be appropriate for mobile hosts such as laptops. Remote desktop does not use the resources of a local machine. For full accessibility, the customer would have to keep all files and application on the host machine as any files stored on a client are not guaranteed to be accessible.

Distributed File Systems, like remote desktop software, place data on an always-connected host machine. Unlike remote desktop software, the host machine is not one on which the customer performs computing tasks. The host machine is used as a storage mechanism, and any computation performed on that machine serves to supports its use as such. Distributed file systems generally provide the right functionality for customers to share files between their devices. However, distributed file systems are usually deployed as a shared resource; that is, other customers have access to it. Because of this sharing, a customer's files may be buried deep in a filing structure, and it may not always be immediately evident to customers what kind of access they have to a particular file. Further, to use a distributed file system, the customer must always be connected to it. Files stored on a distributed file system are generally inaccessible if the customer's machine is not connected to it, unless the customer has copied or moved the files to his machine's local hard drive. However, doing so immediately creates the problem of having two filing systems for the same file, creating a mental burden on the customer.

Additionally, accessing a file located on a distributed file system tends to be slower than accessing files on the local hard drive. Modern applications are usually written to assume that the files they access are located locally, and thus are not optimized to access remote files. When these applications are used with remote files, they can lose performance by an order of magnitude. This problem can be fixed by automatically caching often-used files on the local file system, and only synchronizing them when they have been changed. However, this separate synchronization step introduces another problem: because the synchronization process can be lengthy, the customer is never entirely sure if the file he is remotely accessing is the latest version of the file, versus an earlier one that has been marked to be updated. Further, the directory may not reflect the existence of the file at all until synchronization finishes.

US 11,003,622 B2

3

FTP is similar to a distributed file system with regards to files being hosted on a remote server. However FTP generally does manifest as a "disk drive" on the customer's desktop; the customer must use special FTP client software to access an FTP server. It shares the same problem as distributed file systems, with the additional problem of weak integration with applications. Applications can generally write and read files directly to and from a distributed file system. This is not the case with FTP, as the customer has to manually use the client software to perform these operations as a separate task.

Email was originally invented for messaging. From the beginning, the model it employs to make files accessible remotely is necessarily inefficient. Email's model for making files accessible is in the form of an email "attachment". Attachments are so named because they piggy-back on a message sent from one customer to another. A customer can make a file remotely available using email by attaching the file to an email and sending it to himself He can then retrieve the file from a remote location by accessing the message on the email server. Email used in this way is even worse than FTP as the process is even more manual: a customer must find the message containing the file before he can even access it. Further, the location in which the attachment lives is read only. If the customer, for example, were to open the file, change it, then save it back out, the results would be ambiguous to the user because the email application, not the user, specified its location. Usually, the saved file would end up buried in an email file cache in an undisclosed area of the file system.

Flash Drives and External Disk Drives, although seemingly the most "primitive" way to ensure file availability, avoid all the problems related to network latency. However, these devices must be physically connected to the computer on which the files will be accessed. These restrictions preclude the customer from employing several effective work-flows including: using more than one computer to complete a single task (the files can only be accessed on one computer) and setting up an automated backup (the computer running the backup can't guarantee that the storage device will be connected come backup time). Further, to ensure full availability of the files, the customer must carry the device with them at all times, and must follow the associated protocols for mounting and dismounting the device.

Other problems with the prior art not described above can also be overcome using the teachings of embodiments of the present invention, as would be readily apparent to one of ordinary skill in the art after reading this disclosure.

SUMMARY OF THE INVENTION

In certain embodiments, automatic modification-triggered transfer of a file among two or more computer systems associated with a user. In some embodiments, a copy of a first file may be received, via a first application at a first computer system, from a second application at a second computer system associated with a user. The first file copy may be automatically received from the second application responsive to the user modifying a content of the first file, where the first file copy is a version of the first file that is generated from the user modifying the content of the first file. Responsive to receiving the first file copy from the second computer system, the first file copy may be automatically transferred via the first application to a third

4

computer system associated with the user to replace an older version of the first file stored on the third computer system.

BRIEF DESCRIPTION OF THE DRAWING

Preferred and alternative embodiments of the present invention are described in detail below with reference to the following drawings.

FIG. 1 is a schematic view of an exemplary operating environment in which an embodiment of the invention can be implemented;

FIG. 2 is a functional block diagram of an exemplary operating environment in which an embodiment of the invention can be implemented; and

FIG. 3 is a functional block diagram illustrating file sharing and/or synchronization according to an embodiment of the invention.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

An embodiment of the invention leverages remote programming concepts by utilizing processes called mobile agents (sometimes referred to as mobile objects or agent objects). Generally speaking, these concepts provide the ability for an object (the mobile agent object) existing on a first ("host") computer system to transplant itself to a second ("remote host") computer system while preserving its current execution state. The operation of a mobile agent object is described briefly below.

The instructions of the mobile agent object, its preserved execution state, and other objects owned by the mobile agent object are packaged, or "encoded," to generate a string of data that is configured so that the string of data can be transported by all standard means of communication over a computer network. Once transported to the remote host, the string of data is decoded to generate a computer process, still called the mobile agent object, within the remote host system. The decoded mobile agent object includes those objects encoded as described above and remains in its preserved execution state. The remote host computer system resumes execution of the mobile agent object which is now operating in the remote host environment.

While now operating in the new environment, the instructions of the mobile agent object are executed by the remote host to perform operations of any complexity, including defining, creating, and manipulating data objects and interacting with other remote host computer objects.

File transfer and/or synchronization, according to an embodiment, may be accomplished using some or all of the concepts described in commonly owned U.S. patent application Ser. No. 11/739,083, entitled "Electronic File Sharing," the entirety of which is incorporated by reference as if fully set forth herein.

FIG. 1 illustrates an example of a suitable computing system environment 100 in which one or more embodiments of the invention may be implemented. The computing system environment 100 is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality of the invention. Neither should the computing environment 100 be interpreted as having any dependency or requirement relating to any one or combination of components illustrated in the exemplary operating environment 100.

Embodiments of the invention are operational with numerous other general purpose or special purpose computing system environments or configurations. Examples of

US 11,003,622 B2

5

well known computing systems, environments, and/or configurations that may be suitable for use with the invention include, but are not limited to, personal computers, server computers, hand-held or laptop devices, multiprocessor systems, microprocessor-based systems, set top boxes, programmable consumer electronics, network PCs, minicomputers, mainframe computers, distributed computing environments that include any of the above systems or devices, and the like.

Embodiments of the invention may be described in the general context of computer-executable instructions, such as program modules, being executed by a computer and/or by computer-readable media on which such instructions or modules can be stored. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types. The invention may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in both local and remote computer storage media including memory storage devices.

With reference to FIG. **1**, an exemplary system for implementing the invention includes a general purpose computing device in the form of a computer **110**. Components of computer **110** may include, but are not limited to, a processing unit **120**, a system memory **130**, and a system bus **121** that couples various system components including the system memory to the processing unit **120**. The system bus **121** may be any of several types of bus structures including a memory bus or memory controller, a peripheral bus, and a local bus using any of a variety of bus architectures. By way of example, and not limitation, such architectures include Industry Standard Architecture (ISA) bus, Micro Channel Architecture (MCA) bus, Enhanced ISA (EISA) bus, Video Electronics Standards Association (VESA) local bus, and Peripheral Component Interconnect (PCI) bus also known as Mezzanine bus.

Computer **110** typically includes a variety of computer readable media. Computer readable media can be any available media that can be accessed by computer **110** and includes both volatile and nonvolatile media, removable and non-removable media. By way of example, and not limitation, computer readable media may comprise computer storage media and communication media. Computer storage media includes both volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules or other data. Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical disk storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can accessed by computer **110**. Communication media typically embodies computer readable instructions, data structures, program modules or other data in a modulated data signal such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" means a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal. By way of example, and not limitation, communication media includes wired media such as a wired network or direct-wired connection, and wireless media such as

6

acoustic, RF, infrared and other wireless media. Combinations of the any of the above should also be included within the scope of computer readable media.

The system memory **130** includes computer storage media in the form of volatile and/or nonvolatile memory such as read only memory (ROM) **131** and random access memory (RAM) **132**. A basic input/output system **133** (BIOS), containing the basic routines that help to transfer information between elements within computer **110**, such as during start-up, is typically stored in ROM **131**. RAM **132** typically contains data and/or program modules that are immediately accessible to and/or presently being operated on by processing unit **120**. By way of example, and not limitation, FIG. **1** illustrates operating system **134**, application programs **135**, other program modules **136**, and program data **137**.

The computer **110** may also include other removable/non-removable, volatile/nonvolatile computer storage media. By way of example only, FIG. **1** illustrates a hard disk drive **140** that reads from or writes to non-removable, nonvolatile magnetic media, a magnetic disk drive **151** that reads from or writes to a removable, nonvolatile magnetic disk **152**, and an optical disk drive **155** that reads from or writes to a removable, nonvolatile optical disk **156** such as a CD ROM or other optical media. Other removable/non-removable, volatile/nonvolatile computer storage media that can be used in the exemplary operating environment include, but are not limited to, magnetic tape cassettes, flash memory cards, digital versatile disks, digital video tape, solid state RAM, solid state ROM, and the like. The hard disk drive **141** is typically connected to the system bus **121** through a non-removable memory interface such as interface **140**, and magnetic disk drive **151** and optical disk drive **155** are typically connected to the system bus **121** by a removable memory interface, such as interface **150**.

The drives and their associated computer storage media discussed above and illustrated in FIG. **1**, provide storage of computer readable instructions, data structures, program modules and other data for the computer **110**. In FIG. **1**, for example, hard disk drive **141** is illustrated as storing operating system **144**, application programs **145**, other program modules **146**, and program data **147**. Note that these components can either be the same as or different from operating system **134**, application programs **135**, other program modules **136**, and program data **137**. Operating system **144**, application programs **145**, other program modules **146**, and program data **147** are given different numbers here to illustrate that, at a minimum, they are different copies. A user may enter commands and information into the computer **20** through input devices such as a keyboard **162** and pointing device **161**, commonly referred to as a mouse, trackball or touch pad. Other input devices (not shown) may include a microphone, joystick, game pad, satellite dish, scanner, or the like. These and other input devices are often connected to the processing unit **120** through a user input interface **160** that is coupled to the system bus, but may be connected by other interface and bus structures, such as a parallel port, game port or a universal serial bus (USB). A monitor **191** or other type of display device is also connected to the system bus **121** via an interface, such as a video interface **190**. In addition to the monitor, computers may also include other peripheral output devices such as speakers **197** and printer **196**, which may be connected through an output peripheral interface **190**.

The computer **110** may operate in a networked environment using logical connections to one or more remote computers, such as a remote computer **180**. The remote computer **180** may be a personal computer, a server, a router,

US 11,003,622 B2

7                                    8

a network PC, a peer device or other common network node, and typically includes many or all of the elements described above relative to the computer 110, although only a memory storage device 181 has been illustrated in FIG. 1. The logical connections depicted in FIG. 1 include a local area network (LAN) 171 and a wide area network (WAN) 173, but may also include other networks. Such networking environments are commonplace in offices, enterprise-wide computer networks, intranets and the Internet.

When used in a LAN networking environment, the computer 110 is connected to the LAN 171 through a network interface or adapter 170. When used in a WAN networking environment, the computer 110 typically includes a modem 172 or other means for establishing communications over the WAN 173, such as the Internet. The modem 172, which may be internal or external, may be connected to the system bus 121 via the user input interface 160, or other appropriate mechanism. In a networked environment, program modules depicted relative to the computer 110, or portions thereof, may be stored in the remote memory storage device. By way of example, and not limitation, FIG. 1 illustrates remote application programs 185 as residing on memory device 181. It will be appreciated that the network connections shown are exemplary and other means of establishing a communications link between the computers may be used.

Referring now to FIG. 2, an embodiment of the present invention can be described in the context of an exemplary computer network system 200 as illustrated. System 200 includes electronic user devices 210, 280, such as personal computers or workstations, that are linked via a communication medium, such as a network 220 (e.g., the Internet), to an electronic device or system, such as a server 230. The server 230 may further be coupled, or otherwise have access, to a database 240, electronic storage 270 and a computer system 260. Although the embodiment illustrated in FIG. 2 includes one server 230 coupled to two user devices 210, 280 via the network 220, it should be recognized that embodiments of the invention may be implemented using two or more such user devices coupled to one or more such servers.

In an embodiment, each of the user devices 210, 280 and server 230 may include all or fewer than all of the features associated with the computer 110 illustrated in and discussed with reference to FIG. 1. User devices 210, 280 include or are otherwise coupled to a computer screen or display 250, 290, respectively. User devices 210, 280 can be used for various purposes including both network- and local-computing processes.

The user devices 210, 280 are linked via the network 220 to server 230 so that computer programs, such as, for example, a browser or other applications, running on one or more of the user devices 210, 280 can cooperate in two-way communication with server 230 and one or more applications running on server 230. Server 230 may be coupled to database 240 and/or electronic storage 270 to retrieve information therefrom and to store information thereto. Additionally, the server 230 may be coupled to the computer system 260 in a manner allowing the server to delegate certain processing functions to the computer system.

Referring now to FIG. 3, illustrated is functionality of an embodiment of the invention allowing a user (not shown) who owns or otherwise controls devices 210, 280 to automatically maintain file synchronization between at least devices 210, 280, or any other user devices on which principles of the present invention are implemented. In an embodiment, an administrator (not shown) of the server 230 or other appropriate electronic device transfers a file-transfer and/or synchronization application to the user devices 210, 280 for installation thereon. Once installed on the user devices 210, 280, the file-transfer application provides file-transfer clients 310, 320 executable by the user devices 210, 280, respectively. Each of the file-transfer clients 310, 320 may, but need not, include a respective mobile-agent run-time environment 330, 340. The mobile-agent runtime environment 330, 340 include portions of memory of the user devices 210, 280 dedicated to allowing a mobile object the ability to perform operations that the mobile object is programmed to carry out. Also included in the file-transfer application are user interfaces 350, 360 that are displayable on the displays 250, 290, respectively. In an embodiment, the interfaces 350, 360 allow a user to view, access and/or organize files to be synched among the various user devices.

Generally, all files that the user desires to be synched or shared may at some point be uploaded by one or more of the user devices 210, 280 and stored in storage 270. Upon receiving the files to be synched, the server 230 can store such files in the storage 270 and/or transfer the files to one or more of the respective hard drives of the user devices 210, 280, thereby enabling each respective user device to access such files. In this manner, the server 230 is operable to treat each hard drive of the respective user devices 210, 280 as a local document cache for files received by the server. Typically, the server 230 will store one or more of the received files to the storage 270 only if the destination user device is offline or otherwise temporarily not in communication with the server 230. Upon resuming communication with the destination user device, the server 230 will transfer the temporarily stored files to the destination device.

In operation, according to an embodiment, the user may open and modify a file 370, such as a word-processing document or other electronic file. Alternatively, the user may create a first instance of the file 370. The user may have previously have associated, or may now associate, the file 370 with the transfer client 310. Upon a predetermined and user-configurable triggering event, the transfer client 310 transfers the modified file 370, or a copy of the modified file, to the server 230. Such a triggering event may include, but be not limited to, the user saving the file, the elapsing of a predetermined amount of time during which the file has been opened, or the re-initiation of a communication session between the device 210 and the server 230.

The file 370 is transferred to the server 230 on which is executing a synchronization application 380, which may include a mobile-agent runtime environment. Through user configuration, the synch application 380 monitors a set of user devices to which the file 370 should be transferred to effect file synchronization. In the illustrated embodiment, this set of user devices includes the user device 280. The synch application 380 polls the device 280 to determine whether the device 280 is in communication with the server 230. If the device 280 is in communication with the server 230, the synch application 380 transfers the file 370 to the device 280, whereupon the transfer client 320 resident on the device 280 replaces the previous version of the file 370, previously cached on the device 280, with the latest version of the file 370 modified on the user device 210. If the device 280 is not currently in communication with the server 230, the synch application 380 may store the file 370 in the storage 270 until such time as communication between the device 280 and server 230 is reestablished. As illustrated in FIG. 3, a similar reverse-direction synchronization process may be performed by the synch application 380 and the transfer clients 310, 320 with regard to a file 315 modified on device 280 and synchronized to device 210.

US 11,003,622 B2

9                                              10

In an embodiment, the user interfaces **350**, **360** may include a list of the customer's documents and related metadata, as well as any one-to-one or one-to-many relationships between the documents and metadata. An embodiment can always provide customers with an accurate "picture" of their document collection, regardless of whether their devices physically contain the documents. As alluded to earlier, a problem with distributed file systems and FTP is the latency between a file being put onto a file system and it showing up on a remote machine. To prevent this problem, an embodiment directory is decoupled from the movement of files. An embodiment's directory update system updates at a higher priority than the documents to be synchronized. This feature ensures that when a customer browses or searches through his set of documents, they appear even if they have not yet been cached locally on the user device. An indicator signifying a document's availability may be prominently displayed adjacent to the document's representation so that customers are aware of the document's availability.

An embodiment may include a stand-alone application that allows customers to find and manage documents associated with transfer clients **310**, **320** by visualizing relationships between documents and their metadata. It allows customers to tag documents with any number of identifiers. Customers can relate both documents and tags with each other in any number of user-specified one-to-one and one-to-many relationships, and an embodiment provides a user interface to browse and search on these relationships. To mitigate the customers' learning curve, an embodiment can implement relationships common to contemporary file systems, including a folder hierarchy. In addition to this, an embodiment provides direct support for methods that the customer uses to organize documents by manifesting them as user interface idioms. This is unlike conventional document filing systems which require the customer to work within a strict folder metaphor for organization.

Some alternate methods that an embodiment supports for organizing documents include:

Allow customers to organize their documents by application. Many times customers remember the application used to create a document instead of the document's name or its location in a hierarchy.

Allow customers to organize their documents by most recent access. Customers are likely to access a document they've accessed in the near past. Usually, such documents are part of a task that the customer is actively working.

Allow customers to organize their documents by project or subproject.

Allow customers to organize their documents by people. Many times, especially in the context of a collaboration, a document is directly related to one or more people other than the customer.

Allow the customer to organize their document by process stage. Documents may represent one or more stages of a process. Customers need a method for organizing documents by process stage, and a mechanism for moving the document through a set of predefined stages.

Allow customers to organize their documents by any of the aforementioned methods concurrently. These organization methods are not mutually exclusive.

An embodiment presents an interface that allows a customer to locate one or more documents associated with the transfer clients **310**, **320** and open such document into a separate software application. Since this interface is intended to be used from within the separate application, that application may need to know how to invoke such interface. Advantageously, this invocation behavior can be provided to the application using the application's plug-in API.

An embodiment presents an interface that allows a customer to synchronize a currently opened document according to processes described elsewhere herein. This interface can be invoked within an application and can be made available to the application in the manner described above in connection with the application's plug-in API.

Some files associated with the transfer clients **310**, **320** are dependent on other files associated with the transfer clients **310**, **320**. For example, a desktop publishing document may include images that are stored in files separate from the main document. Previous file-synching solutions treat these files as separate. Because of this, for example, a document synchronized from the device **210** to the device **280** may be opened by the user of the device **280** before the image files have been fully transferred to the device **280**. This causes the document to fail to open, or break, since the image files don't exist or are incomplete. An embodiment prevents this by: (1) always ensuring the file catalog (e.g., the stand-alone application that allows customers to find and manage documents associated with transfer clients **310**, **320**, as discussed above herein) is synchronized before any file data is synchronized, and (2) pausing any file access by any program until the file contents have been fully synchronized. In such an embodiment, if a user attempts, using a software program, to open a file whose related files haven't yet finished transferring to the local (hard drive) cache, if that software attempts to open the related files, the software program is blocked by an embodiment until the requested files are downloaded and ready to access.

Other file sending and synchronizing software requires the user to upload their data to a storage device owned by the operator of the service. An embodiment treats storage as a participant in the synchronization process; this means that the user can choose the service or device where their files will be stored. The file transfer/synching is abstracted from the storage system allowing any storage to be used. An embodiment treats storage like any other synch target, such as a desktop computer, or a cell phone. As such, any device owned or otherwise controlled by the user and running a synch application, such as synch application **380**, as provided in an embodiment of the invention can perform the storage and/or synching functions described elsewhere herein. That is, the user device **280** or user device **210**, rather than the server **230**, may perform such functions.

While a preferred embodiment of the invention has been illustrated and described, as noted above, many changes can be made without departing from the spirit and scope of the invention. For example, as an alternative to the approach described with reference to FIG. **3**, wherein the transfer clients **310**, **320** function to "push" modified or created files to the synch application **380**, the synch application **380** may instead function to periodically "pull" or otherwise actively retrieve such files from the transfer clients **310**, **320** Instead, the invention should be determined entirely by reference to the claims that follow.

What is claimed is:

1. A system comprising:

a server system comprising one or more processors programmed with computer program instructions that, when executed, cause the server system to:

receive, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modi-

US 11,003,622 B2

| 11 | 12 |

fying a content of the first file stored on the first client device, the copy of the first file being a version of the first file that is generated from the user modifying the content of the first file;

store the copy of the first file on the server system;

receive, from the first client device, first metadata associated with the version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;

automatically transfer, based on the first priority being greater than the second priority, the first metadata to the second client device such that the first metadata is transferred to the second client device prior to the copy of the first file being transferred to the second client device; and

automatically transfer, over a network, the copy of the first file to the second client device associated with the user to replace an older version of the first file stored on the second client device, responsive to receiving the copy of the first file from the first client device.

**2**. The system of claim **1**, wherein the computer program instructions, when executed, cause the server system to:

store the copy of the first file to a memory device associated with the server system, wherein the copy of the first file is stored on the memory device associated with the server system responsive to determining that the server system is not in communication with the second client device; and

automatically transfer the copy of the first file to the second client device to replace the older version of the first file stored on the second client device with the copy of the first file, responsive to (i) resuming communication with the second client device and (ii) receiving the copy of the first file from the first client device.

**3**. The system of claim **1**, wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

**4**. The system of claim **1**, wherein availability of the version of the first file is presented at the second client device based on the first metadata.

**5**. The system of claim **1**, wherein the computer program instructions, when executed, cause the server system to:

receive a copy of a second file from the second client device associated with the user, wherein the copy of the second file is automatically received from the second client device responsive to the user modifying a content of the second file stored on the second client device, the copy of the second file being a version of the second file that is generated from the user modifying the content of the second file;

determine that the server system is in communication with the first client device associated with the user; and

automatically transfer the copy of the second file to the first client device associated with the user to replace an older version of the second file stored on the first client device, responsive to (i) determining that the server

system is in communication with the first client device and (ii) receiving the copy of the first file from the second client device.

**6**. The system of claim **1**, wherein the computer program instructions, when executed, cause the server system to:

periodically perform a pull request, wherein the copy of the first file is automatically received from the first client device responsive to (i) the pull request and (ii) the user modifying the content of the first file stored on the first client device.

**7**. The system of claim **1**, wherein the copy of the first file is automatically received from the first client device responsive to (i) a push request of the first client device and (ii) the user modifying the content of the first file stored on the first client device.

**8**. The system of claim **1**, wherein the copy of the first file is automatically received from a first application at the first client device, and wherein the first application comprises a runtime environment for one or more mobile-agent objects.

**9**. The system of claim **8**, wherein the first application is configured to create a first mobile object, and wherein the first mobile object is configured to create a proxy object at the server system.

**10**. The system of claim **9**, wherein the first mobile object is configured to provide the copy of the first file to the proxy object, and wherein the proxy object is configured to store the copy of the first file on a memory device associated with the server system.

**11**. A method being implemented by a server system comprising one or more processors executing computer program instructions that, when executed, perform the method, the method comprising:

receiving, by the server system, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device responsive to the user modifying a content of the first file stored on the first client device, the copy of the first file being a version of the first file that is generated from the user modifying the content of the first file;

receiving, by the server system, from the first client device, first metadata associated with the version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;

automatically transferring, by the server system, based on the first priority being greater than the second priority, the first metadata to the second client device such that the first metadata is transferred to the second client device prior to the copy of the first file being transferred to the second client device; and

automatically transferring, by the server system, over a network, the copy of the first file to the second client device associated with the user to replace an older version of the first file stored on the second client device, responsive to receiving the copy of the first file from the first client device.

**12**. The method of claim **11**, further comprising:

initially determining, by the server system, that the server system is not in communication with the second client device associated with the user; and

automatically transferring, by the server system, the copy of the first file to the second client device to replace the older version of the first file stored on the second client device with the copy of the first file, responsive to (i) resuming communication with the second client device,

US 11,003,622 B2

13

(ii) determining that the server system is in communication with the second client device, (iii) and receiving the copy of the first file from the first client device.

13. The method of claim 11, further comprising:

storing, by the server system, the copy of the first file to a memory device associated with the server system, wherein the copy of the first file is stored on the memory device associated with the server system responsive to initially determining that the server system is not in communication with the second client device.

14. The method of claim 11, wherein at least one of the server system or the first client device comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

15. The method of claim 11, wherein the copy of the first file is automatically received from a first application at the first client device, wherein the first application comprises a runtime environment for one or more mobile-agent objects, and wherein the first application is configured to create a first mobile object, and the first mobile object is configured to create a proxy object at the server system and to provide the copy of the first file to the proxy object.

16. One or more non-transitory machine-readable media storing instructions that, when executed by one or more processors of a first computer system, cause operations comprising:

receiving, by the first computer system, over a network, a copy of a first file from a second computer system associated with a user, wherein the copy of the first file is automatically received from the second computer system responsive to the user modifying a content of

14

the first file stored on the second computer system, the copy of the first file being a version of the first file that is generated from the user modifying the content of the first file;

storing, by the first computer system, the copy of the first file on the first computer system;

receiving, by the first computer system, from the second computer system, first metadata associated with the version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;

automatically transferring, by the first computer system, based on the first priority being greater than the second priority, the first metadata to a third computer system associated with the user such that the first metadata is transferred to the third computer system prior to the copy of the first file being transferred to the third computer system; and

automatically transferring, by the first computer system, over a network, the copy of the first file to the third computer system associated with the user to replace an older version of the first file stored on the third computer system, responsive to receiving the copy of the first file from the second computer system.

17. The one or more non-transitory machine-readable media of claim 16, wherein at least one of the first computer system or the second computer system comprises a priority assignment configuration to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the first computer system or the second computer system assigns the first priority to the first metadata and the second priority to the copy of the first file based on the priority assignment configuration.

*  *  *  *  *